# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

BEAUTIFUL MINDS OF TOMORROW
MINISTRY, NORTH POINT
MINISTRIES, and FAMILY TREE
MINISTRY INCORPORATED,

            Plaintiffs,

   v.

BETH BYE, in her official capacity as
Commissioner of the Connecticut Office of
Early Childhood, LAURIE AUDETTE, in
her official and personal capacities, and
ELIZABETH PROIETTI, in her official
and personal capacities,

            Defendants.

Civil Action No. _____

## COMPLAINT

This is a civil action brought by Plaintiffs Beautiful Minds of Tomorrow Ministry, North Point Ministries, and Family Tree Ministry Incorporated against Defendant Beth Bye, in her official capacity as Commissioner of the Connecticut Office of Early Childhood. Plaintiffs bring claim(s) under 42 U.S.C. § 1983, the Connecticut Constitution, and the First and Fourteenth Amendments to the U.S. Constitution, and allege as follows:

## THE PARTIES

1.     Plaintiff Beautiful Minds of Tomorrow Ministry ("BMOT") is a 501(c)(3) Christian ministry operated by Jamie Bailey.

2.     Plaintiff North Point Ministries, d/b/a From Seeds to Sprouts, is a 501(c)(3) Christian ministry operated by Shawnee Scaniffe.

3.     Plaintiff Family Tree Ministry Incorporated is a 501(c)(3) Christian ministry

operated by Heather Grim and Colin Grim.

4.      Defendant Beth Bye is the Commissioner of the Connecticut Office of Early Childhood ("OEC"), and at all relevant times, worked in Hartford, Connecticut. She is being sued in her official capacity.

5.      Defendant Laurie Audette is a State Program Manager with the OEC, and at all relevant times, worked in Hartford, Connecticut. She is being sued in her official and personal capacities.

6.      Defendant Elizabeth Proietti is the Director of the Division of Licensing with the OEC, and at all relevant times, worked in Hartford, Connecticut. She is being sued in her official and personal capacities.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this civil action per 28 U.S.C. § 1331 as this is a civil action arising, *inter alia*, under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the U.S. Constitution.  This Court has supplemental jurisdiction over Plaintiffs' state law claims per 28 U.S.C. § 1367 as they arise from the same nucleus of facts and form port of the same case and controversy.

8.      This Court has personal jurisdiction over all defendants because they are residents of Connecticut and committed the errors and omissions at issue in Connecticut.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1) & (2) because Defendants reside in this District and the events that give rise to this lawsuit took place in this District.

## FACTUAL BACKGROUND

### Exemption from Child Care Licensure for Religious Educational Activities

10.     Connecticut law establishes a system of licensure of providers of child care services under the auspices of the Commissioner of Early Childcare and Office of Early Childcare.  *See* C.G.S. §§ 19a-77, *et seq.*

11.     C.G.S. § 19a-77(b) establishes a series of exemptions from the definition of "child care services" relative to licensing, whereby such providers need not obtain a license.

12.     Among those exemptions is for: "Classes in music, dance, drama and art that are no longer than two hours in length; classes that teach a single skill that are no longer than two hours in length; library programs that are no longer than two hours in length; scouting; programs that offer exclusively sports activities; rehearsals; academic tutoring programs; or programs exclusively for children thirteen years of age or older[.]" C.G.S. § 19a-77(b)(3).

13.     Another exemption is for "Religious educational activities administered by a religious institution exclusively for children whose parents or legal guardians are members of such religious institution[.]"  C.G.S. § 19a-77(b)(8).

14.     Being licensed is a burden, including required compliance with Conn. Agencies Regs. §§ 19A-79-1A, *et seq.*

15.     Running a licensed child care facility may mean that a religious institution would be a place a public accommodation under Connecticut law, C.G.S. § 45a-64, requiring it to minister and serve non-believers, in violation of its own faith.  *Compare Brown v. St. John's Univ.*, No. 08-CV-2218 (ARR)(VLP), 2010 U.S. Dist. LEXIS 147090, at *42-44 (E.D.N.Y. June 28, 2010)(noting express exemption for religious institutions in ADA).

