## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

BEAUTIFUL MINDS OF TOMORROW
MINISTRY, NORTH POINT MINISTRIES,
and FAMILY TREE MINISTRY
INCORPORATED,

                    Plaintiffs,

        v.

BETH BYE, in her official capacity as
Commissioner of the Connecticut Office of
Early Childhood, LAURIE AUDETTE, in her
official and personal capacities, and
ELIZABETH PROIETTI, in her official and
personal capacities,

                    Defendants.

Case No. 3:24-cv-01783-VDO

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

The state muddies the waters: under state law, a "child care services" includes any program that "provides a program of supplementary care to more than twelve related or unrelated children outside their own homes on a regular basis." C.G.S. § 19a-77a(a)(1). Under this broad definition, Little League, the Girl Scouts, after school art classes, and childrens' theater all provide "child care services" along with every place that calls itself a daycare. However, the state chose to exempt them from obtaining licensure. C.G.S. § 19a-77a(b)(3).

Another exemption from licensure, even though they meet the definition of a "child care services" is "Religious educational activities administered by a religious institution exclusively for children whose parents or legal guardians are members of such religious institution[.]" C.G.S. § 19a-77a(b)(8). Unfortunately, Defendants discriminated against Plaintiffs, Beautiful Minds of Tomorrow Ministry ("BMOT"), North Point Ministries ("NPM"), and Family Tree Ministry

ORAL ARGUMENT REQUESTED

Incorporated ("FTM"), because they choose to educate their members' children in their religious faith more intently than churches that only run "Sunday School" and because they are not "Hebrew Schools". This suit was filed to protect Plaintiffs from arbitrary and discriminatory treatment. Defendants' motion to dismiss (ECF No. 32) should be denied.

## 1. FACTUAL BACKGROUND

By way of general background, General Statutes §19a-77, captioned "Child care services defined" provides in pertinent part: "(a) As used in this section and sections 19a-77a to 19a-80, inclusive, and sections 19a-82 to 19a-87a, inclusive, 'child care services' includes: (1) A 'child care center' which offers or provides a program of supplementary care to more than twelve related or unrelated children outside their own homes on a regular basis." Section 19a-80, captioned "License required for child care centers and group child care homes . . ." provides in pertinent part:

> "(a) No person, group of persons, association, organization, corporation, institution or agency, public or private, shall maintain a child care center or group child care home without a license issued in accordance with sections 19a-77 to 19a-80, inclusive, and 19a-82 to 19a-87a, inclusive. Applications for such license shall be made to the Commissioner of Early Childhood . . . (b)(1) Upon receipt of an application for a license, the commissioner shall issue such license if, upon inspection and investigation, said commissioner finds that the applicant, the facilities and the program meet the health, educational and social needs of children likely to attend the child care center or group child care home and comply with requirements established by regulations adopted under this section and sections 19a-77 to 19a-79a, inclusive, and sections 19a-82 to 19a-87a, inclusive . . ."

"The Office of Early Childhood shall be the lead agency for child care services, as described in section 19a-77, in Connecticut." C.G.S. § 17b-733. The Office of Early Childhood is under the direction of the Commissioner of Early Childhood. C.G.S. § 10-500(a). Defendant Beth Bye is the Commissioner of the Connecticut Office of Early Childhood ("OEC"). Complaint at ¶ 4. Defendant Laurie Audette is a State Program Manager with the OEC. Complaint at ¶ 5. Defendant Elizabeth Proietti is the Director of the Division of Licensing with the OEC. Complaint at ¶ 6.

Licensure subjects an operator of such a program to a complex and costly regulatory scheme. *See* Conn. Agencies Regs. § 19A-79-1A, *et seq.* However, the legislature has seen fit to exempt a multitude of programs. These include "Classes in music, dance, drama and art that are no longer than two hours in length; classes that teach a single skill that are no longer than two hours in length; library programs that are no longer than two hours in length; scouting; programs that offer exclusively sports activities; rehearsals; academic tutoring programs; or programs exclusively for children thirteen years of age or older[.]" C.G.S. § 19a-77(b)(3). Otherwise, every Den Leader would have to become licensed; youth sports are also exempt, else every volunteer parent-coach would have to become licensed. Boys' and Girls' Club programs are exempt. C.G.S. § 19a-77(b)(7). Care by neighbors and close relatives is exempt. C.G.S. § 19a-77(b)(4). Programs of Solar Youth, Inc., the Cardinal Shehan Center, Organized Parents Make a Difference, Inc., Leadership, Education and Athletics in Partnership, Inc., and Police Athletic League of Stamford, Inc., are expressly exempt. C.G.S. §§ 19a-77(b)(5), (8), (11), (12), (13) & (15).

The legislature has also, wisely, seen fit to exempt "Religious educational activities administered by a religious institution exclusively for children whose parents or legal guardians are members of such religious institution[.]" C.G.S. § 19a-77(b)(8). Plaintiffs all claim exemption under this provision.

**Beautiful Minds of Tomorrow Ministry**

BMOT is a 501(c)(3) Christian ministry operated by Jamie Bailey. ECF No. 1 (Complaint) at ¶ 1; ECF No. 1-1, Declaration of Jamie Bailey (Bailey Decl.) at ¶ 4. is a religious institution founded on or about July 24, 2022, as a Christian ministry. Complaint at ¶ 19; Bailey Decl. at ¶ 5. Among its activities, BMOT administers religious educational activities exclusively for children whose parents or legal guardians are members of BMOT. Complaint at ¶ 20; Bailey Decl. at ¶ 6.

Plaintiff BMOT's children's ministry is wholly non-secular. Complaint at ¶ 21; Bailey Decl. at ¶ 7. The art is religious art, the books are religious books, and the curriculum is entirely based and steeped in religion. Complaint at ¶ 21; Bailey Decl. at ¶ 7.

In September 2022, OEC launched an investigation into whether BMOT was operating an illegal, unlicensed child care. Complaint at ¶ 22; Bailey Decl. at ¶ 8.  On September 20, 2022, Assistant Attorney General Cynthia Mahon requested certain information for OEC to determine whether BMOT met the exemption from licensure under Section 19A-77(b)(8). Complaint at ¶ 23; Bailey Decl. at ¶ 9. On September 30, 2022, such information was provided to AAG Mahon.  *See* Complaint at ¶ 24; ECF No. 1-2, Declaration of Jay M. Wolman ("Wolman Decl.") at ¶¶ 5-6; ECF No 1-3. Additional information was provided on October 4, 2022.  *See* Complaint at ¶ 25; Wolman Decl. at ¶¶ 7-8; ECF No. 1-4.  On October 5, 2022, then-OEC Director of the Division of Licensing, Debra L. Johnson, issued a letter acknowledging that BMOT met the exemption from licensure under Section 19A-77(b)(8).  *See* Complaint at ¶ 26; Wolman Decl. at ¶¶ 9-10; ECF No. 1-5.

Two years later, on or about September 30, 2024, Marybeth Miller, OEC Staff Attorney, stated that OEC was investigating whether BMOT's program has changed and further required licensure. *See* Complaint at ¶ 27; Wolman Decl. at ¶¶ 11-12; ECF No. 1-6. Without any known investigation or process, and only on a report as to an alleged change in hours of BMOT's religious educational activities, on or about October 4, 2024, OEC issued a Notice of Illegal Operation of a child care center for BMOT.  *See* Complaint at ¶ 28; Wolman Decl. at ¶¶ 13-14; ECF No. 1-7.