16.     The statutory scheme provides a process relative disciplinary proceedings against

a license holder by OEC through a contested-case hearing (C.G.S. § 19a-79(d)); a process relative to denial of or suspension/revocation of licensure (C.G.S. § 19a-85); and a process for the Commissioner to enjoin the operation of a child care center in violation of regulations (C.G.S. § 19a-86).

17.    Absent from the statutory scheme is a process for those claiming exemption from licensure  C.G.S. § 19a-77(b) to challenge a determination by the Commissioner (acting through OEC) that such a claimant is not exempt.

18.    At all relevant times herein, Beth Bye has been and is Commissioner of Early Childhood and is responsible for directing and administering OEC and its personnel.

**Beautiful Minds of Tomorrow Ministry**

19.    BMOT is a religious institution founded on or about July 24, 2022, as a Christian ministry. *See* **Exhibit 1**, declaration of Jamie Bailey ("Bailey Decl.") at ¶ 5.

20.    Among its activities, BMOT administers religious educational activities exclusively for children whose parents or legal guardians are members of BMOT. *See* Bailey Decl. at ¶ 6.

21.    Plaintiff BMOT's children's ministry is wholly non-secular. The art is religious art, the books are religious books, and the curriculum is entirely based and steeped in religion. *See* Bailey Decl. at ¶ 7.

22.    In September 2022, OEC launched an investigation into whether BMOT was operating an illegal, unlicensed child care. *See* Bailey Decl. at ¶ 8.

23.    On September 20, 2022, Assistant Attorney General Cynthia Mahon requested certain information for OEC to determine whether BMOT met the exemption from licensure under Section 19A-77(b)(8). *See* Bailey Decl. at ¶ 9.

24.     On September 30, 2022, such information was provided to AAG Mahon.  *See* Bailey Decl. at ¶ 10; **Exhibit 2**, declaration of Jay M. Wolman ("Wolman Decl.") at ¶¶ 5-6; **Exhibit 3**.

25.     Additional information was provided on October 4, 2022. *See* Bailey Decl. at ¶ 11; Wolman Decl. at ¶¶ 7-8; **Exhibit 4**.

26.     On October 5, 2022, then-OEC Director of the Division of Licensing, Debra L. Johnson, issued a letter acknowledging that BMOT met the exemption from licensure under Section 19A-77(b)(8). *See* Bailey Decl. at ¶ 12;  Wolman Decl. at ¶¶ 9-10; **Exhibit 5**.

27.     Two years later, on or about September 30, 2024, Marybeth Miller, OEC Staff Attorney, stated that it was investigating whether BMOT's program has changed and further required licensure. *See* Bailey Decl. at ¶ 13;  Wolman Decl. at ¶¶ 11-12;  **Exhibit 6**.

28.     Without any known investigation or process, and only on a report as to a change in hours of BMOT's religious educational activities, on or about October 4, 2024, OEC issued a Notice of Illegal Operation of a child care center for BMOT.  *See* Bailey Decl. at ¶ 14;  Wolman Decl. at ¶¶ 13-14;  **Exhibit 7**.

29.     In fact, that Notice of Illegal Operation was issued despite the statute being silent as to hours of operation for religious educational activities, even though subsection (b)(3) restricts "Classes in music, dance, drama and art that are no longer than two hours in length; classes that teach a single skill that are no longer than two hours in length; library programs that are no longer than two hours in length" as to length of time, which was communicated to Attorney Miller. *See* Bailey Decl. at ¶ 15.

30.     On October 7, 2024, OEC was placed on notice that it was acting in an arbitrary and capricious manner and discriminating against BMOT, favoring alternate religious institutions,

to which OEC responded, admitting that the Notice was issued *before* it began its investigation. *See* Bailey Decl. at ¶ 16; Wolman Decl. at ¶¶ 15-16; **Exhibit 8**.

31.     On October 11, 2024, BMOT again reiterated that OEC was inventing statutory language, acting in a discriminatory manner, and acting in an arbitrary and capricious manner. *See* Bailey Decl. at ¶ 17; Wolman Decl. at ¶¶ 17-18; **Exhibit 9**.