In fact, that Notice of Illegal Operation was issued despite the statute being silent as to hours of operation for religious educational activities, even though subsection (b)(3) restricts "Classes in music, dance, drama and art that are no longer than two hours in length; classes that teach a single skill that are no longer than two hours in length; library programs that are no longer

than two hours in length" as to length of time, which was communicated to Attorney Miller. *See*, Complaint at ¶ 29; Bailey Decl. at ¶ 15.

On October 7, 2024, OEC was notified that it was acting in an arbitrary and capricious manner and discriminating against BMOT, favoring alternate religious institutions, to which OEC responded, admitting the Notice was issued *before* it began its investigation. *See* Complaint at ¶ 30; Wolman Decl. at ¶¶ 15-16; ECF No. 1-8. On October 11, 2024, BMOT reiterated that OEC was inventing statutory language, acting in a discriminatory manner, and acting arbitrarily and capriciously. *See* Complaint at ¶ 31; Wolman Decl. at ¶¶ 17-18; ECF No. 1-9.

On October 21, 2024, arbitrarily and capriciously, OEC asserted that then-Director Johnson had "erred" two years prior, without explanation, and inventing criteria that are nowhere to be found in the law. *See* Complaint at ¶ 32; Wolman Decl. at ¶¶ 19-20; ECF No. 1-10. On October 22, 2024, **OEC explicitly asserted that it was discriminating against BMOT because it did not operate a "Sunday or Hebrew school"**. *See* Complaint at ¶ 33; Wolman Decl. at ¶¶ 21-22; ECF No. 1-11. On or about October 22, 2024, BMOT was issued a Demand to Cease Unlicensed Child Care Operation by Defendant Elizabeth Proietti, in contravention of its previously established exemption. *See* Complaint at ¶ 34; Wolman Decl. at ¶¶ 23-24; ECF No. 1-12.

At no time has OEC provided BMOT with a procedure to challenge or appeal its determination. *See* Complaint at ¶ 35; Bailey Decl. at ¶ 21. Nevertheless, on October 22, 2024, BMOT requested a "deficiency letter" to outline the steps necessary to meet OEC's unpublished criteria for the exemption, as OEC customarily issues such for those who seek licensure and the statute does not direct OEC to favor licensure over exemption. *See* Complaint at ¶ 36; Wolman Decl. at ¶¶ 25-26; ECF No. 1-13. OEC has not provided such a deficiency letter and BMOT

remains under the threat of the Demand to Cease, which threatens a $100/day civil penalty and a state court injunction.  *See* Complaint at ¶ 37; Bailey Decl. at ¶ 23.

### North Point Ministries

North Point Ministries, d/b/a From Seeds to Sprouts, is a 501(c)(3) Christian ministry operated by Shawnee Scaniffe. Complaint at ¶ 2; ECF No. 1-14, Declaration of Shawnee Scaniffe ("Scaniffe Decl.") at ¶ 4.  NPM is a religious Christian-based ministry founded on August 1, 2021. *See* Complaint at ¶ 38; Scaniffe Decl. at ¶ 5.  Its children's ministry is known as "From Seeds to Sprouts". *See* Complaint at ¶ 39; Scaniffe Decl. at ¶ 6.  NPM administers religious educational activities, *i.e.* its children's ministry, exclusively for children whose parents or guardians are members of NPM. *See* Complaint at ¶ 40; Scaniffe Decl. at ¶ 7.  NPM's children's ministry is non-secular. *See* Complaint at ¶ 41; Scaniffe Decl. at ¶ 8.  The art is religious art, the books are religious books, and the curriculum is entirely based and steeped in religion. *See* Complaint at ¶ 41; Scaniffe Decl. at ¶ 41.

On or about November 27, 2023, Karen Hicks, a Child Care Licensing Specialist with OEC issued a Notice of Illegal Child Care Operation and Notice of Illegal Youth Camp Operation to NPM.  *See* Complaint at ¶ 42; Scaniffe Decl. at ¶¶ 9-10;  ECF No. 1-15. Thereafter, OEC purported to conduct an investigation into NPM and its claimed exemption under C.G.S. § 19a-77(b)(8), during which NPM repeatedly provided evidence and argument in support of its exemption.  *See* Complaint at ¶ 43; Scaniffe Decl. at ¶¶ 11-12; ECF No. 1-16 and ECF No. 1-17.

On or around April 1, 2024, OEC, through Defendant Proietti informed NPM that it was not recognizing it as exempt as a religious institution pursuant to C.G.S. § 19a-77(b)(8) and needed to follow steps to continue to provide childcare as a licensed child care program, permitting it to operate while it might seek a license.  *See* Complaint at ¶ 44; Scaniffe Decl. at ¶¶ 13-14; ECF No.

1-18.  Proietti's letter did not provide any direction as to how NPM might meet the exemption. *See* Complaint at ¶ 45; Scaniffe Decl. at ¶ 15.

On May 3, 2024, counsel for NPM sent a letter and exhibits to OEC demonstrating that NPM's  program is exempt.  *See* Complaint at ¶ 46; Wolman Decl. at ¶¶ 28-29; ECF No. 1-19 and ECF No. 1-20.  Five months later, on September 30, 2024, Defendant Audette issued a Demand to Ceased Unlicensed Child Care Operation to NPM.  *See* Complaint at ¶ 47; Wolman Decl. at ¶¶ 30-31; ECF No. 1-21.

On October 1, 2024, Attorney Miller communicated that it was still not recognizing NPM as exempt, arbitrarily and capriciously pointing to its hours, about which the statute is silent, and **asserting that only a "Sunday or Hebrew school" is exempt**.  *See* Complaint at ¶ 48; Wolman Decl. at ¶¶ 32-33; ECF No. 1-22.  Although NPM attempted to question these criteria, OEC ignored that inquiry and, on October 9, 2024, reiterated its demand to cease.  *See* Complaint at ¶ 49; Wolman Decl. at ¶¶ 34-35; ECF No. 1-23.

At no time has OEC provided NPM with a procedure to challenge or appeal its determination.  *See* Complaint at ¶ 50; Scaniffe Decl. at ¶ 20.  Notwithstanding the foregoing, NPM continued to attempt to demonstrate OEC is in error.  *See* Complaint at ¶ 51; Wolman Decl. at ¶¶ 36-37; ECF No. 1-24. At no time has OEC provided NPM with a deficiency letter outlining the steps it might take to meet the exemption. *See* Complaint at ¶ 52; Scaniffe Decl. at ¶ 22. NPM remains under the threat of the Demand to Cease, which threatens a $100/day civil penalty and a state court injunction.  *See* Complaint at ¶ 53; Scaniffe Decl. at ¶ 22.

### Family Tree Ministry

Family Tree Ministry, Inc., is a 501(c)(3) Christian ministry operated by Heather Grim and Colin Grim.  *See* Complaint at ¶ 3; ECF No. 1-25, Declaration of Colin Grim ("Grim Decl.") at ¶

4. FTM is a religious institution, being a Christian-based ministry founded on April 26, 2023. *See* Complaint at ¶ 54; Grim Decl. at ¶ 5. FTM has administered religious educational activities, *i.e.* its children's ministry, exclusively for children whose parents or legal guardians are members of FTM. *See* Complaint at ¶ 55; Grim Decl. at ¶ 6. FTM's children's ministry is wholly non-secular. *See* Complaint at ¶ 56; Grim Decl. at ¶ 7. The art is religious art, the books are religious books, and the curriculum is entirely based and steeped in religion. *See* Complaint at ¶ 56; Grim Decl. at ¶ 7.