32.     On October 21, 2024, arbitrarily and capriciously OEC asserted that then-Director Johnson had "erred" two years prior, without explanation, and inventing criteria that are nowhere to be found in the law. *See* Bailey Decl. at ¶ 18; Wolman Decl. at ¶¶ 19-20; **Exhibit 10**.

33.     On October 22, 2024, OEC explicitly asserted that it was discriminating against BMOT because it did not operate a "Sunday or Hebrew school". *See* Bailey Decl. at ¶ 19; Wolman Decl. at ¶¶ 21-22; **Exhibit 11**.

34.     On or about October 22, 2024, BMOT was issued a Demand to Cease Unlicensed Child Care Operation by Defendant Elizabeth Proietti, in contravention of its previously established exemption. *See* Bailey Decl. at ¶ 20; Wolman Decl. at ¶¶ 23-24; **Exhibit 12**.

35.     At no time has OEC provided BMOT with a procedure to challenge or appeal its determination. *See* Bailey Decl. at ¶ 21.

36.     Nevertheless, on October 22, 2024, BMOT requested a "deficiency letter" to outline the steps necessary to meet OEC's unpublished criteria for the exemption, as OEC customarily issues such for those who seek licensure and the statute does not direct OEC to favor licensure over exemption. *See* Bailey Decl. at ¶ 22; Wolman Decl. at ¶¶ 25-26; **Exhibit 13**.

37.     To date, OEC has not provided such a deficiency letter and BMOT remains under the threat of the Demand to Cease, which threatens a $100/day civil penalty and a state court injunction. *See* Bailey Decl. at ¶ 23.

**North Point Ministries**

38.     North Point Ministry is a religious institution, being a Christian-based ministry founded on August 1, 2021. *See* **<u>Exhibit 14</u>**, declaration of Shawnee Scaniffe ("Scaniffe Decl.") at ¶ 5.

39.     North Point's children's ministry is known as "From Seeds to Sprouts". *See* Scaniffe Decl. at ¶ 6.

40.     North Point administers religious educational activities, *i.e.* its children's ministry, exclusively for children whose parents or legal guardians are members of North Point. *See* Scaniffe Decl. at ¶ 7.

41.     North Point's children's ministry is wholly non-secular. The art is religious art, the books are religious books, and the curriculum is entirely based and steeped in religion. *See* Scaniffe Decl. at ¶ 8.

42.     On or about November 27, 2023, Karen Hicks, a Child Care Licensing Specialist with OEC issued a Notice of Illegal Child Care Operation and Notice of Illegal Youth Camp Operation to North Point. *See* Scaniffe Decl. at ¶¶ 9-10;  **<u>Exhibit 15</u>**.

43.     Thereafter, OEC purported to conduct an investigation into North Point and its claimed exemption under C.G.S. § 19a-77(b)(8), during which North Point repeatedly provided evidence and argument in support of its exemption.  *See* Scaniffe Decl. at ¶¶ 11-12; **<u>Exhibit 16</u>** and **<u>Exhibit 17</u>**.

44.     On or around April 1, 2024, OEC, through Defendant Proietti, informed North Point that it was not recognizing it as exempt as a religious institution pursuant to § 19a-77(b)(8) of the Connecticut General Statutes and needed to follow steps to continue to provide childcare as a licensed child care program, permitting it to operate while it might seek a license.  *See* Scaniffe

Decl. at ¶¶ 13-14; **Exhibit 18**.

45.     Proietti's letter did not provide any direction as to how North Point might meet the exemption. *Id.*; Scaniffe Decl. at ¶ 15.

46.     On May 3, 2024, counsel for North Point sent a letter and exhibits to OEC demonstrating that North Point's program is exempt. *See* Scaniffe Decl. at ¶¶ 16; Wolman Decl. at ¶¶ 28-29; **Exhibit 19** and **Exhibit 20**.