On or about February 7, 2024, OEC Child Care Licensing Specialist Kevin Eddy sent FTM a Notice of Illegal Child Day Care Operation. *See* Complaint at ¶ 57; Grim Decl. at ¶¶ 8-9; ECF No. 1-26. During the course of OEC's investigation, FTM sent OEC information demonstrating its exemption. *See* Complaint at ¶ 58; Grim Decl. at ¶¶ 10-11; ECF No. 1-27.

On or about April 1, 2024, Defendant Proietti sent FTM a letter denying recognition of its exemption under Section 19a-77(b)(8) and permitted it to continue operating if it sought a license; no instructions were provided as to how it might meet the exemption. *See* Complaint at ¶ 59; Grim Decl. at ¶¶ 12-13; ECF No. 1-28. In response, on April 9, 2024, counsel for FTM sent Proietti a letter explaining that FTM is exempt. *See* Complaint at ¶ 60; Grim Decl. at ¶¶ 14-15; ECF No. 1-29. Proietti acknowledged receipt the following day. *See* Complaint at ¶ 61; Grim Decl. at ¶¶ 16-17; ECF No. 1-30. The parties continued to communicate thereafter, but no resolution was had. *See* Complaint at ¶ 62; Grim Decl. at ¶¶ 18-19; ECF No. 1-31.

On or about August 13, 2024, Colin Grim, who acts for FTM in operating the children's ministry, received a Notice of Violation and Order to Abate from the Town of Ledyard Building Department for purportedly operating a daycare facility without the benefit of a corresponding Certificate of Occupancy. *See* Complaint at ¶ 63; Grim Decl. at ¶¶ 20-21; ECF No. 1-32. Upon

information and belief, the said building department has been in communication with OEC regarding FTM in an effort to circumvent the statutory exemption for licensure for religious educational activities. *See* Complaint at ¶ 64; Grim Decl. at 22.

On or about August 29, 2024, the Town of Ledyard issued FTM a zoning Notice of Violation and Intent to Cite, stating the "Land Use Office has received numerous complaints that you are running a daycare before obtaining a license from the state which is a violation of your Zoning Permit[.]" *See* Complaint at ¶ 65; Grim Decl. at ¶¶ 23-24; ECF No. 1-33. FTM, however, was exempt from licensure under Section 19a-77(b)(8). *See* Complaint at ¶ 66; Grim Decl. at ¶ 25.

On September 27, 2024, counsel for FTM wrote to Attorney Miller seeking an explanation for why OEC refused to honor the exemption. *See* Complaint at ¶ 67; Wolman Decl. at ¶¶ 39-40; ECF No. 1-34. OEC responded the next day pointing solely to hours of operation, about which the statutory exemption is silent. Complaint at ¶ 68; Wolman Decl. at ¶¶ 41-42; ECF No. 1-35.

Upon being advised that the statute was silent as to hours of operation, **OEC provided the discriminatory reason that FTM would need to run its children's ministry as a "Sunday or Hebrew school."** *See* Complaint at ¶ 69; Wolman Decl. at ¶¶ 43-44; ECF No. 1-36. Family Tree responded on October 1, 2024, inquiring as to these arbitrary, discriminatory, and capricious criteria. *See* Complaint at ¶ 70; Wolman Decl. at ¶¶ 45-46; ECF No. 1-37. OEC ignored that inquiry. *See* Complaint at ¶ 71; Grim Decl. at ¶ 30.

In the interim, and under protest FTM applied for licensure as a child care center with the OEC. *See* Complaint at ¶ 72; Grim Decl. at ¶ 31. On or about October 4, 2024, OEC issued a Notice of Illegal Operation of a child care center for FTM. *See* Complaint at ¶ 73; Grim Decl. at ¶¶ 32-33; ECF No. 1-38. And, in response to the licensure application, OEC issued a deficiency letter outlining steps needed to obtain licensure, which it never did for meeting the exemption. *See*

Complaint at ¶ 74; Grim Decl. at ¶¶ 34-35; ECF No. 1-39.

On October 8, 2024, Proietti issued FTM a Demand to Cease Unlicensed Child Care Operation, threatening a $100/day penalty and injunctive relief. *See* Complaint at ¶ 75; Grim Decl. at ¶¶ 36-37; ECF No. 1-40. On or about October 11, 2024, FTM shut down its otherwise exempt religious activities under protest and without prejudice pending its licensure application. *See* Complaint at ¶ 76; Grim Decl. at ¶ 38. Thereafter, FTM received its license from OEC, and a certificate of zoning compliance and a certificate of occupancy from the Town of Ledyard. *See* Complaint at ¶ 77; Grim Decl. at ¶¶ 39-40; ECF No. 1-41 – 1-43. Notwithstanding the foregoing, FTM does not wish to be a licensed day care; it wishes to provide religious education activities to its members' children as it did pre-licensure. *See* Complaint at ¶ 78; Grim Decl. at ¶ 41.

## 2.    LEGAL STANDARD

"When the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it..., the plaintiff has no evidentiary burden." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). The task of the district court is to determine whether, after accepting as true all material factual allegations of the complaint and drawing all reasonable inferences in favor of the plaintiff, the alleged facts affirmatively and plausibly suggest that the court has subject matter jurisdiction. *Id*. at 56-57.

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

3.      **LEGAL ARGUMENT**

Plaintiffs brought the following claims: 1) Section 1983: Free Exercise (First Amendment); 2) Section 1983: Establishment Clause (First Amendment); 3) Section 1983: Equal Protection (Fourteenth Amendment); 4) Section 1983: Due Process (Fourteenth Amendment); 5) C.G.S. § 46a-58(a) (Conn. Const., Art. 1, §§ 3-4); and 6) C.G.S. § 46a-58(a) (Conn. Const., Art. 1, §§ 3-4); Except where previously conceded (ECF No. 26), Plaintiffs' claims should not be dismissed either under Rule 12(b)(1) or (b)(6). Defendants are impermissibly inventing criteria that the legislature did not impose and are discriminating against Plaintiffs because they aren't Defendants' favored religious institutions, all without due process. They even admit as much in their motion to dismiss (ECF No. 32-1 at 8-9), which conspicuously omits any statutory or other authority to do so.[2] And they admit to treating a "Sunday School" or "Hebrew School" differently based on days, hours, and parental presence, despite the statutory exemption from licensure omitting any such criteria. *Id.*

### 3.1    The Eleventh Amendment is Not a Complete Bar

In the pre-motion practice, Plaintiffs clarified and conceded certain points; nevertheless, Defendants have formally moved to dismiss on all ground addressed in the pre-motion letters. Thus, Plaintiffs must reiterate certain points.

Contrary to the Defendants' assertions, the Eleventh Amendment is not a wholesale bar to claims raised under Section 1983 against state actors; why they attempt to suggest as much on pp. 10-11 of their motion is perplexing. The Eleventh Amendment does not bar suits for injunctive or

---

[2] Defendants list their purported processes and criteria, but these are outside the four corners of the Complaint. A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

declaratory relief against state officials for violating the U.S. Constitution in their official capacities. *Berman Enters., Inc. v. Jorling*, 3 F.3d 602, 606-07 (2d Cir. 1993). Plaintiffs only seek monetary relief as to Defendants Audette and Proietti, and only in their personal capacities. The Eleventh Amendment does not bar such relief. *Id*. at 607.  To the extent the Complaint is unclear, monetary damages are not sought against the state or any defendant in their official capacity.