47.     Five months later, on September 30, 2024, Defendant Audette issued a Demand to Ceased Unlicensed Child Care Operation to North Point. *See* Scaniffe Decl. at ¶ 17; Wolman Decl. at ¶¶ 30-31; **Exhibit 21**.

48.     On October 1, 2024, Attorney Miller communicated that it was still not recognizing North Point as exempt, arbitrarily and capriciously pointing to its hours, about which the statute is silent, and asserting that only a "Sunday or Hebrew school" is exempt. *See* Scaniffe Decl. at ¶ 18; Wolman Decl. at ¶¶ 32-33; **Exhibit 22**.

49.     Although North Point attempted to question these criteria, OEC ignored that inquiry and, on October 9, 2024, reiterated its demand to cease. *See* Scaniffe Decl. at ¶ 19; Wolman Decl. at ¶¶ 34-35; **Exhibit 23**.

50.     At no time has OEC provided North Point with a procedure to challenge or appeal its determination. *See* Scaniffe Decl. at ¶ 20.

51.     Notwithstanding the foregoing, North Point continues to attempt to demonstrate OEC is in error. *See* Scaniffe Decl. at ¶ 21; Wolman Decl. at ¶¶ 36-37; **Exhibit 24**.

52.     At no time has OEC provided North Point with a deficiency letter outlining the steps it might take to meet the exemption. *See* Scaniffe Decl. at ¶ 22.

53.     North Point remains under the threat of the Demand to Cease, which threatens a

$100/day civil penalty and a state court injunction. *See* Scaniffe Decl. at ¶ 23.

### Family Tree Ministry

54.     Family Tree Ministry is a religious institution, being a Christian-based ministry founded on April 26, 2023. *See* **Exhibit 25**, Declaration of Colin Grim ("Grim Decl.") at ¶ 5.

55.     Family Tree has administered religious educational activities, *i.e.* its children's ministry, exclusively for children whose parents or legal guardians are members of Family Tree. *See* Grim Decl. at ¶ 6.

56.     Family Tree's children's ministry is wholly non-secular. The art is religious art, the books are religious books, and the curriculum is entirely based and steeped in religion. *See* Grim Decl. at ¶ 7.

57.     On or about February 7, 2024, OEC Child Care Licensing Specialist Kevin Eddy sent Family Tree a Notice of Illegal Child Day Care Operation. *See* Grim Decl. at ¶¶ 8-9; **Exhibit 26**.

58.     During the course of OEC's investigation, Family Tree sent OEC information demonstrating its exemption. *See* Grim Decl. at ¶¶ 10-11; **Exhibit 27**.

59.     On or about April 1, 2024, Defendant Proietti sent Family Tree a letter denying recognition of its exemption under Section 19a-77(b)(8) and permitted it to continue operating if it sought a license; no instructions were provided as to how it might meet the exemption. *See* Grim Decl. at ¶¶ 12-13; **Exhibit 28**.

60.     In response, on April 9, 2024, counsel for Family Tree sent Proietti a letter explaining that Family Tree is exempt. *See* Grim Decl. at ¶¶ 14-15; **Exhibit 29**.

61.     Proietti acknowledged receipt the following day. *See* Grim Decl. at ¶¶ 16-17; **Exhibit 30**.

62.    The parties continued to communicate thereafter, but no resolution was had. *See* Grim Decl. at ¶¶ 18-19; **Exhibit 31**.

63.    On or about August 13, 2024, Colin Grim, who acts for Family Tree in operating the children's ministry, received a Notice of Violation and Order to Abade from the Town of Ledyard Building Department for purportedly operating a daycare facility without the benefit of a corresponding Certificate of Occupancy. *See* Grim Decl. at ¶¶ 20-21; **Exhibit 32**.

64.    Upon information and belief, the said building department has been in communication with OEC regarding Family Tree in an effort to circumvent the statutory exemption for licensure for religious educational activities. *See* Grim Decl. at ¶ 22.

65.    On or about August 29, 2024, the Town of Ledyard issued Family Tree a zoning Notice of Violation and Intent to Cite, stating that the "Land Use Office has received numerous complaints that you are running a daycare before obtaining a license from the state which is a violation of your Zoning Permit[.]" *See* Grim Decl. at ¶¶ 23-24; **Exhibit 33**.