As to the state law claims, while *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984), permits an action to be brought with the state's consent, it appears that Defendants do not wish to have their state law violations exposed.  So be it—Plaintiffs may, as needed, have to pursue state law equitable remedies in state court. However, even though they do not so consent, "[t]he jurisdictional limitation recognized in *Pennhurst* does not apply to an individual capacity claim seeking damages against a state official, even if the claim is based on state law." *Bad Frog Brewery v. N.Y. State Liquor Auth*., 134 F.3d 87, 102 (2d Cir. 1998).  The remainder of Defendants' arguments speaks essentially to the merits of Counts 5 & 6, and since the claims against the individual capacity defendants are meritorious, as addressed below, damages under state law can be sought.  Thus, the claims against Defendants Audette and Proietti in their individual capacities for damages under state law may proceed.

Defendants claim that injunctive relief against them in their official capacities is similarly barred because they assert that there is no ongoing violation of federal law.  (ECF No. 32-1 at 16). The entirety of Defendants' argument, however, is conclusory—they assert there was no violation of federal law, therefore there can be no ongoing violation.  *Id.* However, Plaintiffs' federal claims are properly stated.  And, the violation is ongoing—FTM was forced to obtain licensure and

BMOT and NPM remain under threat of Defendants' demands to cease operations.[3]  Thus, the Eleventh Amendment does not bar injunctive relief as prospective relief is necessary.

In sum, there is no jurisdictional bar to Counts 1-4 as to official capacities for equitable relief and as to all counts against the individual capacity defendants for monetary damages.

### 3.2     Plaintiffs' Claims are Meritorious

Plaintiffs' claims arise from Defendants' knowing and intentional misrepresentation of the exemption—their stated interpretation is at odds with the text of the statute.  Technically, Plaintiffs challenge the law as-applied, though Defendants are not really applying the law—they're falsely claiming they are.

The exemption from licensure for religious educational activities was inserted in 2003.  *See* 2003 Ct. P.A. 252; 2003 Ct. HB 6677.  At the time, the statutory exemption for "creative art studios for children that offer parent-child recreational programs and classes in music, dance, drama and art" had, and still has, a two-hour limit.  **There is not and has never been a specific restriction on the number of hours a child may attend religious educational activities or the operating hours of such.**  Such is necessary to avoid infringing on religious freedom, else houses of worship throughout the state could not run Midnight Mass, Tikkun Leil Shavuot, or Laylat al-Qadr programs for children and fulfill their precepts and commandments to educate children in the ways of their faith.

In Connecticut statutory interpretation, "[t]he use of the different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings . . . ." (Internal quotation marks omitted.)

---

[3] Plaintiffs' motion for preliminary injunction (ECF No. 5) was only denied as moot because "defense counsel represented that Defendants do not intend to enforce the licensure law at issue against Plaintiffs *for the duration of this action*."  (ECF No. 30)(emphasis added).  A permanent injunction remains proper, as Plaintiffs remain under the threat at the conclusion of the case.

*Hasselt v. Lufthansa German Airlines*, 262 Conn. 416, 426, 815 A.2d 94 (2003). Thus, the legislature intended that, while art, music, dance, and drama classes would have time restrictions, the exemptions lacking a time restriction, including, but not limited to, religious education activities, do not have a time bar. Else, if Defendants are able to impose a time restriction, it renders the express restriction superfluous, which would violate the "basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a   purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous." (Internal quotation marks omitted.) *Small v. Going Forward, Inc*., 281 Conn. 417, 424, 915 A.2d 298 (2007). Similarly, the courts consider "the tenet of statutory construction referred to as *expressio unius est exclusio alterius*, which may be translated as the expression of one thing is the exclusion of another. . . ." *Gay & Lesbian Law Students Assn. v. Board of Trustees*, 236 Conn. 453, 476, 673 A.2d 484 (1996). Having placed a specific limitation on the hours of operation of those art, drama, dance, and music classes, the legislature did not intend to limit the hours of religious educational activities.

Nor does the statute restrict religious educational activities in any form, even if a parent chose to use a program as one might use a licensed child care program. Otherwise, Defendants' preferred Hebrew schools and Sunday schools could not have story time, arts and crafts, snack time, play time, or even allow for naps, yet they undoubtedly do. OEC was correct in 2022 when it recognized BMOT's exemption and that understanding of the statute should govern. Defendants are now acting in contravention of OEC's own past interpretation, violating Plaintiffs' constitutional rights in the process.

### 3.2.1   Defendants Denied Plaintiffs their Right to Due Process

Commissioner Bye, and the OEC under her command, by and through, *inter alia*, the other named defendants, are making the law up as they go, flipflopping on their determinations. BMOT

was already found to have met the statutory exemption from licensure. Under federal administrative law, "an agency's failure to explain its departure from its own past precedents is reason enough to find the agency's action arbitrary and capricious under the APA." *Rochester-Genesee Reg'l Transp. Auth. v. Hynes-Cherin*, 531 F. Supp. 2d 494, 516 (W.D.N.Y. 2008) citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). While substantive due process does not forbid governmental actions merely because "they might fairly be deemed arbitrary or capricious and for that reason [are] correctable in a state court lawsuit seeking review of administrative action[,]" OEC's actions are unreviewable. *Compare Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999). OEC has refused to apply the procedures of the Uniform Administrative Procedures Act, C.G.S. §§ 4-166 to 4-189g.[4]

Plaintiffs are entitled to due process. To state a claim under 42 U.S.C. § 1983, one must (1) allege the violation of a right secured by the Constitution and laws of the United States, and (2) show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Similarly, the Federal and Connecticut Constitutions are enforceable under state law, C.G.S. § 46a-58(a), which states that "it shall be a discriminatory practice in violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of this state or of the United States, on account of religion…."

The Fourteenth Amendment commands that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., Amdt.14. Article 1. Similarly, Conn. Constit., art. I, section 10 states: "All courts shall be open, and every person, for an injury

---

[4] Such procedures would enable review of whether the agency "acted unreasonably, arbitrarily, illegally or in abuse of its discretion." *GenConn Energy, LLC v. Pub. Utils. Regul. Auth.*, 348 Conn. 532, 542 (2024).

done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." The Connecticut Supreme Court has held that the "due course" clause in Article 1, Section 10 has the same meaning as the due process clause of the Fourteenth Amendment. *See Roundhouse Construction Corp. v. Telesco Masons Supplies Co., In*c., 170 Conn. 155, 159, 365 A.2d 393, 395, *cert. denied*, 429 U.S. 889 (1976). "The Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 196 (1989). Procedural due process within the Due Process Clause of the Fourteenth Amendment requires "the government to follow appropriate procedures when its agents decide to 'deprive any person of life, liberty or property'" and promotes fairness in such decisions. *Daniels v. Williams*, 474 U.S. 327, 331 (1986).

The core requirements of procedural due process are notice and a hearing to present their objections. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, that conduct is also action under color of state law and will support a § 1983 claim. *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 935 (1982). State employment is generally sufficient to render a defendant a state actor. *West v. Atkins*, 487 U.S. 42, 49 (1988). A public employee acts under color of state law while acting in her official capacity or while exercising her responsibilities pursuant to state law. *Id.* at 50.

Defendants acted under color of state law as public employees acting in their official capacity and purportedly exercising their responsibilities pursuant to Connecticut state law. Though Plaintiffs sought to be deemed exempt (and, in BMOT's case, were so deemed until it was arbitrarily withdrawn), Defendants refused to engage in fair procedures and provide due process.

No notice or hearing was offered per C.G.S. § 4-177. No final decision was made, entitling Plaintiffs to seek judicial review. C.G.S. §§ 4-180 & 4-183.