66.    Family Tree, however, was exempt from licensure under Section 19a-77(b)(8). *See* Grim Decl. at ¶ 25.

67.    On September 27, 2024, counsel for Family Tree wrote to Attorney Miller seeking an explanation for why OEC refused to recognize the exemption. *See* Grim Decl. at ¶ 26; Wolman Decl. at ¶¶ 39-40; **Exhibit 34**.

68.    OEC responded on September 30, 2024, pointing solely to hours of operation, about which the statutory exemption is silent. *See* Grim Decl. at ¶ 27; Wolman Decl. at ¶¶ 41-42; **Exhibit 35**.

69.    Upon being advised that the statute was silent as to hours of operation, OEC provided the discriminatory reason that Family Tree would need to run its children's ministry as a

"Sunday or Hebrew school."  *See* Grim Decl. at ¶ 28; Wolman Decl. at ¶¶ 43-44; **Exhibit 36**.

70.    Family Tree responded on October 1, 2024, inquiring as to these arbitrary, discriminatory, and capricious criteria.  *See* Grim Decl. at ¶ 29; Wolman Decl. at ¶¶ 45-46; **Exhibit 37**.

71.    OEC ignored that inquiry. *See* Grim Decl. at ¶ 30.

72.    In the interim, and under protest Family Tree applied for licensure as a child care center with the OEC. *See* Grim Decl. at ¶ 31.

73.    On or about October 4, 2024, OEC issued a Notice of Illegal Operation of a child care center for Family Tree Ministry ("Family Tree").  *See* Grim Decl. at ¶¶ 32-33;  **Exhibit 38**.

74.    And, in response to the licensure application, OEC issued a deficiency letter outlining steps needed to obtain licensure, which it never did for meeting the exemption.  *See* Grim Decl. at ¶¶ 34-35; **Exhibit 39**.

75.    On October 8, 2024, Proietti issued Family Tree a Demand to Cease Unlicensed Child Care Operation, threatening a $100/day penalty and injunctive relief.  *See* Grim Decl. at ¶¶ 36-37; **Exhibit 40**.

76.    On or about October 11, 2024, Family Tree shut down its otherwise exempt religious activities under protest and without prejudice pending its licensure application. *See* Grim Decl. at ¶ 38.

77.    Thereafter, Family Tree received its license from OEC, a certificate of zoning compliance from the Town of Ledyard, and a certificate of occupancy from the Town of Ledyard. *See* Grim Decl. at ¶¶ 39-40; **Exhibits 41-43**.

78.    Notwithstanding the foregoing, Family Tree does not wish to be a licensed day care; it wishes to provide religious education activities to its members' children as it did pre-licensure.

*See* Grim Decl. at ¶ 41.

## CLAIMS FOR RELIEF

### *Count I*
**Violation of the First Amendment to the United States Constitution: Free Exercise**
**(42 U.S.C. 1983 – First Amendment)**

79.　　Plaintiffs hereby repeat and reallege paragraphs 1-78 of the Complaint as if fully set forth herein.

80.　　To state a claim under 42 U.S.C. § 1983, one must (1) allege the violation of a right secured by the Constitution and laws of the United States, and (2) show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

81.　　The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. Amdt. 1. This Clause is applicable to the States pursuant to the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 300 (1940).

82.　　Defendants, at all times relevant, were public employees and exercising responsibilities under color of Connecticut state law.

83.　　In denying Plaintiffs recognition of their exemption, Defendants discriminated against Plaintiffs and threatened them in the exercise of their faith, demanding that they cease operations or, alternatively, subject them to licensure requirements that violate their faith.

84.　　As a direct and proximate result of the infringing of their freedom to exercise their faiths, Plaintiffs have suffered at least a nominal amount of actual damages.

85.　　Additionally, infringement of their freedom of exercise is an irreparable harm.

86.　　Wherefore, Plaintiffs are entitled to an award of actual, nominal, and punitive damages against Audette and Proietti and injunctive relief against all defendants.