Defendants' primary concern appears to be the operating hours and that Plaintiffs are not simply running a "Sunday or Hebrew school", but these were never formally approved standards through C.G.S. §§ 4-168, *et seq*. Nor is there any authority for such arbitrary and discriminatory standards, in any event.

And, notably, as to Family Tree Ministry, Defendants specifically interfered with local building and zoning authorities, effectively forcing Family Tree Ministry to seek licensure under protest, because they were deeming it a non-exempt child care provider.

The Court should not endorse OEC's "shoot first, ask questions later" approach—issuing a Notice of Illegal Child Care Operation even before it investigated, threatening Plaintiffs (and, presumably, others) with fines and penalties for doing exactly what the law (and constitution) allow. It "would be gutting any notions of predeprivation due process and blanketly holding that a state can effectuate any and all deprivations under a 'shoot first, ask questions later' mentality[.]" *Barr v. Johnson*, 777 F. App'x 298, 303 (11th Cir. 2019). Thus, where there has been no process, capricious flip-flopping, and an imposition of arbitrary and discriminatory invented criteria, Plaintiffs stated a valid due process claim.

Defendants assert that the due process should be dismissed because there is no "liberty or property interest in providing child care services without a license." (ECF No. 32-1 at 32). This is not a serious framing of the issues. As addressed below, Plaintiffs were denied their freedom to exercise, their freedom from establishment of religion, and their right to equal protection under the law. If a "Sunday School" and a "Hebrew School" is exempt from licensure, but Plaintiffs are not because Defendants don't like how much and how often Plaintiffs are educating their members'

children in religion, and where licensure requirements would otherwise violate their faith, it violates the aforesaid 1st & 14th Amendment freedoms and Plaintiffs were entitled to, and never provided, any form of pre-deprivation procedure.  Thus, Count 4 should not be dismissed.

### 3.2.2   Defendants are Denying Plaintiffs the Right to Free Exercise

It is a fundamental part of the mission of the Plaintiffs, as religious institutions, to minister to the children of their members.  Defendants are attempting to force Plaintiffs (and, in the case of Family Tree Ministry forced, for now) into abandoning their precepts.

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. Amdt. 1. This Clause is applicable to the States pursuant to the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 300 (1940).  Similarly, Conn. Const., Article First, § 3 provides that "The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state . . .."  A plaintiff may carry the burden of proving a free exercise violation by showing a government entity has burdened its sincere religious practice pursuant to a policy that is not "neutral" or "generally applicable." *Employment Div., Dept. of Human Resources of Ore v. Smith*, 494 U.S. 872, 879-81 (1990).  A law is not generally applicable "where the State has in place a system of individual exemptions" *Fulton v. City of Philadelphia*, 593 U.S. 522, 544 (2021); *see also Employment Div., Dept. of Human Resources of Ore v. Smith*, 494 U.S. 872, 884 (1990).

The Connecticut licensing scheme is not generally applicable.  There are slews of exemptions within the law, only a very few of which are time-restricted.  Large groups of cousins and/or neighbors are exempt.  The scores of sports teams in every town in Connecticut are exempt. Most religious institutions appear to be exempt.  But, apparently, not Plaintiffs.  The only reason given—that their programs are not Sunday or Hebrew schools.  Defendants claim the law is a generally applicable one (ECF No. 32-1 at 25), but such is belied by the series of exemptions.

They do not engage with the statute—they wrongly declare it is generally applicable and the rest of their argument falls apart on account of that.

Obtaining licensure burdens Plaintiffs in their practices. It forces them to meet the strictures of licensure at great expense. Some members have explicitly chosen Plaintiffs because they have not been licensed—they want their children to freely receive the religious educational benefits that they cannot obtain at a licensed facility.

Crucially, a day care center is a place of public accommodation. *See, e.g., Brown v. St. John's Univ.*, No. 08-CV-2218 (ARR)(VLP), 2010 U.S. Dist. LEXIS 147090, at *42-44 (E.D.N.Y. June 28, 2010) (observing that a day care is only exempt from the ADA if it is run by a church). Unlike the observation in *Brown*, the Connecticut public accommodations law prohibits discrimination on the basis of "creed", without an exemption for religious institutions. Compare C.G.S. § 46a-64. Thus, by forcing licensure, Defendants necessarily expose Plaintiffs to liability if they don't administer sacraments or otherwise fully open themselves up to non-believers, infidels, apostates, and heretics. Presumably, this is why the legislature created the exemption in the first place—to avoid a holding that the licensure scheme unduly and unconstitutionally burdens religion, whether Defendants' favored Hebrew Schools or Plaintiffs' programs.

Because Defendants are targeting Plaintiffs in their religious ministry, "'[o]fficial action that targets religious conduct for distinctive treatment' must also satisfy strict scrutiny." *Cent. Rabbinical Cong. of the United States v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 194 (2d Cir. 2014) (quoting *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534 (1993)). Such must be justified by a compelling interest and be narrowly tailored to advance that interest. *Id.* at 196. Defendants and the OEC fail strict scrutiny. There is no compelling interest in preventing Plaintiffs from ministering to the children of their members—the statute expressly

exempts such without any form of time-based qualification. Defendants cannot substitute their preferences for the broad exemption granted by the legislature. Nor is their unspecified interpretation tailored, let alone narrowly so. All they say is some unspecified combination of age, hours, days, and parental location, none of which is in the statute, renders Plaintiffs non-exempt. Thus, Count 1 should not be dismissed.

### 3.2.3    Defendants are Violating the Establishment Clause

Defendants have expressed a clear preference for those faiths that operate Sunday and Hebrew schools only. "The Establishment Clause prohibits States from adopting laws 'respecting an establishment of religion.; Amdt. 1; *see Wallace v. Jaffree*, 472 U. S. 38, 49 (1985) (recognizing the Clause's incorporation against the States)." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 558, 142 S. Ct. 2407, 2441 (2022). Article seventh, § 1 of the Connecticut Constitution has a similar purpose. *Griswold Inn, Inc. v. State*, 183 Conn. 552, 558-59 & n.3, 441 A.2d 16, 19-20 (1981) ("Article seventh's language even more than the federal provision condemns any law which gives 'preference' to one religious society and assures that no person 'shall . . . be compelled to . . . support . . . or be associated with' any religious group but can 'worship in a mode consistent with the dictates of their consciences.' The state provision is thus more comprehensive than the federal provision.") The Supreme Court has held that "the clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). By OEC's own words, the religious exemption under Connecticut law only applies to "services akin to Sunday or Hebrew school." *See* ECF No. 1-11. By stating the religious exemption has to be a Sunday school or Hebrew school, OEC is preferencing certain religions over others—ministries that don't feel called by their Maker to minister to members' children on a full-time basis.

The unwritten preference fails the *Lemon* test. As the Second Circuit put it:

> Although "much criticized," the Lemon test still governs cases alleging violations of the Establishment Clause. *Am. Atheists, Inc. v. Port Auth. of N.Y. & N.J.*, 760 F.3d 227, 238 n.12 (2d Cir. 2014). Under *Lemon*, for "government action to satisfy the neutrality principle of the Establishment Clause, it must (1) 'have a secular purpose,' (2) have a 'principal or primary effect that neither advances nor inhibits religion,' and (3) 'not foster an excessive government entanglement with religion.'" *Id*. at 238 (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971)) (internal ellipses omitted).