### *Count II*
**Violation of the First Amendment to the United States Constitution: Establishment Clause (42 U.S.C. 1983 – First Amendment)**

87.     Plaintiffs hereby repeat and reallege paragraphs 1-78 of the Complaint as if fully set forth herein.

88.     To state a claim under 42 U.S.C. § 1983, one must (1) allege the violation of a right secured by the Constitution and laws of the United States, and (2) show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

89.     The Supreme Court has held that "the clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

90.     By OEC's own words, the religious exemption under Connecticut law only applies to "services akin to Sunday or Hebrew school." *See* **Exhibit 11**.

91.     By stating the religious exemption has to be a Sunday school or Hebrew school, OEC is preferencing certain religions over others.

92.     Defendants, at all times relevant, were public employees and exercising responsibilities under color of Connecticut state law.

93.     In denying Plaintiffs recognition of their exemption, Defendants discriminated against Plaintiffs and threatened them, by establishing religious institutions that run Sunday or Hebrew schools as the only lawful religious institutions, demanding that they cease operations or, alternatively, subject them to licensure requirements that violate their faith.

94.     As a direct and proximate result of the infringing of the establishment clause, Plaintiffs have suffered at least a nominal amount of actual damages.

95.     Additionally, infringement of the establishment clause is an irreparable harm.

96.     Wherefore, Plaintiffs are entitled to an award of actual, nominal, and punitive

damages against Audette and Proietti and injunctive relief against all defendants.

### <u>Count III</u>
**Violation of the Fourteenth Amendment to the United States Constitution: Equal Protection**
**(42 U.S.C. § 1983 – Fourteenth Amendment)**

97.     Plaintiffs hereby repeat and reallege paragraphs 1-78 of the Complaint as if fully set forth herein.

98.     To state a claim under 42 U.S.C. § 1983, one must (1) allege the violation of a right secured by the Constitution and laws of the United States, and (2) show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

99.     The Fourteenth Amendment commands that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." Amdt.14

100.    A State may act through different agencies, either by its legislative, its executive or its judicial authorities, and prohibitions of the [Fourteenth] Amendment extend to all actions of the State denying equal protection of the laws, whether it be action by one of these agencies or by another. *Virginia v. Rives*, 100 U.S. 313, 318 (1879).

101.    The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within a State's jurisdiction against "intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923).

102.    If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, that conduct is also action under color of state law and will support a § 1983 claim. *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 935 (1982).

103.    State employment is generally sufficient to render a defendant a state actor. *West v. Atkins*, 487 U.S. 42, 49 (1988).

104.    The definition of acting under color of state law requires that the defendant in a §

1983 action have exercised "misuse of power, possessed by virtue of state law and made possible

only because the wrongdoer is clothed with the authority of state law." *United States v. Classic*,

313 U.S. 299, 326 (1941).

105.    A public employee acts under color of state law while acting in her official capacity

or while exercising her responsibilities pursuant to state law. *West v. Atkins*, 487 U.S. 42, 50

(1988).

106.    Defendants, at all times relevant, were public employees and exercising

responsibilities under color of Connecticut state law.

107.    In denying Plaintiffs recognition of their exemption, Defendants discriminated

against Plaintiffs and not against religious institutions that run Sunday or Hebrew schools,

demanding that they cease operations or, alternatively, subject them to licensure requirements that

violate their faith.

108.    As a direct and proximate result of the infringing of their equal protection rights,

Plaintiffs have suffered at least a nominal amount of actual damages.

109.    Additionally, infringement of their equal protection rights is an irreparable harm.

110.    Wherefore, Plaintiffs are entitled to an award of actual, nominal, and punitive

damages against Audette and Proietti and injunctive relief against all defendants.

### *Count IV*
**Violation of the Fourteenth to the United States Constitution: Denial of Due Process**
**(42 U.S.C. § 1983 – Fourteenth Amendment)**

111.    Plaintiffs hereby repeat and reallege paragraphs 1-78 of the Complaint as if fully

set forth herein.