*Jewish People for the Betterment of Westhampton Beach v. Vill. of Westhampton Beach*, 778 F.3d 390, 395 (2d Cir. 2015). Here, there is no secular purpose to preferring Sunday or Hebrew schools over Plaintiffs' program. Defendants identify no reasoning, let alone a secular one, even behind its own made-up, undefined criteria of hours, days, ages, and parental location. Defendants' preferences' principal and primary effects inhibit Plaintiffs' ministries while advancing those that operate Sunday or Hebrew schools. And Defendants' preference excessively entangles government with religion—Defendants must decide whether Plaintiffs' activities constitute Sunday or Hebrew schools, which derive their meaning from religion. Thus, Defendants' interpretation of the exemption fails the *Lemon* test.

Similarly, the application of the exemption fails strict scrutiny. When courts "are presented with a state law granting a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality." *Larson v. Valente*, 456 U.S. 228, 246 (1982). OEC's interpretation "must be invalidated unless it is justified by a compelling governmental interest, … and unless it is closely fitted to further that interest[.]" *Id*. at 247. There is no compelling governmental interest in limiting the ages, days, hours, or parental location as to religious educational activities. The statute provides numerous other exemptions, so it cannot be presumed that the children would, in the alternative, attend a licensed child care program as opposed to being left with neighbors or family. Nor does the OEC apply any form of narrow tailoring—in fact, they failed to provide Plaintiffs with any deficiency letter

that would provide direction as to how to qualify for the exemption. It is a revealed preference for licensure rather than exemption, while the legislature favored neither. Defendants are operating solely on the basis of sectarian favoritism, not on the basis of law. Thus, the Court should not suborn Defendants' establishment of religion and Count 2 should not be dismissed.

### 3.2.4   OEC is Denying Plaintiffs Equal Protection Under Law

There is no constitutional basis to exempt religious institutions that operate Hebrew and Sunday schools and not exempt ones who are either not Jewish or ministries that operate on days other than Sunday. The Fourteenth Amendment commands that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amdt.14; *accord* Conn. Const. Art. 1, Sec. 1 ("All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community.") A State may act through different agencies, either by its legislative, its executive or its judicial authorities, and prohibitions of the [Fourteenth] Amendment extend to all actions of the State denying equal protection of the laws, whether it be action by one of these agencies or by another. *Virginia v. Rives*, 100 U.S. 313, 318 (1879). The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within a state's jurisdiction against "intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923). The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *Brady v. Town of Colchester*, 863 F.2d 205, 216 (2d Cir. 1988) (citation and internal quotation omitted). Here, Defendants are dissimilarly treating religious institutions that operate Hebrew and Sunday schools by recognizing them as exempt. Plaintiffs are similarly situated—they are religious institutions, they provide religious educational activities, and such are solely for the children of members.

Relatedly, the Second Circuit recognizes that:

> the Equal Protection Clause may be violated by selective enforcement or selective adverse treatment. To state such a claim, a plaintiff must allege (1) that he or she was treated differently from other similarly situated individuals, and (2) that the "treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980); *see also Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005); *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

*Bush v. City of Utica*, 558 F. App'x 131, 134 (2d Cir. 2014). Here, Defendants selected Plaintiffs for adverse treatment—refusing to recognize their exemption—because their religion involves more frequent and cumulative ministry to children than those religions that only run Sunday/Hebrew schools. And such is solely based on religion and the intent to punish Plaintiffs' exercise of their right to minister to members' children on a full-time bases.

And, the discriminatory practice fails strict scrutiny, which is the standard by which equal protection claims are measured in cases where the government actor purposefully discriminates against a religion. *See W.D. v. Rockland Cty.*, 521 F. Supp. 3d 358, 409-10 (S.D.N.Y. 2021)(collecting cases). As set forth above, Defendants have no compelling interest and there is no tailoring, let alone a narrow one, as to their interpretation. Thus, Defendants' discriminatory conduct violates the Equal Protection clause.

Defendants argue that Plaintiffs did not properly plead that they were treated differently because of their religion. However, Paragraph 107 expressly alleges such discrimination (as do Counts 1 & 2). Plaintiffs were discriminated against because their calling to minister to children exceeds the calling of those ministries operating only Sunday schools and because they do not

operate Hebrew schools.[5]

Defendants also claim that Plaintiffs do not bear a "reasonably close resemblance" to their comparators under *Hu v. City of N.Y.*, 927 F.3d 81, 96 (2d Cir. 2019). In *Hu*, itself, the burden was satisfied where both the plaintiffs and the comparator had a standing pool of water at a jobsite. Here, Plaintiffs and the Churches/Synagogues that run Sunday or Hebrew schools all run religious educational activities that minister to members' children; the only real difference is the volume of ministry informed by the faith of Plaintiffs and the comparators. Thus, there is a reasonably close resemblance. To the extent Plaintiffs must expressly name a comparator, which *Hu*, let alone *Twombley/Iqbal*, do not appear to require, Plaintiffs would seek leave to amend to name the plethora of Churches/Synagogues throughout the state that only run Sunday/Hebrew schools for their childrens' ministries. Thus, Count 3 should not be dismissed.

### 3.2.5    Defendants Violated the Connecticut Freedom of Religion Act

Plaintiffs are entitled to relief pursuant to the Connecticut Freedom of Religion Act ("CFRA"), Conn. Gen. Stat. § 52-571b, for Defendants' violation of their right of free exercise of religion under Article I, Section 3 of the Constitution of the State of Connecticut. The CFRA provides that "[t]he state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 article first of the Constitution of the state even if the burden results from a rule of general applicability" except where application of such a burden "is in furtherance of a compelling governmental interest, and . . . is the least restrictive means of furthering that compelling governmental interest." Conn. Gen. Stat. § 52-571b(a),(b). "Essentially, the CRFA requires the Court to apply strict scrutiny to a government action or law that burdens a

---

[5] While counsel claims Defendants were "inartful", they said what they said and the arguments of counsel are not evidence that it was inartful, rather than factual. Moreover, the excuse, that they really meant "akin" raises even more Constitutional questions as such is an unconstitutionally vague criterion.

plaintiff's exercise of religion." *Omar Islamic Ctr. Inc. v. City of Meriden*, 633 F. Supp. 3d 600, 625 (D. Conn. 2022). Notably, "'the overarching purpose of § 52-57b was to provide more protection for religious freedom under Connecticut law than the' Free Exercise Clause." *Doe v. Mastoloni*, 2016 U.S. Dist. LEXIS 17427, 2016 WL 593439, at *18 (D. Conn. Feb. 12, 2016) (*quoting Rweyemamu v. Comm'n on Human Rights & Opportunities*, 98 Conn. App. 646, 660, 911 A.2d 319 (2006)). It is not limited to those restrictions that are otherwise generally applicable. *See Knights of Columbus Council 2616 v. Town of Fairfield*, No. 3:22-cv-1579 (AWT), 2024 U.S. Dist. LEXIS 150374, at *47-48 (D. Conn. Aug. 22, 2024).

As set forth above, Defendants' interpretation of the exemption fails strict scrutiny. There is no compelling interest in exempting institutions that provide only Sunday and Hebrew schools and not Plaintiffs. Nor have Defendants tailored their interpretation, let alone narrowly.

While, as discussed, above, the *Pennhurst* Doctrine may preclude equitable claims in Defendants' official capacity claims, it does not preclude individual capacity claims for monetary damages. Plaintiffs assert, however, that neither the Connecticut Constitution, Art. 1, §§ 3-4/C.G.S. § 46a-58 nor the Connecticut Freedom of Religion Act, C.G.S. § 52-571b(a),(b) provide for a private right of action. (ECF 32-1 at 12).