112.    To state a claim under 42 U.S.C. § 1983, one must (1) allege the violation of a right

secured by the Constitution and laws of the United States, and (2) show that the alleged deprivation

was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

113.   The Fourteenth Amendment commands that no State shall "deprive any person of life, liberty, or property, without due process of law." Amdt.14.

114.   "The Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 196 (1989).

115.   Procedural due process within the Due Process Clause of the Fourteenth Amendment requires "the government to follow appropriate procedures when its agents decide to 'deprive any person of life, liberty or property'" and promotes fairness in such decisions. *Daniels v. Williams*, 474 U.S. 327, 331 (1986).

116.   The core requirements of procedural due process are notice and a hearing to present their objections. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

117.   A public employee acts under color of state law while acting in her official capacity or while exercising her responsibilities pursuant to state law. *West v. Atkins*, 487 U.S. 42, 50 (1988).

118.   Defendants have interpreted Section 19a-77(b)(8) in an arbitrary and capricious manner.

119.   The Connecticut legislature included specific exemptions for child care services in the Connecticut General Statutes, including in 19a-77(b)(3) that "classes in music, dance, drama and art that are no longer than two hours in length; classes that teach a single skill that are no longer than two hours in length; library programs that are no longer than two hours in length . . ." are not considered child care services.

120.   It can be inferred using the principle of *Expressio unius est exclusion alterius* that

all other exemptions without a time listed were intended to not consider time length when examining the exemption. Therefore, under the principle of *exclusio unius*, § 19a-77(b)(8) was never intended to have a time length, yet Defendants arbitrarily and capriciously deem such a requirement therein, and thereby deny Plaintiffs due process and their statutory exemption.

121.    Similarly, Defendants arbitrarily and capriciously deny Plaintiffs their statutory exemption by requiring them to be Sunday or Hebrew schools, thereby denying them due process.

122.    Further, Plaintiffs have been denied due process in the absence of any method to obtain notice, a contested hearing, appeal, or judicial review of OEC's denials of recognition of their statutory exemption.

123.    Defendants, at all times relevant, were public employees and exercising responsibilities under color of Connecticut state law.

124.    In denying Plaintiffs recognition of their exemption, Defendants denied Plaintiffs due process, demanding that they cease operations or, alternatively, subject them to licensure requirements that violate their faith.

125.    As a direct and proximate result of the infringing of their right to due process, Plaintiffs have suffered at least a nominal amount of actual damages.

126.    Additionally, infringement of their right to due process is an irreparable harm.

127.    Wherefore, Plaintiffs are entitled to an award of actual, nominal, and punitive damages against Audette and Proietti and injunctive relief against all defendants.

### *Count V*
### Violation of the Connecticut Constitution
### (§ 46a-58(a) Conn. Gen. Stat. - Article I, §§ 3-4 of the Connecticut Constitution)

128.    Plaintiffs hereby repeat and reallege paragraphs 1-78 of the Complaint as if fully set forth herein.

129.    The Connecticut General Statutes state that "it shall be a discriminatory practice in

violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of this state or of the United States, on account of religion, national origin, alienage, color, race, sex, gender identity or expression, sexual orientation, blindness, mental disability, physical disability, age, status as a veteran or status as a victim of domestic violence." § 46a-58(a) Conn. Gen. Stat. (2024).

130.    The Connecticut Constitution provides that "the exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in this state; provided, that the right hereby declared and established shall not be so construed as to excuse acts of licentiousness, or to justify practices inconsistent with the peace and safety of the state." Conn. Con. Art. I, § 3.

131.    The Connecticut Constitution also provides that "no preference shall be given by law to any Christian sect or mode of worship" Conn. Const. Art. I, § 4.

132.    Conn. Constit., art. I, section 10 states: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

133.    Conn. Constit., art VII, Sec. 1, states: "It being the duty of all men to worship the Supreme Being, the great Creator and Preserver of the Universe, and their right to render that worship, in the mode most consistent with the dictates of their consciences; no person shall by law be compelled to join or support, nor be classed with, or associated to, any congregation, church or religious association.   But every person now belonging to such congregation, church, or religious association, shall remain a member thereof, until he shall have separated himself therefrom, in the manner hereinafter provided."