There are a handful of non-binding cases that determined that there is no private right of action under C.G.S. § 46a-58 and Connecticut Constitution, Art. 1, §§ 3-4. However, nothing cited by Defendants actually engaged the issues. As to C.G.S. § 46a-58, a right of action is implied by C.G.S. § 52-251b(a), which states "[i]n any civil action to recover damages for injury to the person or to real or personal property arising out of a violation of section 46a-58, the court may allow the prevailing party his costs, together with a reasonable attorney's fee to be taxed by the court." Although subsection (b)(1) states that it does not create a new cause of action, it seems that the

provision would be meaningless if it did not recognize an existing cause of action. Plaintiff can identify a single case on this issue, *Batiste v. Soundview Med. Assocs., LLC*, No. CV065001278, 2008 Conn. Super. LEXIS 709, at *8 (Super. Ct. Mar. 25, 2008). However, *Batiste* focused on the issue of not creating a new cause, rather than the statute evidencing there was a pre-existing cause, citing to cases that, themselves, only rely on non-binding authority. Thus, the Court should not ignore the understanding of the legislature that there must be, necessarily, such a cause.

As for Connecticut Constitution, Art. 1, §§ 3-4, the case cited by Defendants does not do the work of determining whether there is a private right of action. *Baltas v. Rizvani*, cited by Defendants, recognized that "The Connecticut Supreme Court recognized a private cause of action for monetary damages under Article I, Sections 7 and 9 of the Connecticut Constitution when the claims arose out of unreasonable searches and seizures and unlawful arrest committed by police officers. *Binette v. Sabo*, 244 Conn. 23, 47-49, 710 A.2d 688 (1998)." 2022 U.S. Dist. LEXIS 213399, at *60-62 (D. Conn. Nov. 28, 2022). Nothing suggests a cause under Sections 3 & 4 would not be recognized either. Under *Binette*:

> Whether to recognize a cause of action for alleged violations of other state constitutional provisions in the future must be determined on a case-by-case basis. As in the present case, that determination will be based upon a multifactor analysis. The factors to be considered include: the nature of the constitutional provision at issue; the nature of the purported unconstitutional conduct; the nature of the harm; separation of powers considerations and the other factors articulated in *Bivens* and its progeny; the concerns expressed in *Kelley Property Development, Inc*.; and any other pertinent factors brought to light by future litigation.

244 Conn. at 48. Instead of dismissing, the Court should engage with the factors. Discrimination against religion so fundamentally abhorrent that such a cause of action should be recognized. Defendants offer no reason not to, other than no one has done it yet, which is not a reason.

Similarly, for Count 6, the CFRA (C.G.S. § 57-571b), there is a dearth of caselaw on whether there is an individual claim. Plaintiffs have previously pointed out that *Taylor v. City of*

*New Haven* determined CFRA claims are limited only to claims against the state, not individuals, and not for monetary relief.  2023 U.S. Dist. LEXIS 40469, at *30-31 (D. Conn. Mar. 10, 2023). However, Defendants do not seek dismissal on this basis and C.G.S. § 52-571b(c), broadly interpreted, could be interpreted to mean that "appropriate relief" includes holding individual state actors in their personal capacities accountable.  Thus, Counts 5 & 6 should not be dismissed.

### 3.3  Audette and Proietti Cannot Shirk their Constitutional Violations by Claiming Qualified Immunity[6]

Defendants Audette and Proietti are not immune from suit.  A qualified immunity defense "faces a formidable hurdle" at the motion to dismiss stage "and is usually not successful." *Sabir v. Williams*, 52 F.4th 51, 64 (2d Cir. 2022) (citation omitted).  When raised on a motion to dismiss, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). "Qualified immunity bars a plaintiff's claim unless (1) the official violated a statutory or constitutional right, and (2) that right was clearly established at the time of the challenged conduct."  *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023). "A right is 'clearly established' if '[t]he contours of the right . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Courts consider "the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals

---

[6] While the law of qualified immunity is presently binding on this Court, Plaintiffs do not agree it was properly instituted, especially in light of the "Notwithstanding" clause omitted in the 1874 Revised Statutes, and reserve the right to challenge its continued validity on appeal.  *See* Alexander A. Reinhert, *Qualified Immunity's Flawed Foundation*, 111 CAL. L. REV. 201, 235-38 (2023); *see also, Stalley v. Cumbie,* 124 F.4th 1273, 1322 n.7 (11th Cir. 2024) (Jordan, J. concurring); *Price v. Montgomery Cnty., Ky.*, 72 F.4th 711, 727 n.1 (6th Cir. 2023), cert. denied, 144 S. Ct. 2499 (2024) (Nalbandian, J., concurring in part and dissenting in part); *Rogers v. Jarrett*, 63 F.4th 971, 979-81 (5th Cir. 2023) (Willet, J., concurring).

case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014). Qualified immunity does not "require a case directly on point" but that "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Proietti is the one who issued the October 22, 2024, "Demand to Cease" to BMOT, told NPM and FTM they would not be deemed exempt, and issued the October 8, 2024, "Demand to Cease" to BMOT. Audette is the one who issued the September 30, 2024, "Demand to Cease" to NPM. While Defendants call these allegations "sparse" these actions were the very constitutional violations at issue, much in the same way a different plaintiff might plead "On [date], Officer [name] shot plaintiff without probable cause."

Defendants attempt to use deflection to assert there is no statutory or constitutional right to be excluded from licensure. (ECF No. 32-1 at 19). That would be like arguing to the next Paul Cohen there is no constitutional right to wear a jacket in a courthouse, while ignoring that the real issue is freedom of speech. Here, the real issues are free exercise, freedom from establishment of religion, the right to due process, and the right to equal protection.

The right to notice and an opportunity to be heard before a deprivation is clearly established. *See Morizio v. Town of Oyster Bay*, 2015 U.S. Dist. LEXIS 197225, at *17 (E.D.N.Y. Apr. 24, 2015)(denying qualified immunity where deprivation of interest occurred through "concocted building code violations" without notice and opportunity to be heard). Such has been well- and clearly-established for decades. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co*., 339 U.S.

306, 314 (1950). Defendants failed to provide any form of hearing—there was no proceeding before deeming them non-exempt. Defendants know they are supposed to provide notice and opportunity to be heard. In *Sugar Plum Day Care, Inc. v. Office of Early Childhood*, OEC survived a due process challenge because it "provided a detailed written notice of the claims against [Sugar Plum]. A hearing was held before an impartial hearing officer. Sugar Plum was represented at the hearing and called witnesses, cross examined adverse witnesses and entered evidence." No. HHBCV196055244, 2020 Conn. Super. LEXIS 1007, at *9 (Super. Ct. June 26, 2020).[7] Defendants did nothing of the sort here. They are not immune from the due process violation.

Defendants also violated Plaintiffs' clearly-established free exercise rights. "The principle that government may not enact laws that suppress religious belief or practice is so well understood that few violations are recorded in our opinions." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 523 (1993). While this is not "enactment," it is purported enforcement in a manner seeking to suppress full-time religious education merely because Defendants don't like how much time Plaintiffs spend educating children. "The Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 638 (2018) (quoting *Lukumi, supra* at 534). Thus, in *Lukumi*, "the Court **made clear** that the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, supra* at 638 (emphasis added). Defendants committed a clearly established violation of the Free Exercise clause by passing judgment on

---

[7] Sugar Plum also lost because it did not have a property interest in the license. In contrast, Plaintiffs have a liberty interest in their free exercise, freedom from establishment of religion, and equal protection of the law.