134.    Conn. Const. Art. 1, Sec. 1 states that "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

135.    Defendants violated the Connecticut Constitution by depriving Plaintiffs of the religious exemption pursuant to § 19a-77(b)(8) on the basis of their exercise of religion.

136.    Defendants violated the Connecticut Constitution by depriving Plaintiffs of the religious exemption pursuant to § 19a-77(b)(8) by preferring and solely recognizing Sunday schools as Christian religious educational activities.

137.    Defendants violated the Connecticut Constitution by depriving Plaintiffs their right to due process.

138.    Defendants violated the Connecticut Constitution by depriving Plaintiffs of equal protection under law.

139.    Defendants, at all times relevant, were public employees and exercising responsibilities under color of Connecticut state law.

140.    As a direct and proximate result of the infringing of their rights under the Connecticut Constitution, Plaintiffs have suffered at least a nominal amount of actual damages.

141.    Additionally, infringement of their rights under the Connecticut Constitution is an irreparable harm.

142.    Wherefore, Plaintiffs are entitled to an award of actual, nominal, and punitive damages against Audette and Proietti and injunctive relief against all defendants.

### _Count VI_
**Violation of the Connecticut Freedom of Religion Act**
**(§ 46a-58(a) Conn. Gen. Stat. - Article I, §§ 3-4 of the Connecticut Constitution)**

143.    Plaintiffs hereby repeat and reallege paragraphs 1-78 of the Complaint as if fully set forth herein.

144.    The CFRA provides that "[t]he state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 article first of the Constitution of the state even if the burden results from a rule of general applicability" except where application of such a burden "is in furtherance of a compelling governmental interest, and . . . is the least restrictive means of furthering that compelling governmental interest." Conn. Gen. Stat. § 52-571b(a),(b).

145.    Defendants violated the Connecticut Constitution by depriving Plaintiffs of the religious exemption pursuant to § 19a-77(b)(8) on the basis of their exercise of religion.

146.    Defendants violated the Connecticut Constitution by depriving Plaintiffs of the religious exemption pursuant to § 19a-77(b)(8) by preferring and solely recognizing Sunday schools as Christian religious educational activities.

147.    Defendants' deprivation of Plaintiffs' rights was not in furtherance of a compelling government interest.  There is no government interest in the hours of operation of religious educational activities.

148.    Defendants' deprivation of Plaintiffs' rights was not the least restrictive means of furthering whatever interest Defendants claim they may have.

149.    As a direct and proximate result of the infringing of their rights under the Connecticut Constitution, Plaintiffs have suffered at least a nominal amount of actual damages.

150.    Additionally, infringement of their rights under the Connecticut Constitution and Connecticut Religious Freedom Act is an irreparable harm.

151.    Wherefore, Plaintiffs are entitled to an award of actual, nominal, and punitive damages against Audette and Proietti and injunctive relief against all defendants.

## **REQUESTS FOR RELIEF**

WHEREFORE, Plaintiffs respectfully ask this Court to issue and/or award:

A.      Pursuant to 28 U.S.C. § 2201, a declaration that they qualify for a licensure exemption for religious education activities under § 19a-77(b)(8) of the Connecticut General Statutes.

B.      A preliminary and permanent injunction enjoining Defendants to cease refusing to recognize Plaintiffs as exempt under § 19a-77(b)(8).

C.      An award of actual, nominal, and punitive damages against Defendants Audette and Proietti.

D.      An award of attorneys' fees and costs; and

E.      Such further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all causes of action.

Dated: November 8, 2024.                    Respectfully Submitted,

/s/ Jay M. Wolman ct433791
Jay M. Wolman (ct433791)
Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103
Tel: (888) 887-1776
jmw@randazza.com

Marc J. Randazza (31421)
Randazza Legal Group, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (888) 887-1776
ecf@randazza.com

Attorneys for Plaintiffs.