Plaintiffs' religious practices of ministering to members' children and delegitimizing it because it isn't "Sunday School" or "Hebrew School".  Similarly, it is clearly established that interfering with the religious upbringing of children violates the Free Exercise Clause of the First Amendment. *See, e.g. Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972); *Bruker v. City of N.Y.*, 337 F. Supp. 2d 539, 549 (S.D.N.Y. 2004)("The right to control the religious upbringing of one's children is a well-recognized component of the free exercise right protected by the First Amendment.")  While these cases generally address the clearly-established rights of parents, Plaintiffs all met the exemption because the participants were all the children of the parent- members.  Defendants cannot say that, although they violated the clearly-established rights of the members, they are somehow immune from having violated the membership as a whole.  Thus, Defendants are not immune from the free exercise claims.

Defendants are not immune from having violated the Establishment Clause.  As the Second Circuit has stated with regard to the Establishment Clause, "we note that the prohibition of official discrimination against religions is undoubtedly 'clearly established.'" *Cox v. Miller*, 296 F.3d 89, 101 (2d Cir. 2002); *see also Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.").  The Establishment Clause prohibits "excessive government entanglement with religion." *Rweyemamu v. Cote*, 520 F.3d 198, 208 (2d Cir. 2008) (citation omitted). Notably, "[i]n [its] Establishment Clause cases [the Supreme Court] ha[s] often stated the principle that the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general." *Lukumi*, 508 U.S. at 532.   Yet, Defendants particularly, as an official purpose, disapproved of and discriminated against Plaintiffs because their faiths compel them to minister to members' children in a way that is, somehow, not "akin" to those officially preferred

denominations of churches and synagogues that offer "Sunday school" or "Hebrew school".

Nor are Defendants immune from the Equal Protection claim. The prohibition against discrimination on the basis of constitutionally-protected class status is clearly-established. *See, e.g., Patterson v. Balsamico*, 440 F.3d 104, 115-16 (2d Cir. 2006). Although *Patterson* involved race, there is no reason to believe other suspect classes would be left unprotected. "That a government official cannot discriminate against employees on the basis of religion has long been well-established." *Oba Hassan Wat Bey v. City of N.Y.,* 2009 U.S. Dist. LEXIS 87793, at \*68 (S.D.N.Y. Sep. 9, 2009)(denying qualified immunity as to an equal protection claim). Further, the standard set forth in *Leclair, supra*, "clearly established" that selective treatment is a constitutional violation. *Bush,* 558 F. App'x at 135; *Massi v. Flynn*, 254 F. App'x 84, 87 (2d Cir. 2007) (summary order) (citing *LeClair* and *Harlen Assocs*.); *see also Oyler v. Boles*, 368 U.S. 448, 456, (1962) (noting that selective enforcement of laws "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification[,]" violates the Equal Protection Clause). Once again, Defendants treated Plaintiffs differently and selectively targeted them because their ministries to members' children is more intense than that provided by churches/synagogues that merely run "Sunday" or "Hebrew" school. As a result, Defendants are not immune from the Equal Protection claims.

Even though Defendants violated clearly established law, they also try to avoid liability by claiming, nevertheless, that their actions were objectively reasonable. To make this determination, the Court is limited to the "available record", *i.e.* the Complaint (and the exhibits thereto) and nothing in them suggests that the defendants' discriminatory actions were objectively reasonable. *Almonte v. City of Long Beach*, 478 F.3d 100, 110 (2d Cir. 2007). While Defendants claim they were not driven by Plaintiffs' faith, but rather an "obligation to act to ensure the health and safety

of children" (ECF No. 32-1 at 23) there is nothing in the record supporting this argument and assertion. In fact, they admit that they "do not now and have not ever, dispute that Plaintiffs are religious ministries that provide service to its members' children." (ECF No. 32-1 at 22-23). That is, they admit that Plaintiffs qualify for the exemption under the statute, but nevertheless refuse to acknowledge the exemption. Stubborn refusal is not objectively reasonable.

While Defendants assert, based on no facts, that ages, frequency, regularity, days, and hours informed their decision, none of which appears in the statute, the one thing they expressly seem to overlook is whether it was all "religious educational activities," which is the sole statutory criterion. Instead, they argue the false dichotomy of "activities" versus "child care services" when the statute itself otherwise contemplates that religious educational activities, like the Girl Scouts and Little League, are "child care services," all of which are exempt from licensure. The argument that "all child care services providers…must be licensed" (ECF No. 32-1 at 23) is, by definition, false, when each and every child care service provider that meets the series of statutory exemptions under C.G.S. 19a-77(b) need not be licensed. It is objectively unreasonable for Defendants to ignore the statutory commands and choose not to recognize Plaintiffs' exemption simply because they disfavor Plaintiffs' faith-based decision to offer full-time religious educational activities. Thus, this false dichotomy is objectively unreasonable.

Moreover, the claimed concerns over health and safety might sound reasonable, but one need only briefly think about it before the house of cards attempting to mask the overt discrimination falls apart. How is Sunday School or Hebrew School healthier or safer because they spend less time, less frequently? Defendants also insinuate, without basis, that the alternative to Plaintiffs' programs is that the parents will send the children to a licensed daycare. The statute just as well exempts neighborly and familial care, which is unregulated. C.G.S. § 19a-77(b)(4).

Or the children would stay home with a parent.  Moreover, nothing about being licensed necessarily makes one healthier or safer.  One need only consider *Tanvir v. Lee*, in which a child was the victim of Shaken Baby Syndrome while in the care of Goddard School of Wilton—a licensed facility.  FST CV 22-6055525 S, 2024 Conn. Super. LEXIS 2299, at *1 (Super. Ct. Oct. 30, 2024).  Or the abusive, humiliating, and frightening punishment inflicted by the licensed daycare in *Coppa v. Soh-Tan*, No. CV054003679S, 2006 Conn. Super. LEXIS 3887 (Super. Ct. Dec. 26, 2006).  What Defendants' arguments reveal is a prejudice against ministries that are called to provide full-time pastoral care to children, with a blind eye to what the alternatives entail.  Their objectively unreasonable behavior strips away any pretense of qualified immunity.

## 4.    CONCLUSION

Defendants recognize that Plaintiffs provide religious educational activities that should automatically render them exempt from licensure, but they turn their noses at Plaintiffs because they aren't "Sunday School" or "Hebrew School", which Defendants' favored faith groups provide.  They did so in violation of the Connecticut and U.S. Constitutions.  They did so without any due process, in an utterly arbitrary and capricious manner—even reversing, without cause, prior recognition that BMOT was exempt.  They did so in violation of Plaintiffs' free exercise rights.  They have established a preference for their own favored religious groups.  They violated Plaintiffs' equal protection rights.  And they violated Connecticut statutes meant to protect these rights.  The individual capacity defendants are not shielded by qualified immunity from the consequences of their arbitrary and unreasonable actions.  And, except where previously and otherwise acknowledged, the Eleventh Amendment does not bar equitable claims against the official capacity defendants nor the monetary claims against the individual capacity defendants.

In light of the foregoing, Defendants' motion to dismiss should be denied.

Dated: May 2, 2025.                    Respectfully Submitted,

                                       /s/ Jay M. Wolman ct433791
                                       Jay M. Wolman (ct433791)
                                       jmw@randazza.com
                                       Marc J. Randazza (ct442312)
                                       ecf@randazza.com
                                       Randazza Legal Group, PLLC
                                       100 Pearl Street, 14th Floor
                                       Hartford, CT 06103
                                       Tel: (888) 887-1776
                                       Attorneys for Plaintiffs.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 2, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


<u>/s/ Jay M. Wolman ct433791</u>
Jay M. Wolman (ct433791)