# <u>EXHIBIT A</u>

*Mahmoud v. Taylor*, No. 24-297

2025 U.S. LEXIS 2500 (June 27, 2025)

### Mahmoud v. Taylor

Supreme Court of the United States

April 22, 2025, Argued; June 27, 2025, Decided

No. 24-297.

**Reporter**
2025 U.S. LEXIS 2500 *; 2025 LX 274187; __ S.Ct. __; 2025 WL 1773627

TAMER MAHMOUD, ET AL., PETITIONERS v.
THOMAS W. TAYLOR, ET AL.

**Notice:** The pagination of this document is subject to change pending release of the final published version.

**Prior History: [*1]** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

*Mahmoud v. McKnight, 102 F.4th 191, 2024 U.S. App. LEXIS 11752, 2024 WL 2164882 (May 15, 2024)*

**Disposition:** *102 F. 4th 191*, reversed and remanded.

## Syllabus

During the 2022-2023 school year, the Montgomery County Board of Education (Board) introduced a variety of "LGBTQ+-inclusive" texts into the public school curriculum. Those texts included five "LGBTQ+-inclusive" storybooks approved for students in kindergarten through fifth grade, which story lines focused on sexuality and gender. When parents in Montgomery County sought to have their children excused from instruction involving those books, the Board initially compromised with the parents by notifying them when the "LGBTQ+-inclusive" storybooks would be taught and permitting their children to be excused from the instruction. That compromise was consistent with the Board's "Guidelines for Respecting Religious Diversity," which professed a commitment to making "reasonable accommodations" for the religious "beliefs and practices" of students. Less than a year after the Board introduced the books, however, it rescinded the parental opt out policy. Among other things, the Board said that it "could not accommodate the growing number of opt out requests without causing significant **[*2]** disruptions to the classroom environment." App. to Pet. for Cert. 607a.

The petitioners here are a group of individual parents and an unincorporated association of other interested parties. The individual parents come from diverse religious backgrounds and hold sincere views on sexuality and gender which they wish to pass on to their children. Faced with the Board's decision to rescind opt outs, petitioners filed a lawsuit in the United States District Court for the District of Maryland. Among other things, they asserted that the Board's no-opt-out policy infringed on parents' right to the free exercise of their religion. See *Kennedy v. Bremerton School Dist., 597 U. S. 507, 524, 142 S. Ct. 2407, 213 L. Ed. 2d 755*. They relied heavily on *Wisconsin v. Yoder, 406 U. S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15*, in which the Court recognized that parents have a right "to direct the religious upbringing of their children" and that this right can be infringed by laws that pose "a very real threat of undermining" the religious beliefs and practices that parents wish to instill in their children. *Id., at 218, 233, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. Petitioners sought a preliminary and permanent injunction "prohibiting the School Board from forcing [their] children and other students—over the objection of their parents—to read, listen to, or discuss" the storybooks. App. to Pet. for Cert. 206a. The District Court denied relief, and a divided panel of the Fourth Circuit affirmed.

*Held*: Parents challenging the Board's introduction of the "LGBTQ+-inclusive" storybooks, along with its decision to withhold opt outs, are entitled to a preliminary injunction. Pp. 16-41.

(a) The parents assert that the Board's introduction of the "LGBTQ+-inclusive" storybooks—combined with its decision to withhold notice and opt outs—unconstitutionally burdens their religious exercise. At this stage, the parents seek a preliminary injunction that would permit them to have their children excused from instruction related to the storybooks while this **[*3]** lawsuit proceeds. To obtain that form of preliminary relief, the parents must show that: they are likely to succeed on the merits; they are likely to suffer irreparable harm in the absence of preliminary relief; the

balance of equities tips in their favor; and an injunction would be in the public interest. *Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249*. The parents have made such a showing. Pp. 16-17.

(b) The parents are likely to succeed on their claim that the Board's policies unconstitutionally burden their religious exercise. The Court has "long recognized the rights of parents to direct 'the religious upbringing' of their children." *Espinoza v. Mont. Dept. of Revenue, 591 U. S. 464, 486, 140 S. Ct. 2246, 207 L. Ed. 2d 679* (quoting *Yoder, 406 U. S., at 213-214, 92 S. Ct. 1526, 32 L. Ed. 2d 15*). Those rights are violated by government policies that "substantially interfer[e] with the religious development" of children. *Yoder, 406 U. S., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. Pp. 17-27.

(1) For many people of faith, there are few religious acts more important than the religious education of their children. See *Our Lady of Guadalupe School v. Morrissey-Berru, 591 U. S. 732, 754, 140 S. Ct. 2049, 207 L. Ed. 2d 870*. And the practice of educating one's children in one's religious beliefs, like all religious acts and practices, receives a generous measure of constitutional protection. The Constitution protects, for example, a parent's decision to send his or her child to a private religious school instead of a public school. *Pierce v. Society of Sisters, 268 U. S. 510, 532-535, 45 S. Ct. 571, 69 L. Ed. 1070*. And the Court has **[*4]** recognized limits on the government's ability to interfere with a student's religious upbringing in a public school setting. In *West Virginia Bd. of Ed. v. Barnette, 319 U. S. 624, 63 S. Ct. 1178, 87 L. Ed. 1628*, for example, the Court held that a policy requiring public school students to salute the flag could not be enforced against Jehovah's Witnesses—who consider the flag a "graven image"—consistent with the *First Amendment*.

*Barnette* involved an egregious kind of direct coercion: a requirement that students make an affirmation contrary to their parents' religious beliefs. In *Yoder*, the Court held that the *Free Exercise Clause* also protects against policies that impose more subtle forms of interference with the religious upbringing of children. There, the Court considered a compulsory-education law that would place Amish children into "an environment hostile to Amish beliefs," where they would face "pressure to conform" to contrary viewpoints and lifestyles. *406 U. S., at 211, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. The Court concluded that such a law "substantially interfer[ed] with the religious development of the Amish child" and therefore "carrie[d] with it precisely the kind of objective

danger to the free exercise of religion that the *First Amendment* was designed to prevent." *Id., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. Pp. 18-21.

(2) The Board's introduction of the "LGBTQ+-inclusive" storybooks, combined with its decision to withhold notice to parents and to forbid opt outs, substantially interferes with the religious development of petitioners' children and imposes the kind of burden **[*5]** on religious exercise that *Yoder* found unacceptable. The books are unmistakably normative. They are designed to present certain values and beliefs as things to be celebrated, and certain contrary values and beliefs as things to be rejected.

Take, for example, the message sent by the books concerning same-sex marriage. Many Americans "advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned." *Obergefell v. Hodges, 576 U. S. 644, 679, 135 S. Ct. 2584, 192 L. Ed. 2d 609*. That group includes each of the parents in this case. The storybooks, however, are designed to present the opposite viewpoint to young, impressionable children who are likely to accept without question any moral messages conveyed by their teacher's instruction. The storybooks present same-sex weddings as occasions for great celebration and suggest that the only rubric for determining whether a marriage is acceptable is whether the individuals concerned "love each other."

The storybooks similarly convey a normative message on the subjects of sex and gender. Many Americans, like the parents in this case, believe that biological sex reflects divine creation, that sex and gender are inseparable, and that children should be encouraged to accept their **[*6]** sex and to live accordingly. The storybooks, however, suggest that it is hurtful, and perhaps even hateful, to hold the view that gender is inextricably bound with biological sex.

Like the compulsory high school education considered in *Yoder*, these books impose upon children a set of values and beliefs that are "hostile" to their parents' religious beliefs. *Id., at 211, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. And the books exert upon children a psychological "pressure to conform" to their specific viewpoints. *Ibid.* The books therefore present the same kind of "objective danger to the free exercise of religion" that the Court identified in *Yoder*. *Id., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. Pp. 21-27.

(c) None of the counterarguments raised by the Board,

the courts below, or the Board's *amici* give us any reason to doubt the existence of a burden on religious exercise here. Pp. 27-35.

(1) The Court does not accept the Board's characterizations of the "LGBTQ+-inclusive" instruction as mere "exposure to objectionable ideas" or as lessons in "mutual respect." The storybooks unmistakably convey a particular viewpoint about same-sex marriage and gender. And the Board has specifically encouraged teachers to reinforce this viewpoint and to reprimand any children who disagree. That goes beyond mere "exposure." Regardless, the question in cases of this kind is whether the educational requirement or curriculum at issue would "substantially interfer[e] with the religious development" of the child, or pose "a very real threat of undermining" the religious beliefs and practices **[*7]** the parent wishes to instill in the child. *Yoder, 406 U. S., at 218*. Whether or not a requirement or curriculum could be characterized as "exposure" is not the touchstone for determining whether that line is crossed. Pp. 27-28.

(2) The Board's reliance on the Court's decisions in *Bowen v. Roy, 476 U. S. 693, 106 S. Ct. 2147, 90 L. Ed. 2d 735*, and *Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U. S. 439, 108 S. Ct. 1319, 99 L. Ed. 2d 534*, is likewise unpersuasive. In those cases, the Court held that "[t]he *Free Exercise Clause* simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens," *Bowen, 476 U. S., at 699, 106 S. Ct. 2147, 90 L. Ed. 2d 735*, even when the conduct of such internal affairs might result in "incidental interference with an individual's spiritual activities," *Lyng, 485 U. S., at 450, 108 S. Ct. 1319, 99 L. Ed. 2d 534*. That principle has no application here. The government's operation of public schools is not a matter of "internal affairs" akin to the administration of Social Security or the selection of "filing cabinets." *Bowen, 476 U. S., at 700, 106 S. Ct. 2147, 90 L. Ed. 2d 735*. It implicates direct, coercive interactions between the State and its young residents. Pp. 28-29.

(3) The courts below erred by dismissing this Court's decision in *Yoder*. The Court has never confined *Yoder* to its facts, and there is no reason to conclude that the decision is "*sui generis*" or "tailored to [its] specific evidence," as the courts below reasoned. **[*8]** While the Court noted in *Yoder* that the Amish made a showing "that probably few other religious groups or sects could make," that language must be read in the context of the specific claims raised by the Amish respondents, *i.e.,*

the right to withdraw their children from all conventional schooling after a certain age. *406 U. S., at 235-236, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. Contrary to the suggestions of the courts below, *Yoder* embodies a robust principle of general applicability. Pp. 29-31.

(4) The Fourth Circuit's view that the record in this case is too "threadbare" to demonstrate a burden on religious exercise is also unconvincing. *102 F. 4th 191, 209*. That court faulted the parents for failing to make specific allegations describing how the books "are actually being used in classrooms." *Id., at 213*. But when a deprivation of *First Amendment* rights is at stake, a plaintiff need not wait for the damage to occur before filing suit. *Susan B. Anthony List v. Driehaus, 573 U. S. 149, 158, 134 S. Ct. 2334, 189 L. Ed. 2d 246*. To evaluate the plaintiffs' claims, the Court need only decide whether—if teachers act according to the clear and undisputed instructions of the Board—a burden on religious exercise will occur. Pp. 31-32.

(5) It is no answer that parents remain free to place their children in private school or to educate them at home. Public education is a public benefit, and the government cannot "condition" its "availability" on parents' willingness to accept a burden on their religious exercise. **[*9]** *Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U. S. 449, 462, 137 S. Ct. 2012, 198 L. Ed. 2d 551*. Moreover, given that education is compulsory in Maryland, the parents are not being asked simply to forgo a public benefit. They have an obligation—enforceable by fine or imprisonment—to send their children to public school unless they find an adequate substitute they can afford. *§§7-301(a)(3), (e)*.

Nor is it of any comfort to suggest that parents can educate their children at home after school. The parents in *Barnette* and *Yoder* were similarly capable of teaching their religious values "at home," but that made no difference in the *First Amendment* analysis in those cases. It is similarly unconvincing to suggest that the parents could have challenged the educational requirements via the democratic process. The parents tried and failed to obtain legislative change, and had every right to resort to judicial review to protect their rights. Pp. 32-35.

(d) Having concluded that the Board's policy burdens the parents' right to the free exercise of religion, the Court turns to the question whether that burden is constitutionally permitted. Pp. 35-40.

(1) In most circumstances, the government is generally

free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally **[\*10]** applicable. *Employment Div., Dept. of Human Resources of Ore. v. Smith, 494 U. S. 872, 878-879, 110 S. Ct. 1595, 108 L. Ed. 2d 876*. But when a law imposes a burden of the same character as that in *Yoder*, as does the challenged Board policy here, strict scrutiny is appropriate regardless of whether the law is neutral or generally applicable. *Smith, 494 U. S., at 881, 110 S. Ct. 1595, 108 L. Ed. 2d 876*. Pp. 35-37.

(2) To survive strict scrutiny, a government must demonstrate that its policy "advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton v. Philadelphia, 593 U. S. 522, 541, 141 S. Ct. 1868, 210 L. Ed. 2d 137* (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U. S. 520, 546, 113 S. Ct. 2217, 124 L. Ed. 2d 472*). The Board asserts that its curriculum and no-opt-out policy serve its compelling interest in maintaining a school environment that is safe and conducive to learning for all students. As a general matter, schools have a "compelling interest in having an undisrupted school session conducive to the students' learning." *Grayned v. City of Rockford, 408 U. S. 104, 119, 92 S. Ct. 2294, 33 L. Ed. 2d 222*. But the Board's conduct in continuing to permit opt outs in a variety of other circumstances undermines its assertion that its no-opt-out policy is necessary to serve that interest. Pp. 37-40.

(e) Without an injunction, the parents will continue to suffer an unconstitutional burden on their religious exercise, and such a burden unquestionably constitutes irreparable injury. See *Roman Catholic Diocese of Brooklyn v. Cuomo, 592 U. S. 14, 19, 141 S. Ct. 63, 208 L. Ed. 2d 206* (*per curiam*). And an injunction here would be both equitable and in the public interest. Thus, the petitioners have shown that they are entitled to a preliminary injunction. Specifically, until all appellate review in this case is completed, the Board should be ordered to notify the petitioners in advance whenever one of the books in question or any other similar book is to be used in any way and to allow them to have their children excused from that instruction. Pp. 40-41.

*102 F. 4th 191*, reversed and remanded.

**Counsel: Eric S. Baxter** argued the cause for petitioner.

**Sarah M. Harris** argued the cause for petitioner.

**Alan E. Schoenfeld** argued the cause for respondent.

**Judges:** ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. THOMAS, J., filed a concurring opinion. SOTOMAYOR, J., filed a dissenting opinion, **[\*11]** in which KAGAN and JACKSON, JJ., joined.

**Opinion by:** ALITO

# Opinion

JUSTICE ALITO delivered the opinion of the Court.

The Board of Education of Montgomery County, Maryland (Board), has introduced a variety of "LGBTQ+-inclusive" storybooks into the elementary school curriculum. These books—and associated educational instructions provided to teachers—are designed to "disrupt" children's thinking about sexuality and gender. The Board has told parents that it will not give them notice when the books are going to be used and that their children's attendance during those periods is mandatory. A group of parents from diverse religious backgrounds sued to enjoin those policies. They assert that the new curriculum, combined with the Board's decision to deny opt outs, impermissibly burdens their religious exercise.

Today, we hold that the parents have shown that they are entitled to a preliminary injunction. A government burdens the religious exercise of parents when it requires them to submit their children to instruction that poses "a very real threat of undermining" the religious beliefs and practices that the parents wish to instill. *Wisconsin v. Yoder, 406 U. S. 205, 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972)*. And a government cannot condition the benefit of free public education on parents' **[\*12]** acceptance of such instruction. Based on these principles, we conclude that the parents are likely to succeed in their challenge to the Board's policies.

I

A

1

With just over one million residents, Montgomery County is Maryland's most populous county. According to a recent survey, it is also the "most religiously diverse

county" in the Nation. [1] In addition to hosting a diverse mix of Christian denominations, the county ranks in the top five in the Nation in per-capita population of Jews, Muslims, Hindus, and Buddhists. [2] The county's religious diversity is accompanied by strong cultural diversity as well. The county is home to several notable ethnic communities. For example, the Ethiopian community in Silver Spring is one of the largest in the country. [3] And according to one survey, "[o]nly 56.8% of county residents speak English at home." N. 1, *supra*.

Most Montgomery County residents with school age children, by choice or necessity, send them to public school. As a general matter, Maryland law requires that resident children ages 5 to 18 "attend a public school regularly during the entire school year." *Md. Educ. Code Ann. §7-301(a-1)(1)* (2025). As an exception to this general rule, the State permits parents to send their children to private school or to educate them at home if certain requirements can be met. *§7-301(a)(3)*. Parents who cause their children to be absent **[*13]** unlawfully from school can face fines, mandatory community service, and even imprisonment. *§7-301(e)*.

Public education in Montgomery County is provided by Montgomery County Public Schools (MCPS), one of the largest school districts in the Nation. In the 2022-2023 school year, MCPS enrolled 160,554 students in its 210 schools and had an operating budget of nearly $3 billion. App. to Pet. for Cert. 597a-598a; MCPS, FY2024 Operating Budget, p. vi-1 (2023). The district is overseen and managed by the Montgomery County Board of Education, a policymaking body consisting of seven elected county residents and one student. See *Md. Educ. Code Ann. §3-901(b)*.

In recognition of the county's religious diversity, the Board's "Guidelines for Respecting Religious Diversity" profess a commitment to making "reasonable accommodations" for the religious "beliefs and practices" of MCPS students. App. to Pet. for Cert. 210a, 212a. [4] These accommodations take various forms. For example, according to one MCPS official, the Board "advises principals that schools should avoid scheduling tests or other major events on dozens of . . . 'days of commemoration,' during which MCPS expects that many students may be absent . . . or engaged in religious or **[*14]** cultural observances." *Id.*, at 602a.

This case, however, arises from the Board's abject refusal to heed widespread and impassioned pleas for accommodation. In the years leading up to 2022, the Board apparently "determined that the books used in its existing [English & Language Arts] curriculum were not representative of many students and families in Montgomery County because they did not include LGBTQ characters." *Id.*, at 603a. The Board therefore decided to introduce into the curriculum what it described as "'LGBTQ+-inclusive texts." [5] *Id.*, at 174a. As one email sent by MCPS principals reflects, the Board selected the books according to a "Critical Selection Repertoire" that required selectors to review potential texts and ask questions such as: "Is heteronormativity reinforced or disrupted?"; "Is cisnormativity reinforced or disrupted?"; and "Are power hierarchies that uphold the dominant culture reinforced or disrupted?" *Id.*, at 622a.

In accordance with this "[r]epertoire" and other criteria, the Board eventually selected 13 "LGBTQ+-inclusive" texts for use in the English and Language Arts curriculum from pre-K through 12th grade. *Id.*, at 603a-604a, 622a. At issue in this lawsuit **[*15]** are the five "LGBTQ+-inclusive" storybooks that are approved for students in Kindergarten through fifth grade—in other words, for children who are generally between 5 and 11

---

[1] See A. Hertzler-McCain, Montgomery County, Maryland, Was Most Religiously Diverse US County in 2023, Religion News Service (Aug. 30, 2024), https://religionnews.com/2024/08/30/montgomery-county-maryland-was-most-religiously-diverse-u-s-county-in-2023/.

[2] Public Religion Research Institute, 2023 PRRI Census of American Religion: County-Level Data on Religious Identity and Diversity 19, 28, 42-49 (Aug. 29, 2024).

[3] See, *e.g.*, R. Skirble, Silver Spring Is the Epicenter of a Thriving Ethiopian Diaspora, Montgomery Magazine (Oct. 19, 2022), https://www. montgomerymag.com/silver-spring-is-the-epicenter-of-a-thriving-ethiopian-diaspora/.

---

[4] The Board has modified its religious diversity guidelines since the 2022-2023 school year, when many of the events in this lawsuit took place. The most recent version of the Board's guidelines, available online, continues to state that "MCPS is committed to making reasonable accommodations" for the religious "beliefs and practices" of its students. MCPS, Religious Diversity Guidelines in Montgomery County Public Schools 1 (2024-2025).

[5] Some sources in the record use different variations of "LGBTQ+-inclusive" when referring to the books at issue in this case (*e.g.*, "LGBTQ-Inclusive"). App. to Pet. for Cert. 603a. For consistency, we use "LGBTQ+-inclusive" throughout the opinion, except in instances where the designation appears in the middle of other quoted language, in which case we retain the formulation that appears in the source.

years old. [6]

A few short descriptions will serve to illustrate the general tenor of the storybooks. Intersection Allies tells the stories of several children from different backgrounds, including Kate, who is apparently a transgender child. One page shows Kate in a sex-neutral or sex-ambiguous bathroom, and Kate proclaims: "My friends defend my choices and place. A bathroom, like all rooms, should be a safe space." *Id.*, at 323a. Intersection Allies includes a "Page-By-Page Book Discussion Guide" that asserts: "When we are born, our gender is often decided for us based on our sex . . . . But at any point in our lives, we can choose to identify with one gender, multiple genders, or neither gender." *Id.*, at 349a-350a. The discussion guide explains that "Kate prefers the pronouns they/their/them" and asks "**What pronouns fit you best?**" *Id.*, at 350a (boldface in original).

Prince & Knight tells the story of a coming-of-age prince whose parents wish to match him with "a kind and worthy bride." *Id.*, at 397a. After meeting [*16] with "many ladies," the prince tells his parents that he is "'looking for something different in a partner by [his] side.'" *Id.*, at 398a, 400a. Later in the book, the prince falls into the "embrace" of a knight after the two finish battling a fearsome dragon. *Id.*, at 415a. After the knight takes off his helmet, the prince and knight "gaz[e] into each other's eyes, [and] their hearts beg[in] to race." *Id.*, at 418a-419a. The whole kingdom later applauds "on the two men's wedding day." *Id.*, at 424a.

Love Violet follows a young girl named Violet who has a crush on her female classmate, Mira. Mira makes Violet's "heart skip" and "thunde[r] like a hundred galloping horses." *Id.*, at 431a, 436a. Although Violet is initially too afraid to interact with Mira, the two end up exchanging gifts on Valentine's Day. Afterwards, the two girls are seen holding hands and "galloping over snowy drifts to see what they might find. Together." *Id.*, at 446a.

Born Ready: The True Story of a Boy Named Penelope tells the story of Penelope, a child who is initially treated as a girl. The story is told from the perspective of Penelope, who at one point says "If they'd all stop and listen, I'd tell them about me. [*17] Inside I'm a boy." *Id.*, at 454a. When Penelope's mother later assures her that "'If you feel like a boy, that's okay,'" Penelope responds: "'No, Mama, I don't *feel* like a boy. I AM a boy.'" *Id.*, at 458a. Penelope tells her mother:

> "'I love you, Mama, but I don't want to *be* you. I want to be Papa. I don't want tomorrow to come because tomorrow I'll look like you. Please help me, Mama. Help me to be a boy.'" *Id.*, at 459a.

Penelope's mother then agrees that she is a boy, and Penelope says: "For the first time, my insides don't feel like fire. They feel like warm, golden love." *Id.*, at 462a. Later, after the family starts treating Penelope as a boy, Penelope's brother complains that "'You can't *become* a boy. You have to be born one.'" *Id.*, at 465a. This comment draws a rebuke from Penelope's mother: "'Not everything *needs* to make sense. *This is about love.*'" *Ibid.*

Finally, Uncle Bobby's Wedding tells the story of a young girl named Chloe who is informed that her favorite uncle, Bobby, will be getting married to his boyfriend, Jamie. When Bobby and Jamie announce their engagement, everyone is jubilant "except . . . Chloe." *Id.*, at 287a. Chloe says that she does not "'understand'" why her uncle [*18] is getting married, but her mother responds by explaining: "'When grown-up people love each other that much, sometimes they get married.'" *Id.*, at 288a.

The Board suggested "that teachers incorporate the new texts into the curriculum in the same way that other books are used, namely, to put them on a shelf for students to find on their own; to recommend a book to a student who would enjoy it; to offer the books as an option for literature circles, book clubs, or paired reading groups; or to use them as a read aloud." *Id.*, at 604a-605a. And "[a]s with all curriculum resources," the Board voiced its "expectation that teachers use the LGBTQ-Inclusive Books as part of instruction." *Id.*, at 605a. An MCPS official has made clear that "[t]eachers cannot . . . elect not to use the LGBTQ-Inclusive Books at all." *Ibid.*

The Board also contemplated that instruction involving the "LGBTQ+-inclusive" storybooks would include classroom discussion. See *id.*, at 642a (Board's lawyer: "there will be discussion that ensues. In fact, I think everyone would hope that discussion ensues"). In anticipation of such discussion, the Board hosted a

---

[6] This lawsuit initially concerned seven books: one approved for pre-K and Head Start students, and six approved for grades K through 5. However, the one book approved for pre-K students was removed from the curriculum due to content concerns, and one of the books approved for grades K through 5 was removed for similar reasons. Brief for Petitioners 11, n. 10; Brief for Respondents 6, n. 4.

"professional development workshop" in the summer of 2022, where **[*19]** it provided teachers with a guidance document suggesting how they might respond to student inquiries regarding the themes presented in the books. *Id.*, at 273a-276a, 604a, 628a-635a. For example, if a student asserts that two men cannot get married, the guidance document encouraged teachers to respond by saying: "When people are adults they can get married. Two men who love each other can decide they want to get married." *Id.*, at 628a. If a student claims that a character "can't be a boy if he was born a girl," teachers were encouraged to respond: "That comment is hurtful." *Id.*, at 630a. And if a student asks "[w]hat's transgender?", it was recommended that teachers explain: "When we're born, people make a guess about our gender and label us 'boy' or 'girl' based on our body parts. Sometimes they're right and sometimes they're wrong." *Ibid.* The guidance document encouraged teachers to "[d]isrupt the either/or thinking" of their students. *Id.*, at 629a, 633a.

At the same workshop, the Board also provided teachers with a guidance document that suggested particular responses to inquiries by parents. For example, if a parent were to ask whether the school was attempting to teach a child to **[*20]** "reject" the values taught at home, teachers were encouraged to respond that "[t]eaching about LGBTQ+ is not about making students think a certain way; it is to show that there is no one 'right' or 'normal' way to be." *Id.*, at 638a. The guidance also urged teachers to assure parents that there would not be "explicit instruction" about gender and sexual identity, but that "there may be a need to define words that are new and unfamiliar to students," and that "questions and conversations might organically happen." *Id.*, at 640a. If parents were not comforted by that information, teachers could tell them that "[p]arents always have the choice to keep their student(s) home while using these texts; however, it will not be an excused absence." *Ibid.*

2

The Board officially launched the "LGBTQ+-inclusive" texts into MCPS schools in the 2022-2023 school year. Shortly thereafter, parents "began contacting individual teachers, principals, or MCPS staff " about the storybooks and asking that their children be excused from classroom instruction related to them. *Id.*, at 606a. Some parents showed up at the Board's public business meetings to express their concerns about the storybooks' content. In an **[*21]** early 2023 meeting, for example, one parent represented herself as "a voice for parents in [her] community, many of [whom] are actually working today and unable to attend." See MCPS, Jan. 12, 2023, Business Meeting, at 27:15-27:20, https://mcpsmd.new.swagit.com/videos/196679. She said that MCPS parents were "frustrated" because, in their view, "educators and administrators are going behind what [parents] are teaching their kids at home, and pushing ideas of gender ideology on their kids." *Id.*, at 27:21-27:30. The parent felt that the Board was "implying to [children] that their religion, their belief system, and their family tradition is actually wrong." *Id.*, at 28:25-28:30.

At the same Board meeting, one Board member responded by saying that "some of the testimony today was disturbing to me personally. Transgender, LGBTQ individuals are not an ideology, they are a reality. . . . [T]here are religions out there that teach that women should only achieve certain subservient roles in life, and MCPS would never think of not having a book in a classroom that showed a woman" in a professional role. *Id.*, at 38:35-39:00. The Board's student member agreed with the sentiment and proclaimed that **[*22]** "ignorance and hate does exist within our community, but please know that every student—each of our 160,000 students in our large county—has a place in the school system." *Id.*, at 40:25-40:36.

Initially, the Board compromised with objecting parents by notifying them when the "LGBTQ+-inclusive" storybooks would be taught and permitting their children to be excused from instruction involving the books. That policy was consistent with the Board's general "Guidelines for Respecting Religious Diversity," which at the time provided that "[w]hen possible, schools should try to make reasonable and feasible adjustments to the instructional program to accommodate requests from students, or requests from parents/guardians on behalf of their students, to be excused from specific classroom discussions or activities that they believe would impose a substantial burden on their religious beliefs." App. to Pet. for Cert. 220a-221a.

This compromise, however, did not last long. In March 2023, less than a year after the "LGBTQ+-inclusive" texts were introduced, the Board issued a statement declaring that "[s]tudents and families may not choose to opt out of engaging" with the storybooks and that "teachers **[*23]** will not send home letters to inform families when inclusive books are read in the future." *Id.*, at 657a. According to one MCPS official, the Board decided to change its policy because, among other things, "individual principals and teachers could not

accommodate the growing number of opt out requests without causing significant disruptions to the classroom environment." *Id.*, at 607a. The official also stated that permitting some students to exit the classroom while the storybooks were being taught would expose other students "to social stigma and isolation." *Id.*, at 608a. It was therefore announced that any existing accommodations would expire at the end of the 2022-2023 school year.

Shortly after the Board rescinded parental opt outs, more than 1,000 parents signed a petition asking the Board to restore opt out rights. See Brief for Petitioners 14. And hundreds of displeased parents, including many Muslim and Ethiopian Orthodox parents, appeared at the Board's public meetings and implored the Board to allow opt outs. *Id.*, at 14-15. At a May 2023 meeting, one community member testified that "thousands" of parents felt "deeply dismayed and betrayed" by the rescission of opt outs from **[*24]** "content that conflict[s] with their sincerely held religious beliefs." MCPS, May 25, 2023, Business Meeting, at 35:33-35:44, https://mcpsmd.new.swagit.com/videos/232766. At the same meeting, an MCPS student testified and asked the Board "to allow students like me to opt out of content and books that contain sensitive and mature topics that go against my religious beliefs." *Id.*, at 40:47-40:56.

The Board was unmoved. After the testimony, several Board members and another MCPS official spoke up to "clarify" that the storybooks would not be used for explicit instruction on sexuality and gender, but rather as part of the "literacy curriculum." *Id.*, at 1:11:14-1:16:22. According to a later news article, one Board member recalled that "she felt 'kind of sorry'" for the student who testified in favor of opt outs, "and wondered to what extent she may have been 'parroting dogma' learned from her parents." [7] The Board member also expressed her view that "'[i]f [parents] want their child to receive an education that strictly adheres to their religious dogma, they can send their kid to a private religious school.'" N. 7, *supra*. The Board member went on to suggest that the objecting parents were comparable **[*25]** to "'white supremacists'" who want to prevent their children from learning about civil rights and "'xenophobes'" who object to "'stories about immigrant families.'" *Ibid.*

The Board continues to permit children to opt out of other school activities, including the "family life and human sexuality" unit of instruction, for which opt outs are required under Maryland law. Code of Md. Regs., tit. 13a, §04.18.01(D)(2)(e)(i) (2025); see App. to Pet. for Cert. 657a. And although the Board has amended its "Guidelines for Respecting Religious Diversity" to narrow the circumstances in which opt outs are permissible, those guidelines still allow opt outs from "noncurricular activities, such as classroom parties or free-time events that involve materials or practices in conflict with a family's religious, and/or other, practices." *Id.*, at 672a.

B

1

At the time when this lawsuit was filed, petitioners Tamer Mahmoud and Enas Barakat had three children enrolled in MCPS, including one who was still in elementary school. Mahmoud and Barakat are Muslims who believe "that mankind has been divinely created as male and female" and that "'gender' cannot be unwoven from biological 'sex'—to the extent there are even distinct—without rejecting the dignity and **[*26]** direction God bestowed on humanity from the start." *Id.*, at 165a-166a. Mahmoud and Barakat believe that it would be "immoral" to expose their "young, impressionable, elementary-aged son" to a curriculum that "undermine[s] Islamic teaching." *Id.*, at 532a. And, in their view, "[t]he storybooks at issue in this lawsuit . . . directly undermine [their] efforts to raise" their son in the Islamic faith "because they encourage young children to question their sexuality and gender . . . and to dismiss parental and religious guidance on these issues." *Ibid.*

After the "LGBTQ+-inclusive" storybooks were introduced, Mahmoud and Barakat asked to have their son excused from the classroom when Prince & Knight was read. Their son's principal initially permitted the boy to sit outside the classroom during that time. But, soon after, the Board announced that opt outs would no longer be available. Mahmoud and Barakat then felt "religiously compelled to send their son to private school at significant financial sacrifice." Brief for Petitioners 16.

Petitioners Jeff and Svitlana Roman also had a son enrolled in an MCPS elementary school when this lawsuit was filed. Jeff Roman is Catholic, and Svitlana Roman **[*27]** is Ukrainian Orthodox. They believe that

---

[7] E. Espey, Parents, Students, Doctors React to MCPS Lawsuit Targeting LGBTQ+ Storybooks, Bethesda Magazine (June 2, 2023), https://bethesdamagazine.com/2023/06/02/parents-students-doctors-react-to-mcps-lawsuit-targeting-lgbtq-storybooks; see also *Mahmoud v. McKnight, 688 F. Supp. 3d 265, 285 (Md. 2023)* (recounting the Board member's statements).

"sexuality is expressed only in marriage between a man and a woman for creating life and strengthening the marital union." App. to Pet. for Cert. 166a. The Romans further believe "that gender and biological sex are intertwined and inseparable" and that "the young need to be helped to accept their own body as it was created." Id., at 537a (internal quotation marks omitted). The Romans understand that their son "loves his teachers and implicitly trusts them," and so they fear that allowing those teachers to "teach principles about sexuality or gender identity that conflict with [their] religious beliefs" would "significantly interfer[e] with [their] ability to form [their son's] religious faith and religious outlook on life." Id., at 541a.

After the "LGBTQ+-inclusive" storybooks were introduced, the Romans asked the principal of their son's elementary school to notify them when the books were being read and to excuse their son from that instruction. The Romans were initially told that it was their "right" to ask that their son not be present when the books are read, id., at 496a, but they were later informed that notice and opt outs would no longer [*28] be provided. Thus, the Romans, like Mahmoud and Barakat, were "religiously compelled to send their son to private school, at significant expense." Brief for Petitioners 18.

Petitioners Chris and Melissa Persak have two elementary-age daughters who attend public school in Montgomery County. The Persaks are Catholics who believe "that all humans are created as male or female, and that a person's biological sex is a gift bestowed by God that is both unchanging and integral to that person's being." App. to Pet. for Cert. 543a. The Persaks believe "that children—particularly those in elementary school—are highly impressionable to ideological instruction presented in children's books or by schoolteachers." Id., at 544a. They are concerned that the Board's "LGBTQ+-inclusive" storybooks "are being used to impose an ideological view of family life and sexuality that characterizes any divergent beliefs as 'hurtful.'" Ibid. They think that such instruction will "undermine [their] efforts to raise [their] children in accordance with" their religious faith. Ibid. The Persaks' daughters were initially permitted to opt out of instruction related to the storybooks, but they no longer have that option. [*29]

The final petitioner, Kids First, is an unincorporated association of parents and teachers that was "formed to advocate for the return of parental notice and opt-out rights in the Montgomery County Public Schools." Id., at

624a. One of Kids First's board members—Grace Morrison—has a daughter who previously attended an MCPS elementary school. Morrison's daughter has Down syndrome and attention deficit disorder. She previously required special accommodations from her public school, including a "full time, one-on-one paraeducator." Id., at 624a-625a. Morrison's daughter also received special services from the school, such as speech and occupational therapy. Morrison and her husband are Catholics who believe that "marriage is the lifelong union of one man and one woman" and that gender is "interwoven" with sex. Id., at 625a. Due to their daughter's learning challenges, they fear that she "doesn't understand or differentiate instructions from her teachers and parents" and that they "won't be able to contradict what she hears from teachers." Id., at 626a.

Because of the services provided to her disabled daughter in public school, Morrison faced enormous "pressure" to keep her daughter enrolled. [*30] Ibid. She asked that her daughter be excused from "LGBTQ+-inclusive" instruction, even after the Board's decision to rescind opt outs. She was told, however, that opt outs would not be possible. As a result, the Morrisons felt "religiously compelled" to remove their daughter from public school. Brief for Petitioners 19. They anticipate that it will cost at least $25,000 per year to replace the academic and other services that their daughter formerly received from the public school system.

2

Faced with the Board's decision to rescind opt outs, petitioners filed this lawsuit in the United States District Court for the District of Maryland. Among other things, they asserted that the Board's no-opt-out policy infringed their right to the free exercise of their religion. See *Kennedy v. Bremerton School Dist., 597 U. S. 507, 524, 142 S. Ct. 2407, 213 L. Ed. 2d 755 (2022)*. They sought a preliminary and permanent injunction "prohibiting the School Board from forcing [their] children and other students—over the objection of their parents—to read, listen to, or discuss" the storybooks. App. to Pet. for Cert. 206a.

In support of their request, the parents relied heavily on this Court's decision in *Wisconsin v. Yoder, 406 U. S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. That case concerned Amish parents who wished to withdraw their children from conventional schooling [*31] after the eighth grade, in direct contravention of a Wisconsin law requiring children to attend school until the age of 16. In

2025 U.S. LEXIS 2500, *31

*Yoder*, we recognized that parents have a right "to direct the religious upbringing of their children," and that this right can be infringed by laws that pose "a very real threat of undermining" the religious beliefs and practices that parents wish to instill in their children. *Id., at 218, 233, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. Given the substantial burdens that Wisconsin's compulsory-attendance law placed on the religious practices of the Amish, we held that it "carrie[d] with it precisely the kind of objective danger to the free exercise of religion that the *First Amendment* was designed to prevent." *Id., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*.

In the present case, the parents asserted that *Yoder*'s principle applies to their situation, and they therefore asked for a preliminary injunction permitting their children to opt out of the challenged instruction pending the completion of their lawsuit. The District Court denied that relief. It characterized the petitioners' primary argument as an objection to school "indoctrination" and asserted that the petitioners had not "identified any case recognizing a free exercise violation based on indoctrination." *Mahmoud v. McKnight, 688 F. Supp. 3d 265, 295 (Md. 2023)*. It dismissed **[*32]** *Yoder* as "*sui generis*" and "inexorably linked to the Amish community's unique religious beliefs and practices." *688 F. Supp. 3d, at 294, 301*. And although the District Court acknowledged that the "LGBTQ+-inclusive" curriculum might result in petitioners' being "less likely to succeed" in raising their children in their religious faiths, *id., at 300*, it nonetheless held that the curriculum was likely consistent with the *Free Exercise Clause*.

A divided panel of the Fourth Circuit affirmed. The majority did not expressly endorse the District Court's view regarding the constitutionality of "indoctrination," but it suggested that petitioners could succeed on their free exercise claim only if they could "show direct or indirect coercion arising out of the exposure" to the storybooks. *Mahmoud v. McKnight, 102 F. 4th 191, 212 (2024)*. And the majority found that the evidence in the record was insufficient to make that showing. The majority expressed concern that "[t]he record does not show how the Storybooks are actually being used in classrooms." *Id., at 213*. And without such evidence, the majority held, petitioners could not obtain a preliminary injunction because it could not simply be assumed that any past lessons had or that any future lessons would "cross the line and pressure students to change their **[*33]** views or act contrary to their faith." *Ibid.* As for petitioners' reliance on *Yoder*, the majority quickly dismissed that argument, describing the decision as "markedly circumscribed" and "tailored to the specific

evidence in [its] record." *102 F. 4th, at 210-211*.

Judge Quattlebaum dissented. He accepted the parents' representation that "their faith compels that they teach their children about sex, human sexuality, gender and family life." *Id., at 222*. And he acknowledged their claim that "the messages from the books conflict with and undermine the sincerely held religious beliefs they hold and seek to convey to their children." *Ibid.* Judge Quattlebaum therefore concluded that the Board had "force[d] the parents to make a choice—either adhere to their faith or receive a free public education for their children." *Ibid.* Forcing parents to make such a choice was, in his view, a burden on their religion exercise.

After the Fourth Circuit ruled, the parents asked this Court to review the decision, and we granted their petition for a writ of certiorari. *604 U.S. ___, 145 S. Ct. 1123, 220 L. Ed. 2d 420 (2025)*. We now hold that the parents have shown that they are entitled to a preliminary injunction and reverse the judgment below.

II

Our Constitution proclaims that "Congress shall **[*34]** make no law . . . prohibiting the free exercise" of religion. Amdt. 1. That restriction applies equally to the States by way of the *Fourteenth Amendment*. *Cantwell v. Connecticut, 310 U. S. 296, 303, 60 S. Ct. 900, 84 L. Ed. 1213 (1940)*. And the right to free exercise, like other *First Amendment* rights, is not "shed . . . at the schoolhouse gate." *Tinker v. Des Moines Independent Community School Dist., 393 U. S. 503, 506-507, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969)*. Government schools, like all government institutions, may not place unconstitutional burdens on religious exercise.

The parents assert that the Board's introduction of the "LGBTQ+-inclusive" storybooks—combined with its decision to withhold notice and opt outs—unconstitutionally burdens their religious exercise. At this stage, the parents seek a preliminary injunction that would permit them to have their children excused from instruction related to the storybooks while this lawsuit proceeds. To obtain that form of preliminary relief, the parents must show that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc., 555 U. S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*. The parents have made that showing.

III

To begin, we hold that the parents are likely to succeed on their claim that the Board's policies unconstitutionally burden their [*35] religious exercise. "[W]e have long recognized the rights of parents to direct 'the religious upbringing' of their children." *Espinoza v. Mont. Dept. of Revenue, 591 U. S. 464, 486, 140 S. Ct. 2246, 207 L. Ed. 2d 679 (2020)* (quoting *Yoder, 406 U. S., at 213-214, 92 S. Ct. 1526, 32 L. Ed. 2d 15*). And we have held that those rights are violated by government policies that "substantially interfer[e] with the religious development" of children. *Id., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15.* Such interference, we have observed, "carries with it precisely the kind of objective danger to the free exercise of religion that the *First Amendment* was designed to prevent." *Ibid.* For the reasons explained below, we conclude that such an "objective danger" is present here.

A

We start by describing the nature of the religious practice at issue here and explaining why it is burdened by the Board's policies.

1

At its heart, the *Free Exercise Clause of the First Amendment* protects "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of " religious acts. *Kennedy, 597 U. S., at 524, 142 S. Ct. 2407, 213 L. Ed. 2d 755* (internal quotation marks omitted). And for many people of faith across the country, there are few religious acts more important than the religious education of their children. See *Our Lady of Guadalupe School v. Morrissey-Berru, 591 U. S. 732, 754, 140 S. Ct. 2049, 207 L. Ed. 2d 870 (2020)* ("Religious education is vital to many faiths practiced in the United States"). Indeed, for many Christians, Jews, Muslims, and others, the religious education [*36] of children is not merely a preferred practice but rather a religious obligation. See *id., at 754-756, 140 S. Ct. 2049, 207 L. Ed. 2d 870.* The parent petitioners in this case reflect this reality: they all believe they have a "sacred obligation" or "God-given responsibility" to raise their children in a way that is consistent with their religious beliefs and practices. App. to Pet. for Cert. 531a, 538a, 543a, 625a.

The practice of educating one's children in one's religious beliefs, like all religious acts and practices, receives a generous measure of protection from our Constitution. "Drawing on 'enduring American tradition,' we have long recognized the rights of parents to direct

'the religious upbringing' of their children." *Espinoza, 591 U. S., at 486, 140 S. Ct. 2246, 207 L. Ed. 2d 679* (quoting *Yoder, 406 U. S., at 213-214, 232, 92 S. Ct. 1526, 32 L. Ed. 2d 15*). And this is not merely a right to teach religion in the confines of one's own home. Rather, it extends to the choices that parents wish to make for their children outside the home. It protects, for example, a parent's decision to send his or her child to a private religious school instead of a public school. *Pierce v. Society of Sisters, 268 U. S. 510, 532-535, 45 S. Ct. 571, 69 L. Ed. 1070 (1925).*

Due to financial and other constraints, however, many parents "have no choice but to send their children to a public school." *Morse v. Frederick, 551 U. S. 393, 424, 127 S. Ct. 2618, 168 L. Ed. 2d 290 (2007)* (Alito, J., concurring). As a result, the right of parents "to [*37] direct the religious upbringing of their" children would be an empty promise if it did not follow those children into the public school classroom. We have thus recognized limits on the government's ability to interfere with a student's religious upbringing in a public school setting.

An early example comes from our decision in *West Virginia Bd. of Ed. v. Barnette, 319 U. S. 624, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943)*. In that case, we considered a resolution adopted by the West Virginia State Board of Education that required students "to participate in the salute honoring the Nation represented by the flag." *Id., at 626, 63 S. Ct. 1178, 87 L. Ed. 1628* (internal quotation marks omitted). If students failed to comply, they faced expulsion and could not be readmitted until they yielded to the State's command. *Id., at 629, 63 S. Ct. 1178, 87 L. Ed. 1628.* A group of plaintiffs sued to prevent the enforcement of this policy against Jehovah's Witnesses who considered the flag to be a "graven image" and refused to salute it. *Ibid.* (internal quotation marks omitted). The challengers asserted that the policy was, among other things, "an unconstitutional denial of religious freedom." *Id., at 630, 63 S. Ct. 1178, 87 L. Ed. 1628.*

We agreed that the policy could not be squared with the *First Amendment*. The effect of the State's policy, we observed, was to "condition access to public education on making a prescribed sign and profession [*38] and at the same time to coerce attendance by punishing both parent and child." *Id., at 630-631, 63 S. Ct. 1178, 87 L. Ed. 1628.* Although the policy did not clearly require students to "forego any contrary convictions of their own and become unwilling converts," it nonetheless required a particular "affirmation of a belief and an attitude of mind." *Id., at 633, 63 S. Ct. 1178, 87*

*L. Ed. 1628*. For a public school to require students to make such an affirmation, in contravention of their beliefs and those of their parents, was to go further than the *First Amendment* would allow.

*Barnette* dealt with an especially egregious kind of direct coercion: a requirement that students make an affirmation contrary to their parents' religious beliefs. But that does not mean that the protections of the *First Amendment* extend only to policies that *compel* children to depart from the religious practices of their parents. To the contrary, in *Yoder*, we held that the *Free Exercise Clause* protects against policies that impose more subtle forms of interference with the religious upbringing of children.

*Yoder* concerned a Wisconsin law that required parents to send their children to public or private school until the age of 16. Respondents Jonas Yoder, Wallace Miller, and Adin Yutzy were members of Wisconsin's Amish community who refused to send their **[*39]** children to public school after the completion of the eighth grade. In their view, the values taught in high school were "in marked variance with Amish values and the Amish way of life," and would result in an "impermissible exposure of their children to a 'worldly' influence in conflict with their beliefs." *406 U. S., at 211, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. In response, this Court observed that formal high school education would "plac[e] Amish children in an environment hostile to Amish beliefs . . . with pressure to conform to the styles, manners, and ways of the peer group" and that it would "tak[e] them away from their community, physically and emotionally, during the crucial and formative adolescent period of life." *Ibid.* "In short," the Court concluded, "high school attendance . . . interposes a serious barrier to the integration of the Amish child into the Amish religious community." *Id., at 211-212, 92 S. Ct. 1526, 32 L. Ed. 2d 15*.

In *Yoder*, unlike in *Barnette*, there was no suggestion that the compulsory-attendance law would *compel* Amish children to make an affirmation that was contrary to their parents' or their own religious beliefs. Nor was there a suggestion that Amish children would be compelled to commit some specific practice forbidden by their religion. Rather, the **[*40]** threat to religious exercise was premised on the fact that high school education would "expos[e] Amish children to worldly influences in terms of attitudes, goals, and values contrary to [their] beliefs" and would "substantially interfer[e] with the religious development of the Amish child." *406 U. S., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*.

That interference, the Court held, violated the parents' free exercise rights. The compulsory-education law "carrie[d] with it precisely the kind of objective danger to the free exercise of religion that the *First Amendment* was designed to prevent" because it placed Amish children into "an environment hostile to Amish beliefs," where they would face "pressure to conform" to contrary viewpoints and lifestyles. *Id., at 211, 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*.

As our decision in *Yoder* reflects, the question whether a law "substantially interfer[es] with the religious development" of a child will always be fact-intensive. *Id., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. It will depend on the specific religious beliefs and practices asserted, as well as the specific nature of the educational requirement or curricular feature at issue. Educational requirements targeted toward very young children, for example, may be analyzed differently from educational requirements for high school students. A court must **[*41]** also consider the specific context in which the instruction or materials at issue are presented. Are they presented in a neutral manner, or are they presented in a manner that is "hostile" to religious viewpoints and designed to impose upon students a "pressure to conform"? *Id., at 211, 92 S. Ct. 1526, 32 L. Ed. 2d 15*.

We now turn to the application of these principles to this case.

2

In light of the record before us, we hold that the Board's introduction of the "LGBTQ+-inclusive" storybooks—combined with its decision to withhold notice to parents and to forbid opt outs—substantially interferes with the religious development of their children and imposes the kind of burden on religious exercise that *Yoder* found unacceptable.

To understand why, start with the storybooks themselves. Like many books targeted at young children, the books are unmistakably normative. They are clearly designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected.

Take, for example, the message sent by the books concerning same-sex marriage. Many Americans "advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned." *Obergefell v. Hodges, 576 U. S. 644, 679, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015)*. **[*42]** That group

includes each of the parents in this case. App. to Pet. for Cert. 530a, 537a, 543a, 625a. The storybooks, however, are designed to present the opposite viewpoint to young, impressionable children who are likely to accept without question any moral messages conveyed by their teachers' instruction.

For example, the book Prince & Knight clearly conveys the message that same-sex marriage should be accepted by all as a cause for celebration. The young reader is guided to feel distressed at the prince's failure to find a princess, and then to celebrate when the prince meets his male partner. See id., at 397a-401a, 419a-423a. The book relates that "on the two men's wedding day, the air filled with cheer and laughter, for the prince and his shining knight would live happily ever after." Id., at 424a. Those celebrating the same-sex wedding are not just family members and close friends, but the entire kingdom. For young children, to whom this and the other storybooks are targeted, such celebration is liable to be processed as having moral connotations. If this same-sex marriage makes everyone happy and leads to joyous celebration by all, doesn't that mean it is in every respect a good **[*43]** thing? High school students may understand that widespread approval of a practice does not necessarily mean that everyone should accept it, but very young children are most unlikely to appreciate that fine point.

Uncle Bobby's Wedding, the only book that the dissent is willing to discuss in any detail, conveys the same message more subtly. The atmosphere is jubilant after Uncle Bobby and his boyfriend announce their engagement. Id., at 286a ("*Everyone* was smiling and talking and crying and laughing" (emphasis added)). The book's main character, Chloe, does not share this excitement. "'I don't understand!'" she exclaims, "'Why is Uncle Bobby getting married?'" Id., at 288a. The book is coy about the precise reason for Chloe's question, but the question is used to tee up a direct message to young readers: "'Bobby and Jamie love each other,' said Mummy. 'When grown-up people love each other that much, sometimes they get married.'" Ibid. The book therefore presents a specific, if subtle, message about marriage. It asserts that two people can get married, regardless of whether they are of the same or the opposite sex, so long as they "'love each other.'" Ibid. That view is now accepted by **[*44]** a great many Americans, but it is directly contrary to the religious principles that the parents in this case wish to instill in their children.

It is significant that this book does not simply refer to same-sex marriage as an existing practice. Instead, it presents acceptance of same-sex marriage as a perspective that should be celebrated. The book's narrative arc reaches its peak with the actual event of Uncle Bobby's wedding, which is presented as a joyous event that is met with universal approval. See id., at 300a-305a. And again, there are many Americans who would view the event that way, and it goes without saying that they have every right to do so. But other Americans wish to present a different moral message to their children. And their ability to present that message is undermined when the exact opposite message is positively reinforced in the public school classroom at a very young age.

Next, consider the messages sent by the storybooks on the subject of sex and gender. Many Americans, like the parents in this case, believe that biological sex reflects divine creation, that sex and gender are inseparable, and that children should be encouraged to accept their sex and to live **[*45]** accordingly. Id., at 530a-531a, 538a-540a, 543a, 625a. But the challenged storybooks encourage children to adopt a contrary viewpoint. Intersection Allies presents a transgender child in a sex-ambiguous bathroom and proclaims that "[a] bathroom, like all rooms, should be a safe space." Id., at 323a. The book also includes a discussion guide that asserts that "at any point in our lives, we can choose to identify with one gender, multiple genders, or neither gender" and asks children "**What pronouns fit you best?**" Id., at 350a (boldface in original). The book and the accompanying discussion guidance present as a settled matter a hotly contested view of sex and gender that sharply conflicts with the religious beliefs that the parents wish to instill in their children.

The book Born Ready presents similar ideas in an even less veiled manner. The book follows the story of Penelope, an apparently biological female who asserts "'I AM a boy.'" Id., at 458a. Not only does the story convey the message that Penelope is a boy simply because that is what she chooses to be, but it slyly conveys a positive message about transgender medical procedures. Penelope says the following to her mother:

"'I love **[*46]** you, Mama, but I don't want to *be* you. I want to be Papa. I don't want tomorrow to come because tomorrow I'll look like you. Please help me, Mama. Help me to be a boy.'" Id., at 459a.

Penelope's mother then agrees that Penelope is a boy, and Penelope exclaims: "For the first time, my insides don't feel like fire. They feel like warm, golden love." Id.,

at 462a. To young children, the moral implication of the story is that it is seriously harmful to deny a gender transition and that transitioning is a highly positive experience. The book goes so far as to present a contrary view as something to be reprimanded. When the main character's brother says "'You can't *become* a boy. You have to be born one,'" his mother corrects him by saying: "'Not everything *needs* to make sense. *This is about love.*'" *Id.*, at 465a (emphasis in original). The upshot is that it is hurtful, perhaps even hateful, to hold the view that gender is inextricably bound with biological sex.

These books carry with them "a very real threat of undermining" the religious beliefs that the parents wish to instill in their children. *Yoder, 406 U. S., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. Like the compulsory high school education considered in *Yoder*, these books impose upon children [*47] a set of values and beliefs that are "hostile" to their parents' religious beliefs. *Id., at 211, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. And the books exert upon children a psychological "pressure to conform" to their specific viewpoints. *Ibid*. The books therefore present the same kind of "objective danger to the free exercise of religion" that we identified in *Yoder. Id., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*.

That "objective danger" is only exacerbated by the fact that the books will be presented to young children by authority figures in elementary school classrooms. As representatives of the Board have admitted, "there is an expectation that teachers use the LGBTQ-Inclusive Books as part of instruction," and "there will be discussion that ensues." App. to Pet. for Cert. 605a, 642a.

The Board has left little mystery as to what that discussion might look like. The Board provided teachers with suggested responses to student questions related to the books, and the responses make it clear that instruction related to the storybooks will "substantially interfer[e]" with the parents' ability to direct the "religious development" of their children. *Yoder, 406 U. S., at 218*. In response to a child who states that two men "can't get married," teachers are encouraged to respond "[t]wo men who love each other [*48] can decide they want to get married . . . . There are so many different kinds of families and ways to be a family." App. to Pet. for Cert. 628a-629a. If a child says "[h]e can't be a boy if he was born a girl," the teacher is urged to respond "that comment is hurtful." *Id.*, at 630a. If a child asks "What's transgender?", it is suggested that the teacher answer: "When we're born, people make a guess about our

gender . . . . Sometimes they're right and sometimes they're wrong." *Ibid*.

In other contexts, we have recognized the potentially coercive nature of classroom instruction of this kind. "The State exerts great authority and coercive power through" public schools "because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure." *Edwards v. Aguillard, 482 U. S. 578, 584, 107 S. Ct. 2573, 96 L. Ed. 2d 510 (1987)*; see also *Lee v. Weisman, 505 U. S. 577, 592, 112 S. Ct. 2649, 120 L. Ed. 2d 467 (1992)* ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools"). Young children, like those of petitioners, are often "impressionable" and "implicitly trus[t]" their teachers. App. to Pet. for Cert. 532a, 541a. [8] Here, the Board requires teachers to instruct young children using storybooks that explicitly contradict [*49] their parents' religious views, and it encourages the teachers to correct the children and accuse them of being "hurtful" when they express a degree of religious confusion. *Id.*, at 630a. Such instruction "carries with it precisely the kind of objective danger to the free exercise of religion that the *First Amendment* was designed to prevent." *Yoder, 406 U. S., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*.

3

None of the counterarguments raised by the dissent, the Board, the courts below, or the Board's *amici* give us any reason to doubt the existence of a burden here.

a

To start, we cannot accept the Board's characterization of the "LGBTQ+-inclusive" instruction as mere "exposure to objectionable ideas" or as lessons in "mutual respect." Brief for Respondents 27-28; Tr. of Oral Arg. 101, 169. As we have explained, the storybooks unmistakably convey a particular viewpoint

---

[8] The dissent tries to divert attention from the ages of the children subject to the instruction at issue here. It sees no difference between petitioners' young children and the high school students in *Kennedy v. Bremerton School Dist., 597 U. S. 507, 142 S. Ct. 2407, 213 L. Ed. 2d 755 (2022)*. See *post*, at 11 (opinion of Sotomayor, J.). And it criticizes our decision for taking the age of students into account. *Post*, at 19. It goes without saying, however, that the age of the children involved is highly relevant in any assessment of the likely effect of instruction on the subjects in question.

about same-sex marriage and gender. And the Board has specifically encouraged teachers to reinforce this viewpoint and to reprimand any children who disagree. That goes far beyond mere "exposure."

We similarly disagree with the dissent's deliberately blinkered view that these storybooks and related instruction merely "expos[e] students to the 'message' that LGBTQ people exist" and teach them [*50] to treat others with kindness. See *post*, at 1, 31 (opinion of SOTOMAYOR, J.). In making this argument, the dissent ignores what anyone who reads these books can readily see. It ignores the messages that the authors plainly intended to convey. And, what is perhaps most telling, it ignores the Board's stated reasons for inserting these books into the curriculum and much of the instructions it gave to teachers. See *supra*, at 3-4, 6-8. Only by air-brushing the record can the dissent claim that the books and instruction are just about exposure and kindness.

In any event, the Board and the dissent are mistaken when they rely extensively on the concept of "exposure." The question in cases of this kind is whether the educational requirement or curriculum at issue would "substantially interfer[e] with the religious development" of the child or pose "a very real threat of undermining" the religious beliefs and practices the parent wishes to instill in the child. *Yoder, 406 U. S., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. Whether or not a requirement or curriculum could be characterized as "exposure" is not the touchstone for determining whether that line is crossed.

b

We are also unpersuaded by the Board's reliance—echoed by the dissent—on our decisions [*51] in *Bowen v. Roy, 476 U. S. 693, 106 S. Ct. 2147, 90 L. Ed. 2d 735 (1986)*, and *Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U. S. 439, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988)*. See *post*, at 16-19 (opinion of Sotomayor, J.). In *Bowen*, a father mounted a free exercise challenge to the Government's use of a Social Security number associated with his daughter. *476 U. S., at 695-698, 106 S. Ct. 2147, 90 L. Ed. 2d 735*. And in *Lyng*, Native Americans and other plaintiffs raised a free exercise challenge to the construction of a paved road on federal land. *485 U. S., at 442-443, 108 S. Ct. 1319, 99 L. Ed. 2d 534*. In those cases, we held that "[t]he *Free Exercise Clause* simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens," *Bowen, 476 U. S.,*

*at 699, 106 S. Ct. 2147, 90 L. Ed. 2d 735*, even when the conduct of such internal affairs might result in "incidental interference with an individual's spiritual activities," *Lyng, 485 U. S., at 450, 108 S. Ct. 1319, 99 L. Ed. 2d 534*. And, we emphasized, that conclusion was appropriate because the government actions at issue did not "discriminate" against religion or "coerce individuals into acting contrary to their religious beliefs." *Id., at 450, 453, 108 S. Ct. 1319, 99 L. Ed. 2d 534*; see also *Bowen, 476 U. S., at 703, 106 S. Ct. 2147, 90 L. Ed. 2d 735* (plurality opinion).

These cases have no application here. The government's operation of the public schools is not a matter of "internal affairs" akin to the administration of Social Security or the selection of "filing cabinets." *Id., at 700, 106 S. Ct. 2147, 90 L. Ed. 2d 735* (majority opinion). It implicates direct, coercive interactions between the State [*52] and its young residents. The public school imposes rules and standards of conduct on its students and holds a limited power to discipline them for misconduct. See, *e.g.*, *Mahanoy Area School Dist. v. B. L., 594 U. S. 180, 187-188, 141 S. Ct. 2038, 210 L. Ed. 2d 403 (2021)*. If questions of public school curriculum were purely a matter of internal affairs, one could imagine that other *First Amendment* protections—such as the right to free speech or the right to be free from established religion—would also be inapplicable in the public school context. But our precedents plainly provide otherwise. See *Tinker, 393 U. S., at 506, 89 S. Ct. 733, 21 L. Ed. 2d 731*; *Weisman, 505 U. S., at 587, 112 S. Ct. 2649, 120 L. Ed. 2d 467*.

c

Next, we cannot agree with the decision of the lower courts to dismiss our holding in *Yoder* out of hand. Although the decision turned on a close analysis of the facts in the record, there is no reason to conclude that the decision is "*sui generis*" or uniquely "tailored to [its] specific evidence," as the courts below reasoned. See *688 F. Supp. 3d, at 301*; *102 F. 4th, at 211*. We have never confined *Yoder* to its facts. To the contrary, we have treated it like any other precedent. We have at times relied on it as a statement of general principles. See, *e.g.*, *Espinoza, 591 U. S., at 486, 140 S. Ct. 2246, 207 L. Ed. 2d 679*; *Employment Div., Dept. of Human Resources of Ore. v. Smith, 494 U. S. 872, 881, 110 S. Ct. 1595, 108 L. Ed. 2d 876, and n. 1 (1990)*. And we have distinguished it when appropriate. See, *e.g.*, *Lyng, 485 U. S., at 456-457, 108 S. Ct. 1319, 99 L. Ed. 2d 534*.

True, we noted in *Yoder* that the Amish had made a "convincing showing, one that probably few other religious groups or sects [*53] could make." *406 U. S., at 235-236, 92 S. Ct. 1526, 32 L. Ed. 2d 15*; see *post*, at 21 (SOTOMAYOR, J., dissenting). But that language must be read in the context of the specific claims raised by the Amish respondents. They did not challenge a discrete educational requirement or element of the curriculum, like the plaintiffs in *Barnette*. Instead, they asserted a right to withdraw their children from all conventional schooling after a certain age. Such a claim required them to show that the practice of formal education after the eighth grade would substantially and systemically interfere with the religious development of their children. It was on that point that they had made a "convincing showing" that others might struggle to make. But that says nothing at all about whether other parents could make the same convincing showing with respect to more specific educational requirements. *Yoder* is an important precedent of this Court, and it cannot be breezily dismissed as a special exception granted to one particular religious minority.

It instead embodies a principle of general applicability, and that principle provides more robust protection for religious liberty than the alarmingly narrow rule that the dissent propounds. The dissent sees the [*54] *Free Exercise Clause's* guarantee as nothing more than protection against compulsion or coercion to renounce or abandon one's religion. See *post*, at 10 (opinion of Sotomayor, J.) ("the Clause prohibits the government from compelling individuals, whether directly or indirectly, to give up or violate their religious beliefs"); *ibid*. (the "*Free Exercise Clause* forbids affirmatively compelling individuals to perform acts undeniably at odds with fundamental tenets of their religious beliefs" (internal quotation marks and alterations omitted)); *ibid*. (the "*Free Exercise Clause* prohibits laws that have a tendency to coerce individuals into acting contrary to their religious beliefs" (internal quotation marks omitted)). Under this test, even instruction that denigrates or ridicules students' religious beliefs would apparently be allowed. [9]

---

[9] In a footnote, the dissent retreats and suggests that denigration and ridicule could amount to prohibited "coercion." See *post*, at 12, n. 6 (opinion of SOTOMAYOR, J.). But this concession is either meaningless or undermines the dissent's entire argument. The primary definition of "coercion" is little different from compulsion. See Webster's Third New International Dictionary 439 (1971) ("use of physical or moral force to compel to act or assent"); Random House Webster's

We reject this chilling vision of the power of the state to strip away the critical right of parents to guide the religious development of their children. *Yoder* and *Barnette* embody a very different view of religious liberty, one that comports with the fundamental values of the American people.

d

We also disagree with the Fourth Circuit's view that the record before us is too "threadbare" to demonstrate [*55] a burden on religious exercise. *102 F. 4th, at 209*. That court faulted the parents for failing to make specific allegations describing how the books "are actually being used in classrooms." *Id., at 213*. But when a deprivation of *First Amendment* rights is at stake, a plaintiff need not wait for the damage to occur before filing suit. *Susan B. Anthony List v. Driehaus, 573 U. S. 149, 158, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014)* (citing *Steffel v. Thompson, 415 U. S. 452, 459, 94 S. Ct. 1209, 39 L. Ed. 2d 505 (1974)*). Instead, to pursue a pre-enforcement challenge, a plaintiff must show that "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *573 U. S., at 158, 134 S. Ct. 2334, 189 L. Ed. 2d 246* (internal quotation marks omitted). Here, the parents have undoubtedly made that showing. The Board does not dispute that it is introducing the storybooks into classrooms, that it is requiring teachers to use them as part of instruction, and that it has encouraged teachers to approach classroom discussions in a certain way. See, *e.g.*, Brief for Respondents 9-10. We do not need to "wait and see" how a particular book is used in a particular classroom on a particular day before evaluating the parents' *First Amendment* claims. We need only decide whether—if teachers act according to the clear and undisputed instructions of the Board—a burden on religious exercise will occur.

Besides, it is not clear how the Fourth Circuit expects [*56] the parents to obtain specific information about how a particular book was used or is planned for use at a particular time. The Board has stated that it will not notify parents when the books are being read. And it is not realistic to expect parents to rely on after-the-fact reports by their young children to determine whether the

---

Unabridged Dictionary 398 (2d ed. 2001) ("use of force or intimidation to obtain compliance"). If that is what the dissent means by "coercion," then it is unclear why ridicule or denigration would qualify as coercion under its test. By contrast, if the dissent defines "coercion" to require less, then it has failed to explain why our understanding of what the Clause protects is flawed.

parents' free exercise rights have been burdened. In circumstances like these, where the Board has clearly stated how it intends to proceed, the parents may base their _First Amendment_ claim on the Board's representations.

e

Finally, we reject the alternatives offered to parents by those who would defend the judgment below. The first of those proposed alternatives is the suggestion that any parents who are unhappy about the instruction in question can simply "place their children in private school or . . . educate them at home." Brief for Religious and Civil-Rights Organizations as _Amici Curiae_ 14; accord, Brief for National Education Association et al. as _Amici Curiae_ 15; Brief for American Civil Liberties Union et al. as _Amici Curiae_ 10; Tr. of Oral Arg. 61-62. The availability of this option is no answer to the parents' _First Amendment_ objections. As we have previously held, when the **[*57]** government chooses to provide public benefits, it may not "condition the availability of [those] benefits upon a recipient's willingness to surrender his religiously impelled status." _Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U. S. 449, 462, 137 S. Ct. 2012, 198 L. Ed. 2d 551 (2017)_ (internal quotations marks and alterations omitted). That is what the Board has done here. Public education is a public benefit, and the government cannot "condition" its "availability" on parents' willingness to accept a burden on their religious exercise. _Ibid._ Moreover, since education is compulsory in Maryland, see _Md. Educ. Code Ann. §7-301(a-1)(1)_, the parents are not being asked simply to forgo a public benefit. They have an obligation—enforceable by fine or imprisonment—to send their children to public school unless they find an adequate substitute. _§§7-301(a)(3), (e)_. [10] And many

---

[10] In light of this obligation, _Wisconsin v. Yoder, 406 U. S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972)_, cannot be distinguished, as the dissent claims, see _post_, at 14-15 (opinion of Sotomayor, J.), on the ground that it involved compulsory school attendance. Here, the parents are being "affirmatively compel[led]" to do the same thing as the parents in _Yoder_: submit their children to instruction that would "substantially interfer[e] with the[ir] religious development." _406 U. S., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15_. The dissent claims that the parents in _Yoder_, unlike petitioners, "were prohibited by the challenged law from engaging in religious teaching at home," _post_, at 15, n. 6, but that is plainly untrue. All that the Wisconsin law required was that the children attend school until they reached the age of 16. _Yoder, 406 U. S., at 207, 92 S. Ct. 1526, 32 L. Ed. 2d 15_. The State made no

parents cannot afford such a substitute.

The provision of education is an expensive endeavor. In Montgomery County, as in many other jurisdictions, public education is the most significant expenditure in the county budget by a wide margin. [11] In the 2025-2026 school year, the county expects to spend $3.6 billion on public schools, amounting to roughly $22,644 per student. See M. Elrich, County Executive, FY26 Recommended Operating Budget and FY26-FY31 **[*58]** Public Services Program, pp. 16 (message), 10-11 (Mar. 2025). To help finance that budget, Montgomery County will levy property taxes and income taxes on all residents, regardless of whether they send their children to a public school. _Id._, at 5-10 to 5-11. Private elementary schools in Montgomery County are expensive; many cost $10,000 or more per year prior to financial aid. [12] And homeschooling comes with a hefty price as well; it requires at least one parent to stay at home during the normal workday to educate children, thereby forgoing additional income opportunities. It is both insulting and legally unsound to tell parents that they must abstain from public education in order to raise their children in their religious faiths, when alternatives can be prohibitively expensive and they already contribute to financing the public schools.

Although the dissent does not follow suit in proposing that the objecting parents send their children to private school, it offers two other alternatives that are no better. First, it suggests that the parents in this case have no legitimate cause for concern because enforcement of the Board's policy would not prevent them from

---

effort to prevent religious training when students were not in school.

[11] In fiscal year 2026, the county expects to spend 47.3% of its budget on public schools. See Montgomery County MD, Operating Budget by the Numbers (2025), https://apps.montgomerycountymd.gov/BASISOPERATING /Common/Index.aspx. By comparison, the next greatest expenditure (public safety) is expected to account for just 10.6% of the budget. _Ibid._

[12] See, _e.g._, Melvin J. Berman Hebrew Academy, Tuition and Financial Aid, https://www.bermanhebrewacademy.org/admissions/financial-aid; St. Bartholomew Catholic School, Tuition, https://www.school. stbartholomew.org/tuition-and-support; St. Bernadette Catholic School, 2025-2026 Tuition, https://saintbernadetteschool.org/tuition; Alim Academy, Tuition 2025-2026, https://alimacademy.org/tuition-2025-2026/.

"teach[ing] **[\*59]** their religious beliefs and practices to their children at home." *Post*, at 15, n. 6 (opinion of SOTOMAYOR, J.). This suggestion complements the dissent's narrow view of the right of parents to raise their children in accordance with their faith. According to the dissent, parents who send their children to public school must endure any instruction that falls short of direct compulsion or coercion and must try to counteract that teaching at home. The *Free Exercise Clause* is not so feeble. The parents in *Barnette* and *Yoder* were similarly capable of teaching their religious values "at home," but that made no difference to the *First Amendment* analysis in those cases.

Mustering one last alternative, the dissent asserts that, under its approach, the parents would "remain free to raise objections to specific material through the" democratic process. *Post*, at 28. In making this argument, the dissent seems to confuse our country with those in which laws enacted by a parliament or another legislative body cannot be challenged in court. In this country, that is not so. Here, the *Bill of Rights* and the doctrine of judicial review protect individuals who cannot obtain legislative change. The *First Amendment* protects the parents' religious liberty, and they had **[\*60]** every right to file suit to protect that right. [13]

B

For these reasons, we conclude that the Board's introduction of the "LGBTQ+-inclusive" storybooks, combined with its no-opt-out policy, burdens the parents' right to the free exercise of religion. We now turn to the question whether that burden is constitutionally permitted.

1

Under our precedents, the government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable. *Smith, 494 U. S., at 878-879, 110 S. Ct. 1595, 108 L. Ed. 2d 876*. Thus, in most circumstances, two questions remain after a burden on religious exercise is found. First, a court must ask if the burdensome policy is neutral and generally applicable. Second, if the first question can be answered in the negative, a court will proceed to ask whether the policy

can survive strict scrutiny. Under that standard, the government must demonstrate that "its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy, 597 U. S., at 525, 142 S. Ct. 2407, 213 L. Ed. 2d 755*.

Here, the character of the burden requires us to proceed differently. When the burden imposed is of the same character as that imposed in *Yoder*, we need not ask whether the law at issue is **[\*61]** neutral or generally applicable before proceeding to strict scrutiny. That much is clear from our decisions in *Yoder* and *Smith*.

In *Yoder*, the Court rejected the contention that the case could be "disposed of on the grounds that Wisconsin's requirement . . . applies uniformly to all citizens of the State and does not, on its face, discriminate against religions or a particular religion." *406 U. S., at 220, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. Instead, the Court bypassed those issues and proceeded to subject the law to close judicial scrutiny, asking whether the State's interest "in its system of compulsory education [was] so compelling that even the established religious practices of the Amish must give way." *Id., at 221, 92 S. Ct. 1526, 32 L. Ed. 2d 15*.

Then, in *Smith*, we recognized *Yoder* as an exception to the general rule that governments may burden religious exercise pursuant to neutral and generally applicable laws. Specifically, we described *Yoder* as a case "in which we have held that the *First Amendment* bars application of a neutral, generally applicable law to religiously motivated action." *Smith, 494 U. S., at 881, 110 S. Ct. 1595, 108 L. Ed. 2d 876*. And we explained that the general rule did not apply in *Yoder* because of the special character of the burden in that case. *494 U. S., at 881, 110 S. Ct. 1595, 108 L. Ed. 2d 876*. Thus, when a law imposes a burden of the same character as that in *Yoder* **[\*62]**, strict scrutiny is appropriate regardless of whether the law is neutral or generally applicable. [14]

---

[13] In any event, the dissent's argument ignores the extensive efforts already made by parents in Montgomery County. Indeed, hundreds of parents beseeched the Board to allow opt outs, but those pleas fell largely on deaf ears. *Supra*, at 8-10.

---

[14] In *Smith*, the Court speculated that the general rule was not applied in *Yoder* because it "involved not the *Free Exercise Clause* alone, but the *Free Exercise Clause* in conjunction with other constitutional protections." *494 U. S., at 881, 110 S. Ct. 1595, 108 L. Ed. 2d 876*. We need not consider whether the case before us qualifies as such a "hybrid rights" case. Contra, *post*, at 35 (Sotomayor, J., dissenting). Rather, it is sufficient to note that the burden imposed here is of the exact same character as that in *Yoder*. That is enough to conclude that here, as in *Yoder*, strict scrutiny is appropriate regardless of whether the policy is neutral and generally applicable.

As we have explained, the burden in this case is of the exact same character as the burden in *Yoder*. The Board's policies, like the compulsory-attendance requirement in *Yoder*, "substantially interfer[e] with the religious development" of the parents' children. *406 U. S., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. And those policies pose "a very real threat of undermining" the religious beliefs and practices that the parents wish to instill in their children. *Ibid.* We therefore proceed to consider whether the policies can survive strict scrutiny.

2

To survive strict scrutiny, a government must demonstrate that its policy "advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton v. Philadelphia, 593 U. S. 522, 541, 141 S. Ct. 1868, 210 L. Ed. 2d 137 (2021)* (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U. S. 520, 546, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993)*). In its filings before us, the Board asserts that its curriculum and no-opt-out policy serve its compelling interest in "maintaining a school environment that is safe and conducive to learning for all students." Brief for Respondents 49 (internal quotation marks omitted). It relies on the statements of an MCPS official who testified that permitting opt outs would result in "significant disruptions **[*63]** to the classroom environment" and would expose certain students to "social stigma and isolation." App. to Pet. for Cert. 607a-608a.

We do not doubt that, as a general matter, schools have a "compelling interest in having an undisrupted school session conducive to the students' learning." *Grayned v. City of Rockford, 408 U. S. 104, 119, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972)*. But the Board's conduct undermines its assertion that its no-opt-out policy is necessary to serve that interest. As we have noted, the Board continues to permit opt outs in a variety of other circumstances, including for "noncurricular" activities and the "Family Life and Human Sexuality" unit of instruction, for which opt outs are required under Maryland law. App. to Pet. for Cert. 672a; Brief for Respondents 10-11 (citing Code of Md. Regs., tit. 13a, §04.18.01(D)(2)). And the Board goes to great lengths to provide independent, parallel programming for many

---

We acknowledge the many arguments pressed by the parents that the Board's policies are not neutral and generally applicable. See Brief for Petitioners 35-44. But we need not consider those arguments further given that strict scrutiny is appropriate under *Yoder*.

other students, such as those who qualify as emergent multilingual learners (EMLs) or who qualify for an individualized educational program. [15]

This robust "system of exceptions" undermines the Board's contention that the provision of opt outs to religious parents would be infeasible or unworkable. *Fulton, 593 U. S., at 542, 141 S. Ct. 1868, 210 L. Ed. 2d 137*.

The Board's attempt to distinguish the other programs for which it provides opt **[*64]** outs is unconvincing. The Board asserts that the "Family Life and Human Sexuality" unit of instruction is meaningfully different because it is "discrete" and "predictably timed," and therefore schools can accommodate opt outs without producing the same "absenteeism and administrability concerns." Brief for Respondents 46. But this assertion only tends to show that the Board's concerns about "administrability" are a product of its own design. If the Board can structure the "Family Life and Human Sexuality" curriculum to more easily accommodate opt outs, it could structure instruction concerning the "LGBTQ+-inclusive" storybooks similarly. The Board cannot escape its obligation to honor parents' free exercise rights by deliberately designing its curriculum to make parental opt outs more cumbersome.

The Board also suggests that permitting opt outs from the "LGBTQ+-inclusive" storybooks would be especially unworkable because, when it permitted such opt outs in the past, they resulted in "unsustainably high numbers of absent students." *Id.*, at 12. But again, the Board's concern is self-inflicted. The Board is doubtless aware of the presence in Montgomery County of substantial religious communities **[*65]** whose members hold

---

[15] As of September 30, 2023, 24.6% of Montgomery County elementary school students qualified as EMLs. See MCPS, School Profiles, MCPS Elementary Summary Dashboard, at Slide 1, https://www. montgomeryschoolsmd.org/school-profiles/. Many MCPS schools provide EML students with independent parallel programming pursuant to a "[p]ullout" model, "in which . . . teachers work with EML students outside of regular content classrooms." M. McKnight, MCPS Superintendent, English Language Development Program Evaluation Report, pt. 2, pp. 2-4 to 2-5 (Dec. 15, 2022) (prepared by Center for Applied Linguistics). In the 2022-2023 school year, "approximately one out of every eight students" in MCPS schools received "special education services" pursuant to an "'Individualized Educational Program.'" Brief for 66 Members of Congress as *Amici Curiae* 18-19 (internal quotation marks omitted).

traditional views on marriage, sex, and gender. When it comes to instruction that would burden the religious exercise of parents, the Board cannot escape its obligations under the *Free Exercise Clause* by crafting a curriculum that is so burdensome that a substantial number of parents elect to opt out. There is no *de maximis* exception to the *Free Exercise Clause*.

Nor can the Board's policies be justified by its asserted interest in protecting students from "social stigma and isolation." App. to Pet. for Cert. 608a. In Maryland, the "Family Life and Human Sexuality" unit of instruction includes discussions about sexuality and gender. See Maryland State Dept. of Ed., Maryland Comprehensive Health Education Framework 33 (June 2021). Yet the Board has not suggested that the legally-required provision of opt outs from that curriculum has resulted in stigma or isolation. Even if it did, the Board cannot purport to rescue one group of students from stigma and isolation by stigmatizing and isolating another. A classroom environment that is welcoming to all students is something to be commended, but such an environment cannot be achieved through hostility toward the religious beliefs of students and their parents. **[\*66]**

We acknowledge that "courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education." *Yoder, 406 U. S., at 235, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. It must be emphasized that what the parents seek here is not the right to micromanage the public school curriculum, but rather to have their children opt out of a particular educational requirement that burdens their well-established right "to direct 'the religious upbringing' of their children." *Espinoza, 591 U. S., at 486, 140 S. Ct. 2246, 207 L. Ed. 2d 679* (quoting *Yoder, 406 U. S., at 213-214, 92 S. Ct. 1526, 32 L. Ed. 2d 15*). We express no view on the educational value of the Board's proposed curriculum, other than to state that it places an unconstitutional burden on the parents' religious exercise if it is imposed with no opportunity for opt outs. Providing such an opportunity would give the parents no substantive control over the curriculum itself.

Several States across the country permit broad opt outs from discrete aspects of the public school curriculum without widespread consequences. See, *e.g.*, *22 Pa. Code §4.4(d)(3)* (2025); *Minn. Stat. §120B.20* (2024); *Ariz. Rev. Stat. Ann. §§15-102(A)(4), (8)(c)* (2024). And prior to the introduction of the "LGBTQ+-inclusive" storybooks, the Board's own "Guidelines for Respecting Religious Diversity" gave parents a broad right to have their children excused **[\*67]** from specific aspects of the school curriculum. These facts belie any suggestion that the provision of parental opt outs in circumstances like these "will impose impossible administrative burdens on schools." *Post*, at 24 (Sᴏᴛᴏᴍᴀʏᴏʀ, J., dissenting).

IV

The Board's introduction of the "LGBTQ+-inclusive" storybooks, along with its decision to withhold opt outs, places an unconstitutional burden on the parents' rights to the free exercise of their religion. The parents have therefore shown that they are likely to succeed in their free exercise claims. They have likewise shown entitlement to a preliminary injunction pending the completion of this lawsuit. In the absence of an injunction, the parents will continue to be put to a choice: either risk their child's exposure to burdensome instruction, or pay substantial sums for alternative educational services. As we have explained, that choice unconstitutionally burdens the parents' religious exercise, and "'[t]he loss of *First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Roman Catholic Diocese of Brooklyn v. Cuomo, 592 U. S. 14, 19, 141 S. Ct. 63, 208 L. Ed. 2d 206 (2020)* (*per curiam*) (quoting *Elrod v. Burns, 427 U. S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)* (plurality opinion)). Furthermore, in light of the strong showing made by the parents here, and the lack **[\*68]** of a compelling interest supporting the Board's policies, an injunction is both equitable and in the public interest. The petitioners should receive preliminary relief while this lawsuit proceeds. See *Winter, 555 U. S., at 20, 129 S. Ct. 365, 172 L. Ed. 2d 249*. Specifically, until all appellate review in this case is completed, the Board should be ordered to notify them in advance whenever one of the books in question or any other similar book is to be used in any way and to allow them to have their children excused from that instruction.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

APPENDIX



App. to Pet. for Cert. 286a



App. to Pet. for Cert. 287a



App. to Pet. for Cert. 288a



App. to Pet. for Cert. 350a



App. to Pet. for Cert. 323a



App. to Pet. for Cert. 424a

2025 U.S. LEXIS 2500, *68



App. to Pet. for Cert. 459a



App. to Pet. for Cert. 462a



App. to Pet. for Cert. 461a



App. to Pet. for Cert. 465a

**Concur by:** THOMAS

## Concur

Justice Thomas, concurring.

The Board of Education of Montgomery County (Board) adopted a series of controversial "LGBTQ+-inclusive" storybooks for use in its prekindergarten through fifth-grade English Language Arts (ELA) curriculum. Hundreds of parents raised religious objections and **[*69]** sought to use the Board's then-existing opt-out policy to exclude their children from lessons involving these books. The Board responded by removing the opt-out option, and even refused to provide parents with notice of when schools would use the materials. Parents sued, arguing that the Board's new no-opt-out policy violates their *First Amendment* rights. The Court correctly holds that the policy contravenes the parents' free exercise right to direct the religious upbringing of their children, see *ante,* at 17, and I join its opinion in full. I write separately to highlight additional reasons why the Board's policy cannot survive constitutional scrutiny, as well as to emphasize an important implication of this decision for schools across the country.

I

As the Court today holds, the Board's policy is incompatible with this Court's decision in *Wisconsin v. Yoder, 406 U. S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972)*. *Ante,* at 17-27. *Yoder* addressed whether a Wisconsin law requiring children to attend school past the eighth grade violated the free exercise rights of Amish parents who objected on the ground that the law interfered with their ability to direct their children's religious upbringing. *406 U. S., at 207-209, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. In holding that the law violated the parents' *First Amendment* rights, the Court made clear that only "interests of the highest order" that are "not otherwise served can overbalance legitimate claims to the free exercise of religion." *Id., at 215, 92 S. Ct. 1526, 32 L. Ed. 2d 15*.

The Court understood history and tradition to inform the inquiry whether Wisconsin had established "interests of the highest order," and it explicitly examined the historical pedigree of the State's alleged interest in education past the eighth grade. The Court explained that **[*70]** one key reason why Wisconsin's interests could not justify its law as applied to the Amish was that "compulsory education beyond the eighth grade [was] a relatively recent development" that emerged "[l]ess than 60 years ago," yet the Amish had a track record of "successful social functioning . . . approaching almost three centuries." *Id., at 226-227, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. In a similar vein, the Court observed that the Amish were not "a group claiming to have recently

discovered some 'progressive' or more enlightened process for rearing children," but instead had a centuries-long history "as an identifiable religious sect and a long history as a successful and self-sufficient segment of American society." *Id., at 235, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. Thus, for the Amish, education past the eighth grade was demonstrably inessential to "meeting the duties of citizenship." *Id., at 227, 92 S. Ct. 1526, 32 L. Ed. 2d 15*.

That analysis is instructive here. As with compulsory education past the eighth grade at the time the Court decided *Yoder*, sex education is also a "relatively recent development"—and the practice of teaching sexuality- and gender-related lessons to young children even more so. And, as in *Yoder*, there is little to suggest that these lessons are critical to the students' civic development.

What is **[*71]** now labeled "sex education" is a 20th-century innovation. Early in the Nation's history, "schooling seldom extended beyond the elementary subjects." M. Katz, A History of Compulsory Education Laws 14 (1976). It was not until the 1970s that public schools began implementing what we might today recognize as sex education, with lessons focused on cautioning students about how to avoid "unintended pregnancy and sexually transmitted diseases." K. Rufo, Note, Public Policy vs. Parent Policy: States Battle Over Whether Public Schools Can Provide Condoms to Minors Without Parental Consent, *13 N.Y.L. Sch. J. Hum. Rts. 589, 591-592*, and n. 15 (1997). Sex education has shifted in recent decades toward the even more controversial "[c]omprehensive [a]pproach," though the curriculum generally still "begin[s] with 'basic facts'" and emphasizes "contraceptive use" to avoid pregnancy and disease. *Id., at 592-593*; see Brief for Petitioners 32.

The practice of teaching sexuality and gender identity to very young children at school appears to be significantly more recent than typical sex education. Although the plaintiffs placed the storybook curriculum's recency and lack of historical pedigree in issue, see *id.*, at 47, the Board failed to identify any tradition **[*72]** of teaching sexuality and gender identity to young children—much less a tradition of preventing parents from opting their children out of such instruction. The Board's "LGBTQ+-inclusive" storybook curriculum appears to be as novel as the storybooks themselves, all of which were

published within the last decade. [1] See App. to Pet. for Cert. 603a (storybook curriculum was adopted because "[i]n recent years" ELA curriculum had not been sufficiently representative of Montgomery County community).

The storybook curriculum is also different in kind from traditional sex education. See Brief for Respondents 1-2 ("[T]he storybooks are not sex-education materials"). Instead of incorporating materials focused on health and reproduction, for example, the Board chose the storybooks based on factors such as whether they "reinforced or disrupted" "heteronormativity," "cisnormativity," and "power hierarchies that uphold the dominant culture." App. to Pet. for Cert. 622a; see also *ante,* at 3-4. The Board further provided teachers with guidance about how to conduct "LGBTQ+-inclusive" instruction, which, among other things, suggested that teachers should "[d]isrupt" their students' "either/or thinking" **[\*73]** about sexuality and gender. App. to Pet. for Cert. 629a, 633a. In the Board's view, these instructional directives helped advance its objective of "educational equity"—that is, viewing each student's "[g]ender identity and expression," "[s]exual orientation," and other specified "individual characteristics as valuable." Code of Md. Regs., tit. 13a, §§01.06.01(B, 01.06.03(B) (2025). [2]

*Yoder*'s historical analysis applies with full force in this case. Until very recently, young children have gone without sexual- and gender-identity education in school.

Nothing suggests that the countless generations who did not receive such education failed to "mee[t] the duties of citizenship," *406 U. S., at 227, 92 S. Ct. 1526, 32 L. Ed. 2d 15*—or that, if they did, their failure was due to a lack of exposure to sexual- and gender-identity instruction during early adolescence. Further, as in *Yoder*, the parents seeking to protect their children's religious upbringings do not belong to a group pushing some "recently discovered . . . 'progressive' or more enlightened process for rearing children for modern life." *Id., at 235, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. They are devout Christians and Muslims. See *ante,* at 11-13. Given the novelty of its "LGBTQ+-inclusive" curriculum and no-opt-out policy, if any party is pressing a progressive child-rearing process in this litigation, clearly it is the Board. Such an unprecedented curriculum cannot "overbalance" the parents' "legitimate claims to the free exercise of religion." *406 U. S., at 215, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. [3]

II

Perhaps recognizing that its ban on parental opt-outs lacks historical support, the Board seeks to defend its policy by claiming that it promotes "equity" and "inclusi[on]" and diminishes classroom disruption. Decl. of N. Hazel in *Mahmoud* v. *McKnight*, No. 8:23-cv-01380 (D Md.), ECF Doc. 42-1, pp. 2, 6; Brief for Respondents 49. But, these assertions do not amount to "interests of the highest order" sufficient to justify the policy's interference with parents' *First Amendment* rights. *Yoder, 406 U. S., at 215, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. And, much of the alleged potential for classroom disruption stems from choices that the Board itself made.

A

The record in this case suggests that the Board's "LGBTQ+-inclusive" **[\*74]** curriculum and no-opt-out policy rest on the sort of conformity-driven rationales

---

[1] See S. Brannen, Uncle Bobby's Wedding (2020); C. Johnson, L. Council, & C. Choi, Intersection Allies (2019); D. Haack, Prince & Knight (2020); C. Wild, Love, Violet (2021); J. Patterson, Born Ready (2021).

[2] The majority discusses five books currently incorporated in the Board's "LGBTQ+-inclusive" curriculum. *Ante,* at 4-6. The Board had also approved another book, Pride Puppy, but, after more than a year of using the book in classroom instruction, the Board removed it due to content concerns during the course of this litigation. See N. Asbury, Montgomery Schools Stopped Using Two LGBTQ-Inclusive Books Amid Legal Battle, Washington Post, Oct. 23, 2024, https://www.washingtonpost.com/education/2024/10/23/montgomery-schools-opt-out-storybooks/; see also *ante,* at 4, n. 6. Pride Puppy tells the story of a young child "celebrating Pride Day" and losing his dog in the parade. See App. to Pet. for Cert. 234a. The book, which the Board intended for teachers to read to 3- and 4-year-olds, see *ibid.,* invites readers to search for items depicted in the book's illustrations, including "underwear," a "[drag] king," and a "[drag] queen," *id.,* at 270a.

[3] According to Justice Sotomayor, the recency inquiry outlined in *Yoder* could inhibit schools' ability to teach "computer literacy, robotics, and film studies," and thus "fails to appreciate the constantly evolving nature of education." *Post,* at 37, n. 17 (dissenting opinion). But, Justice Sotomayor fails to appreciate the enduring nature of religion—and the Constitution's respect for it. As the Court explained in *Yoder,* a compelled curriculum focused on "contemporary worldly society"—no matter how practically useful—may still impermissibly "contraven[e] . . . basic religious tenets and practice . . .," both as to the parent and the child." *406 U. S., at 211, 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*.

that this Court rejected in *Pierce v. Society of Sisters, 268 U. S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925)*.

In *Yoder*, the Court observed that if a State were "empowered, as *parens patriae*, to 'save' a child" from the supposed "ignorance" of his religious upbringing, then "the State will in large measure influence, if not determine, the religious future of the child." *406 U. S., at 222, 232, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. Such an arrangement would upend the "enduring American tradition" of parents occupying the "primary role . . . in the upbringing of their children"—a role that includes the "inculcation of . . . religious beliefs." *Id., at 232-233, 92 S. Ct. 1526, 32 L. Ed. 2d 15*.

In reaching this conclusion, the Court relied heavily on its earlier decision in *Pierce*, which articulated "perhaps the most significant statements of the Court in this area." *Yoder, 406 U. S., at 232, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. The Court held in *Pierce* that Oregon's Compulsory Education Act, 1922 Ore. Laws p. 9, §1, as amending §5259, which mandated public schooling for children between 8 and 16 years old and thus forbade them from attending religious schools, "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Pierce, 268 U. S., at 530, 534-535, 45 S. Ct. 571, 69 L. Ed. 1070*. "The fundamental theory of liberty upon which all governments in this Union repose," the Court explained, "excludes **[*75]** any general power of the State to standardize its children by forcing them to accept instruction from public teachers only." *Id., at 535, 45 S. Ct. 571, 69 L. Ed. 1070*. The Court rejected the premise that the child was merely a "creature of the State"; rather, "those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Ibid.*

While the Court did not decide *Pierce* on free exercise grounds, [4] the context in which *Pierce* arose confirms that it "stands as a charter of the rights of parents to direct the religious upbringing of their children." *Yoder, 406 U. S., at 233*. The case came to the Court during "a time of broad and relentless hostility to the European immigrants whose labor the nation needed but whose religions were seen as alien and un-American." S.

Carter, Parents, Religion and Schools: Reflections on *Pierce*, 70 Years Later, *27 Seton Hall L. Rev. 1194, 1196 (1997)* (Carter). "Roman Catholicism and, to a lesser extent, Judaism, were widely viewed as threats to America, which was self-consciously a Protestant country." *Id., at 1197*. Public schooling was perceived as a solution that could "Protestantize the immigrant children" and thus diminish the threats these foreign beliefs posed. *Id., at 1199*; see also *Espinoza v. Montana Dept. of Revenue, 591 U.S. 464, 499-504, 140 S. Ct. 2246, 207 L. Ed. 2d 679 (2020)* (Alito, J., concurring) **[*76]** (describing popular anti-Catholic sentiment and attempts to "'Americanize' the incoming Catholic immigrants"). Unsurprisingly, parents who adhered to the disfavored faiths sought alternative educational options. "[B]y the end of the nineteenth century, there were Catholic schools everywhere there were Catholics." Carter 1200.

The arguments that Oregon pressed in defense of its compulsory-education law make clear that the State sought ideological conformity among its citizens, and viewed immigrants and their religious schools as standing in the way. It would be "both unjust and unreasonable," Oregon argued, "to prevent [the States] from taking the steps which each may deem necessary and proper for Americanizing its new immigrants and developing them into patriotic and law-abiding citizens." *Pierce, 268 U. S., at 526, 45 S. Ct. 571, 69 L. Ed. 1070* (arguments of counsel). Absent such power, there would be no way to "prevent the entire education of a considerable portion of [a State's] future citizens being controlled and conducted by bolshevists, syndicalists and communists." *Ibid.* The State even asserted an interest in "a greater equality" to justify its attempt at state-enforced uniformity. *Id., at 527, 45 S. Ct. 571, 69 L. Ed. 1070*. Though these sentiments were "comfortably consonant with the smart-set views of the day," R. Garnett, Taking *Pierce* Seriously: The Family, Religious Education, and Harm to Children, *76 Notre Dame L. Rev. 109, 124 (2000)* (Garnett), [5] the Court

---

[4] The Court decided *Pierce* 15 years before it recognized that the *First Amendment's* free-exercise guarantee applies against the States. See *Cantwell v. Connecticut, 310 U. S. 296, 303, 60 S. Ct. 900, 84 L. Ed. 1213 (1940)*.

---

[5] The anti-Catholic views animating Oregon's law were both popular and prestigious. Harper's Weekly warned that "every good citizen should strenuously oppose" Catholics' plans for "extension of the Roman sect." The "Parochial" Schools, Harpers Weekly, Apr. 10, 1875, p. 294; see also *Espinoza v. Mont. Dept. of Revenue, 591 U. S. 464, 500, 140 S. Ct. 2246, 207 L. Ed. 2d 679 (2020)* (ALITO, J., concurring) (picturing 1871 Harper's Weekly cartoon "depict[ing] Catholic [bishops] as crocodiles slithering hungrily toward American children"). "Books full of anti-Catholic sentiment, and stern nativist

rejected them as antithetical to our Nation's "fundamental theory of liberty," *268 U. S., at 535, 45 S. Ct. 571, 69 L. Ed. 1070*.

The Board's "LGBTQ+-inclusive" curriculum and no-opt-out policy pursue the kind of ideological conformity that *Pierce* and *Yoder* prohibit. To be sure, the Board frames its policy in more veiled terms. It has maintained throughout this litigation that the storybooks serve broad interests in "promot[ing] equity, respect, and civility among [its] diverse community"; **[\*77]** "normaliz[ing] a fully inclusive environment"; "encourag[ing] respect for all"; and creating a "safe educational environment." Defendants' Memorandum of Law in Opposition, ECF Doc. 42, p. 32; ECF Doc. 42-1, at 2, 6 (internal quotation marks omitted). It further determined that allowing opt-outs might "expos[e]" students "who believe that the books represent them or their families" to "social stigma and isolation." App. to Pet. for Cert. 607a-608a; see also *ante,* at 10. As the acting principal of one Montgomery County public school euphemistically explained, "being accepting is the goal." App. to Pet. for Cert. 498a.

But, the Board's response to parents' unsuccessful attempts to opt their children out of the storybook curriculum conveys that parents' religious views are not welcome in the "fully inclusive environment" that the Board purports to foster. ECF Doc. 42-1, at 6. As the majority recounts, the Board ignored that "'thousands' of parents felt 'deeply dismayed and betrayed' by the rescission of opt outs from 'content that conflict[s] with their sincerely held religious beliefs.'" *Ante,* at 10. After parents attempted to opt their children out of the Board's new curriculum on religious grounds, at least one Board member suggested that students were "' 'parroting' '" their parents' "' "dogma" '" *Ibid*. The Board member further analogized the parents to "' 'white supremacists' '" and "' 'xenophobes.' '" *Ante,* at 11. And, a different Board member suggested that any objection to the "LGBTQ+-inclusive" curriculum stemmed from "'ignorance and hate.'" *Ante,* at 9. In the Board's view,

_____

warnings, were best-sellers at the time. Carter 1197. Ellwood Cubberley of Stanford University—the "preeminent education scholar" of the era—"identified the assimilation of immigrants as the dominant schooling challenge of the time." J. Driver, The Schoolhouse Gate: Public Education, the Supreme Court, and the Battle for the American Mind 44 (2018). And, John Dewey, one of the 20th century's most prominent educational reformers, "insisted that parents should not be permitted to 'inoculate' their children with the outdated and useless religious beliefs that they 'happen[ed] to have found serviceable to themselves.'" Garnett 124, n. 69.

for parents **[\*78]** to suggest that the storybooks were inappropriate would be "a dehumanizing form of erasure." App. to Pet. for Cert. 514a. At a minimum, these statements suggest that "being accepting" has limits—and that parents' sincerely held religious beliefs fall beyond them. *Id.*, at 498a.

The curriculum itself also betrays an attempt to impose ideological conformity with specific views on sexuality and gender. The storybooks are, "[l]ike many books targeted at young children, . . . unmistakably normative." *Ante,* at 22. They present views that run contrary to traditional religious teachings as "correct and worthy of acclaim," asserting, for example, that "sex is irrelevant to whether two people can get married," that students should question their genders, and that gender transitions are unequivocally positive. See *ante,* at 22-25. Beyond the materials themselves, the Board instructed teachers to reprimand certain traditional religious views about sex and gender as "'hurtful,'" and to respond to students' questions with answers that, among other things, endorse same-sex marriage and transgender ideology. See *ante,* at 25-26.

The Board's exclusion of traditional religious views, coupled with a curriculum that "pressure[s students] to conform," *Yoder, 406 U. S., at 211, 92 S. Ct. 1526, 32 L. Ed. 2d 15*, constitute an impermissible attempt to "standardize" the views of students, *Pierce, 268 U. S., at 535, 45 S. Ct. 571, 69 L. Ed. 1070*. Just as Oregon claimed that it would use its education system to promote "equality" and generate "patriotic and law-abiding citizens," *id., at 526-527, 45 S. Ct. 571, 69 L. Ed. 1070* (arguments of counsel), the Board purports to use the same means to promote "'equity'" and create "civi[l]" students. ECF Doc. 42, at 8, 9. But, in both instances, the government's vision is irreconcilable with "the rights of parents to direct the religious upbringing of their children," *Yoder, 406 U. S., at 233, 92 S. Ct. 1526, 32 L. Ed. 2d 15*, even if it aligns with "the smart-set views of the **[\*79]** day," Garnett 124; see, *e.g.*, H. Alvaré, Families, Schools, and Religious Freedom, *54 Loy. U. Chi. L.J. 579, 631-632 (2022)* (observing that "the most visible corporations and websites . . . celebrate beliefs and conduct about the family that directly contradict Christian norms").

At bottom, the parents in this case are "member[s] of the community too." *Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U. S. 449, 463, 137 S. Ct. 2012, 198 L. Ed. 2d 551 (2017)*. Their objections to the Board's curriculum follow "decent and honorable religious . . . premises." *Obergefell v. Hodges, 576 U. S. 644, 672,*

*135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015)*. Far from promoting "inclusi[on]" and "respect for all," ECF Doc. 42-1, at 6, the Board's no-opt-out policy imposes conformity with a view that undermines parents' religious beliefs, and thus interferes with the parents' right to "direct the religious upbringing of their children," *Yoder, 406 U. S., at 232-233, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. [6]

B

The Board's alleged interest in efficient administration does not help it, either. In the Board's view, if it can show that it "'could not accommodate the growing number of opt out requests without causing significant disruptions to the classroom and undermining [its] educational mission,'" then it can vindicate its policy. Brief for Respondents 49. But, as the majority notes, the significant disruptions that the Board complains about are "a product of its own design." *Ante,* at 39. If the Court were to accept the Board's argument, we would effectively give schools a playbook for evading the *First Amendment.*

Teaching young children about [*80] sexual and gender identity in ways that contradict parents' religious teachings undermines those parents' right to "direct the religious upbringing of their children," *Yoder, 406 U. S., at 233, 92 S. Ct. 1526, 32 L. Ed. 2d 15*, [7] and the Board

_____

[6] JUSTICE SOTOMAYOR responds that, "[i]f there is any conformity that the Board seeks to instill, it is universal acceptance of kindness and civility." *Post,* at 33, n. 15. I recognize that the Board *purports* to instill such a principle. See *supra,* at 8-9. But, as discussed above, in this case Board members' treatment of parents has been neither "kin[d]" nor "civi[l]" nor "universal[ly] accept[ing]." *Post,* at 33, n. 15 (opinion of SOTOMAYOR, J.). The Board's decision to disregard—or, in some cases, to denigrate—parents' sincerely held religious beliefs is anathema to its declared objectives.

[7] Not only are "sexual orientation and gender identity" "sensitive political topics," *Janus v. State, County, and Municipal Employees, 585 U.S. 878, 913-914, 138 S. Ct. 2448, 201 L. Ed. 2d 924 (2018)*, but education about these subjects is uniquely likely to "interfer[e]" with children's "religious development," *Yoder, 406 U. S., at 218*. These subjects relate to "the very architecture" of many faiths. H. Alvaré, Families, Schools, and Religious Freedom, *54 Loy. U. Chi. L.J. 579, 629 (2022)*. Thus, when schools "offe[r] normative answers to moral questions" about these "familial matters," their moral statements inevitably address "religious matter[s]," leaving the instruction "inseparable from what *Pierce* and *Yoder* firmly agreed belongs to parents'

may undermine that right only if it has no other way to advance a compelling interest. Here, not only do the Board's interests in its curriculum and policy fall below the "highest order" of importance, see *supra,* at 4-5, 8-11, but these alleged logistical challenges are attributable to the Board's deliberate decision to "weave" the storybooks into its broader curriculum. Brief for Respondents 13; see also *ante,* at 38-39.

The Board easily could avoid sowing tension between its curriculum and parents' *First Amendment* rights. Most straightforwardly, rather than attempt to "weave the storybooks seamlessly into ELA lessons," the Board could cabin its sexual- and gender-identity instruction to specific units. Brief for Respondents 13; see *ante,* at 38-39. The Board's formal sex-education curriculum, for example, is a "discrete" "[u]nit of [i]nstruction" from which parents may opt out their children "for any reason." Brief for Respondents 11; see also Tr. of Oral Arg. 131 (noting that sex education is "something where you're able to predict precisely when the curriculum is going to be deployed"). Had the Board confined its "LGBTQ-inclusive" curriculum to a "discrete" "[u]nit" as well, Brief for Respondents 11, parental opt outs would pose no greater administrative burden on schools than those that the schools already confront. The Board instead chose to incorporate these controversial concepts into broader instruction.

The Board [*81] may not insulate itself from *First Amendment* liability by "weav[ing]" religiously offensive material throughout its curriculum and thereby significantly increase the difficulty and complexity of remedying parents' constitutional injuries. *Id.,* at 13. Were it otherwise, the State could nullify parents' *First Amendment* rights simply by saturating public schools' core curricula with material that undermines "family decisions in the area of religious training." *Yoder, 406 U. S., at 231, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. The "Framers intended" for "free exercise of religion to flourish." *Espinoza, 591 U. S., at 497, 140 S. Ct. 2246, 207 L. Ed. 2d 679* (Thomas, J., concurring). Insofar as schools or boards attempt to employ their curricula to interfere with religious exercise, courts should carefully police such "ingenious defiance of the Constitution" no less than they do in other contexts. *South Carolina v.*

_____

constitutional authority respecting their children." *Id., at 617*. The interference with parents' right to direct their children's religious upbringing is especially pronounced here, given the Board's concession that the storybook curriculum may provide children with "a new perspective not easily contravened by their parents." App. 46.

*Katzenbach, 383 U. S. 301, 309, 86 S. Ct. 803, 15 L. Ed. 2d 769 (1966).*

**Dissent by:** SOTOMAYOR

# Dissent

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

Public schools, this Court has said, are "'at once the symbol of our democracy and the most pervasive means for promoting our common destiny.'" *Edwards v. Aguillard, 482 U. S. 578, 584, 107 S. Ct. 2573, 96 L. Ed. 2d 510 (1987).* They offer to children of all faiths and backgrounds an education and an opportunity to practice living in our multicultural society. That experience is critical to our Nation's civic vitality. Yet it will become a mere memory if children must be insulated from exposure to ideas and concepts that may conflict with their parents' religious beliefs.

Today's ruling ushers in that new reality. Casting aside longstanding precedent, the Court invents a constitutional right to avoid exposure to "subtle" themes "contrary to the religious principles" that parents wish to instill in their children. *Ante,* at 23. Exposing students to the "message" that LGBTQ people exist, and that their loved ones may celebrate their marriages and life events, the majority says, is enough to trigger the most demanding form of judicial scrutiny. *Ibid.* That novel rule is squarely foreclosed by our **[*82]** precedent and offers no limiting principle. Given the great diversity of religious beliefs in this country, countless interactions that occur every day in public schools might expose children to messages that conflict with a parent's religious beliefs. If that is sufficient to trigger strict scrutiny, then little is not.

The result will be chaos for this Nation's public schools. Requiring schools to provide advance notice and the chance to opt out of every lesson plan or story time that might implicate a parent's religious beliefs will impose impossible administrative burdens on schools. The harm will not be borne by educators alone: Children will suffer too. Classroom disruptions and absences may well inflict long-lasting harm on students' learning and development.

Worse yet, the majority closes its eyes to the inevitable chilling effects of its ruling. Many school districts, and particularly the most resource strapped, cannot afford to engage in costly litigation over opt-out rights or to divert resources to tracking and managing student absences. Schools may instead censor their curricula, stripping material that risks generating religious objections. The Court's ruling, in effect, thus hands a subset of parents the right to veto curricular choices long left **[*83]** to locally elected school boards. Because I cannot countenance the Court's contortion of our precedent and the untold harms that will follow, I dissent.

I

By the majority's telling, the Montgomery County Public School Board (Board) has undertaken an intentional campaign to "impose upon children a set of values and beliefs that are 'hostile' to their parents' religious" principles. *Ante,* at 25; see *ante*, at 3-11. The Court draws on excerpts from Board documents and statements, shorn from context, see *infra*, at 30-33, and n. 16, that it claims reflect that intent. The full record reveals a starkly different reality.

A

In the years leading up to the present dispute, the Board determined that the books in its English language curriculum failed to represent many students and families in the county. The Board has long been committed to promoting a "fully inclusive environment for all students" by using instructional materials that "reflect [the] diversity of the global community," including "persons with disabilities, persons from diverse racial, ethnic, and cultural backgrounds, as well as persons of diverse gender identity, gender expression, or sexual orientation." App. to Pet. for Cert. **[*84]** 589a-590a, 603a. Yet certain perspectives, the Board concluded, were absent from its English language curriculum. The Board, for instance, determined that some "races and cultures" were not adequately reflected. *Id.*, at 602a. In response, it added books like The Leavers, which tells the story of an Asian-American immigrant family, and the March trilogy, which recounts the life of civil rights leader John Lewis.

The Board found that LGBTQ children and families were similarly underrepresented in its English language curriculum. The books taught in English classes simply "did not include LGBTQ characters." *Id.*, at 603a. To fill that gap, the Board worked with a committee of specialists to identify LGBTQ-inclusive books that it could incorporate into the existing curriculum. After a years-long process, the Board announced in October 2022 that it would add several new books into the elementary school English language curriculum, five of which are at issue in this case (collectively, the

Storybooks). [1]

 Uncle Bobby's Wedding tells the story of a young girl named Chloe and her "favourite uncle." *Id.*, at 282a. Chloe loves spending time with her Uncle Bobby, and the two often go on adventures, [*85] like boating trips and stargazing outings. One day, during a family picnic, Uncle Bobby announces that he is engaged to his friend, Jamie. The announcement is met with much excitement, and the whole family is "smiling and talking and crying and laughing." *Id.*, at 286a. Chloe, however, is apprehensive. She tells her uncle she "do[esn't] think [he] should get married" because she "want[s them] to keep having fun together like always." *Id.*, at 292a. Uncle Bobby promises that they will "'still have fun together,'" *ibid.*, and he and Jamie take Chloe on trips to the ballet, to the beach, and out camping. Chloe's excitement for the wedding grows, and on the day of the ceremony, she "was so happy, she felt like doing a cartwheel" down the aisle. *Id.*, at 302a. The story ends with everyone dancing happily at the wedding under the light of the moon.



*Id.*, at 279a.

Because the majority selectively excerpts the book in order to rewrite its story, readers are encouraged to go directly to the source, reproduced below. See Appendix, *infra*; see also *infra*, at 19-20, and n. 8. [2]

The remaining books play on similar themes. Prince & Knight tells the story of a prince who falls in love with a [*86] young knight after the knight helps him defeat a fearsome dragon. Love, Violet describes a shy girl who has a crush on her classmate, Mira and eventually gives her a Valentine's Day card that says "For Mira, Love, Violet." *Id.*, at 434a.

Other books introduce readers to children from different backgrounds and identities. Intersection Allies features eight different characters, each with their own unique attributes. Alejandra, for instance, uses a wheelchair that allows her to "zzzip glide and play," *id.*, at 316a, while Kate prefers "superhero cape[s]" over "[s]kirts and frills" and is pictured in a gender-neutral bathroom, *id.*, at 322a-323a. Born Ready: The True Story of a Boy Named Penelope tells the story of a child who likes skateboarding, "baggy blue jeans, button-front shirts, math, science, and getting straight A's," and "most of all" wants a "Mohawk haircut." *Id.*, at 452a. When Penelope tells his mother that he is a boy, she accepts him: "'However you feel is fine, baby,'" she says. *Id.*, at 458a. When Penelope's brother expresses skepticism, his mother says, "'Not everything *needs* to make sense. *This is about love.*'" *Id.*, at 465a (emphasis in original).

The five Storybooks introduce [*87] readers to LGBTQ characters, but they draw on many of the themes common to children's books. Indeed, Montgomery County Public Schools (MCPS) libraries are replete with children's books that tell similar stories about overcoming differences, fairytale romances, and celebrating big milestones like weddings. See MCPS Library Portal, https://mcpsmd.follettdestiny.com /portal (online catalogue of MCPS elementary school books).

The Board directed the schools to use the new books in the same manner as all other books in the English language program, namely, to "assist students with mastering reading concepts like answering questions about characters, retelling key events about characters in a story, and drawing inferences about story characters based on their actions." *Id.*, at 605a. The Board made clear to individual schools that "there is no planned explicit instruction on gender identity and sexual orientation in elementary school," using the Storybooks or otherwise. *Ibid.* The Board's policies,

---

[1] The complaint identified seven books to which petitioners object, but two are no longer approved for instructional use. See Brief for Respondents 8.

[2] The majority buries this book at the end of its discussion of

the challenged materials, see *ante,* at 6, and understandably so. The Court's conclusion that even mere exposure to Uncle Bobby's Wedding poses an intolerable "threat" to religious views illustrates the untenable breadth of its position. *Ante,* at 25; see *infra*, at 19-21, and n. 8.

moreover, mandate that "no student or adult [will be] asked to change how they feel about" issues of "gender identity and sexual orientation," *ibid.*, and that, "[i]f a child does not agree with or **[*88]** understand another student's gender identity or expression or their sexuality . . ., they do not have to change how they feel about it," *id.*, at 638a; see also *id.*, at 520a.

Before MCPS introduced the books into classrooms, the Board provided guidance to teachers on how to respond to student questions and commentary regarding the books. The guidance focuses on encouraging mutual tolerance and "respect" for all those in the community. *Id.*, at 628a. To take one example, if a child says that "[b]eing . . . gay, lesbian, queer, etc[.] is wrong and not allowed in [her] religion," the guidance suggests that a teacher could respond by saying:

> "I understand that is what you believe, but not everyone believes that. We don't have to understand or support a person's identity to treat them with respect and kindness. School is a place where we learn to work together regardless of our differences. In any community, we'll always find people with beliefs different from our own and that is okay—we can still show them respect." *Ibid.*

The guidance also directs teachers to discourage the use of language that could be hurtful to students in the class. If a student says, "That's so gay," for instance, the **[*89]** guidance suggests a teacher may respond by saying: "Regardless of how it's intended, using gay to describe something negative reflects a long history of prejudice against LGBTQ+ people, so please don't use it in that way." *Id.*, at 634a.

During the first year of the Storybooks' inclusion in the English language program, MCPS permitted parents, through agreements with individual schools, to opt their children out of lessons that featured the books. Parents began making individualized opt-out requests. Although some of the requests were religious in nature, many were not.

In March 2023, the Board met with a "small group of principals" and learned that teachers could not accommodate the opt-out requests "without causing significant disruptions to the classroom environment and undermining MCPS's educational mission." *Id.*, at 607a. The Board also worried that permitting some students to leave the classroom whenever a teacher brought out books featuring LGBTQ characters could expose LGBTQ students (and those with LGBTQ parents) to social stigma and isolation. MCPS therefore announced

it would no longer permit parents to opt out of instruction using the Storybooks.

B

MCPS regulations establish **[*90]** a multilevel appeal process for parents to challenge the "appropriateness of instructional materials or library books." App. 25. Parents can first raise objections at the school level. If that proves unsuccessful, parents can appeal to the head of the district's evaluation and selection unit, who must "[a]ppoint an ad hoc committee" of library media specialists, teachers, principals, and other staff "to reevaluate the material." *Ibid.* The committee makes a recommendation to the associate superintendent for instruction and program development, who herself considers the appropriateness of the relevant instructional material and renders a decision. If the parents are still unsatisfied, they may appeal to the superintendent of schools, and then the board itself, pursuant to extensive county regulations governing appeal and hearing procedures.

C

Rather than avail themselves of the district's established process for challenging objectionable instructional material, petitioners sued the MCPS Board in federal court. [3] Using the Storybooks in English class "without parental notice or opt-out rights," the parents argued, violates the *Free Exercise Clause of the Constitution* by "expos[ing]" their children to content that conflicts with **[*91]** the parents' religious views. App. to Pet. for Cert. 190a, 194a. More specifically, petitioners Tamer Mahmoud and Enas Barakat object to "exposing" their son "to activities and curriculum on sex, sexuality, and gender that undermine Islamic teaching on these subjects." *Id.*, at 532a. They worry that "reading th[e] [Story]books and engaging in related discussions would confuse [their son's] religious upbringing" and "undermine [their] efforts to raise" their son "in accordance with [their] faith." *Id.*, at 532a-533a. Chris and Melissa Persak likewise object to "exposing" their children to "viewpoints on sex, sexuality, and gender that contradict Catholic teaching on these subjects." *Id.*,

---

[3] There are three sets of parent-plaintiffs: Tamer Mahmoud and Enas Bakarat, Jeff and Svitlana Roman, and Chris and Melissa Persak. Although the majority discusses evidence in the record related to the associational plaintiff, Kids First, see *ante,* at 13-14, that association did not join in the parent-plaintiffs' motion for a preliminary injunction. See *Mahmoud v. McKnight, 102 F. 4th 191, 201, n. 4 (CA4 2024)*.

at 544a. Jeff and Svitlana Roman similarly believe that their son's teachers should not "teach principles about sexuality or gender identity that conflict with [their] religious beliefs." *Id.*, at 541a.

Petitioners asked the district court to enjoin MCPS from "denying [them] notice and opportunity to opt their children out of reading, listening to, or discussing the . . . Storybooks," and "any other instruction related to family life or human sexuality that violates the Parents' or their children's **[*92]** religious beliefs." Motion for Preliminary Injunction in *No. 23-cv-01380, 374 So. 3d 977*, ECF Doc. 23, p. 1. After an evidentiary hearing, the district court denied petitioners' preliminary injunction motion. See *Mahmoud v. McKnight, 688 F. Supp. 3d 265, 272 (Md. 2023)*. The Fourth Circuit affirmed. *102 F. 4th 191 (2024)*. It held that petitioners had failed to establish that the Board "direct[ly] or indirect[ly] pressure[d]" them or their children to "abandon [their] religious beliefs or affirmatively act contrary to those beliefs" in the way this Court's precedents require. *Id., at 210* (citing *Lyng v. Northwest Indian Cemetery Protective Assn., 485 U.S. 439, 450, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988)*).

II

A

The *Free Exercise Clause* commands that the government "shall make no law . . . prohibiting the free exercise" of religion. *U. S. Const., Amdt. 1*. "The crucial word in the constitutional text is 'prohibit,'" for it makes clear "'the *Free Exercise Clause* is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.'" *Lyng, 485 U. S., at 451, 108 S. Ct. 1319, 99 L. Ed. 2d 534*.

It follows from the text that the *Free Exercise Clause* does not "require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family." *Bowen v. Roy, 476 U. S. 693, 699, 106 S. Ct. 2147, 90 L. Ed. 2d 735 (1986)* (emphasis in original). Instead, the Clause prohibits the government from compelling individuals, whether directly or indirectly, to give up or violate their religious beliefs. See, **[*93]** *e.g.*, *Wisconsin v. Yoder, 406 U. S. 205, 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972)* (*Free Exercise Clause* forbids "affirmatively compel[ling]" individuals "to perform acts undeniably at odds with fundamental tenets of their religious beliefs"); *School Dist. of Abington Township v. Schempp, 374 U. S. 203, 223, 83 S. Ct. 1560, 10 L. Ed. 2d 844 (1963)* ("[I]t is necessary in a free exercise case

for one to show the coercive effect of the enactment as it operates against him in the practice of his religion"); *Bowen, 476 U. S., at 700, 106 S. Ct. 2147, 90 L. Ed. 2d 735* ("The *Free Exercise Clause* affords an individual protection from certain forms of governmental compulsion . . . "); *Lyng, 485 U. S., at 451, 108 S. Ct. 1319, 99 L. Ed. 2d 534* (*Free Exercise Clause* prohibits laws that have a "tendency to coerce individuals into acting contrary to their religious beliefs"); *Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U. S. 449, 463, 137 S. Ct. 2012, 198 L. Ed. 2d 551 (2017)* ("[T]he *Free Exercise Clause* protects against 'indirect coercion . . . '"); *Carson v. Makin, 596 U. S. 767, 778, 142 S. Ct. 1987, 213 L. Ed. 2d 286 (2022)* (same).

Consistent with these longstanding principles, this Court has made clear that mere exposure to objectionable ideas does not give rise to a free exercise claim. That makes sense: Simply being exposed to beliefs contrary to your own does not "prohibi[t]" the "free exercise" of your religion. Amdt. 1. Nor does mere "'[o]ffense . . . equate to coercion.'" *Kennedy v. Bremerton School Dist., 597 U. S. 507, 539, 142 S. Ct. 2407, 213 L. Ed. 2d 755 (2022)* (quoting *Town of Greece v. Galloway, 572 U. S. 565, 589, 134 S. Ct. 1811, 188 L. Ed. 2d 835 (2014)* (plurality opinion) (alteration in original). The Constitution thus does not "'guarantee citizens a right entirely to avoid ideas with which they disagree.'" *Id., at 589, 134 S. Ct. 1811, 188 L. Ed. 2d 835*. Indeed, "[i]t would betray its own principles if it did," for "no robust democracy insulates **[*94]** its citizens from views that they might find novel or even inflammatory." *Elk Grove Unified School Dist. v. Newdow, 542 U. S. 1, 44, 124 S. Ct. 2301, 159 L. Ed. 2d 98 (2004)* (O'Connor, J., concurring in judgment).

There is no public school exception to these principles. This Court's decision in *West Virginia Bd. of Ed. v. Barnette, 319 U. S. 624, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943)*, is instructive. There, the Court held that "compelling" students who adhere to the Jehovah's Witnesses faith to salute the flag, in contravention of their religious beliefs, violated the *First Amendment*. *Id., at 642, 63 S. Ct. 1178, 87 L. Ed. 1628*. Yet the Court distinguished the "compulsion of students to declare a belief " from simply exposing students to ideas that might conflict with their religious tenets. *Id., at 631, 63 S. Ct. 1178, 87 L. Ed. 1628*. For instance, the Court recognized that schools could "acquain[t students] with the flag salute so that they may be informed as to what it is or even what it means." *Ibid.* No problem arose, either, the Court observed, from having objecting students "remai[n] passive during a flag salute ritual,"

while watching the rest of the class engage in it. *Id., at 634, 63 S. Ct. 1178, 87 L. Ed. 1628*. What the State could not do, however, is "compel[l] the flag salute and pledge," when those actions required students to "declare a belief " contrary to their own religious views. *Id., at 631, 642, 63 S. Ct. 1178, 87 L. Ed. 1628*.

So too, in *Kennedy* v. *Bremerton School Dist.*, the Court recognized that seeing objectionable conduct alone is not **[\*95]** actionable under the *First Amendment*. There, the Court rejected the argument that the exposure of children to a school coach's religious prayer violated the *Establishment Clause*. See *597 U. S., at 538-539, 142 S. Ct. 2407, 213 L. Ed. 2d 755*. Even though hearing and watching an authority figure engage in a denominational prayer with classmates at a school-sponsored event could, of course, undermine parents' efforts to instill different religious beliefs in their children, a majority of this Court concluded that no cognizable "coercion" had occurred, and so no *Establishment Clause* violation inhered in the coach's conduct. See *id., at 539, 142 S. Ct. 2407, 213 L. Ed. 2d 755*. 4

In sum, never, in the context of public schools or elsewhere, has this Court held that mere exposure to concepts inconsistent with one's religious beliefs could give rise to a *First Amendment* claim. 5

---

4 The Court misconstrued the record in that case, and thus erred in deciding that the coach's prayer ritual was not coercive. See *Kennedy, 597 U. S., at 547-556, 561-562, 142 S. Ct. 2407, 213 L. Ed. 2d 755* (Sotomayor, J., dissenting). Taking the majority's recitation of the facts at face value, however, the Court plainly viewed exposure to the aforementioned activities as insufficient to raise *First Amendment* concerns, notwithstanding their apparent potential to undermine a parent's religious upbringing of their child. See *id., at 538-539, 142 S. Ct. 2407, 213 L. Ed. 2d 755*.

5 The majority claims that this Court's precedent, as set forth above, establishes an "alarmingly narrow rule" that would permit "even instruction that denigrates or ridicules students' religious beliefs." *Ante,* at 30-31. That the majority sees exposure to books featuring LGBTQ characters as comparable to "denigrat[ion] or ridicul[e]" of religion is telling. *Ante,* at 31. In any event, the majority is wrong: Denigration and ridicule can easily amount to coercion. Such conduct bears no resemblance to merely exposing children to concepts or ideas that incidentally conflict with a parent's religious beliefs. (The majority, for its part, cannot comprehend that coercion may cover denigration without reaching exposure, and so mistakes this point for a concession. See *ante,* at 31 n. 10.) Additionally, this Court's precedent forbids government action motivated by "hostility to a religion or religious

**B**

These well-established principles, previously recognized and respected by this Court, resolve this case. As recounted earlier, each of the three sets of parent-plaintiffs premised their objections on, in essence, "expos[ure]" to material that conflicts with their religious beliefs. App. to Pet. for Cert. 532a; see *supra*, at 8-9; see also App. to Pet. for Cert. 194a (challenging "exposure to the Pride Storybooks" and having "children . . . read the Pride Storybooks"). **[\*96]** Yet for the reasons just explained, the effects of mere exposure to material with which one disagrees does not and should not give rise to a free exercise claim.

Nor have petitioners shown that MCPS's policies coerced them to give up or violate their religious beliefs. See *Barnette, 319 U. S., at 633, 63 S. Ct. 1178, 87 L. Ed. 1628*. To the contrary, MCPS explicitly prohibits teachers from asking students to give up or change their views regarding gender and sexuality, whether religious or not. See *supra*, at 6; see also App. to Pet. for Cert. 520a, 605a, 638a. The parents have proffered no evidence of teachers acting contrary to that policy.

Recall, too, that MCPS exclusively uses the challenged Storybooks to teach students literacy in English language class. Like all other books in the English language curriculum, the Storybooks will be used to "assist students with mastering reading concepts like answering questions about characters, retelling key events about characters in a story, and drawing inferences about story characters based on their actions." *Id.,* at 605a. As for integrating the books into classes, teachers may opt "to put them on a shelf for students to find on their own; to recommend a book to a student who would enjoy it; to offer **[\*97]** the books as an option for literature circles, book clubs, or paired reading groups; or to use them as a read aloud." *Id.,* at 604a-605a. It is possible, of course, that such instruction may introduce students to concepts or views objectionable to their faiths. Being "merely made acquainted with" these themes, however, does not give rise to a cognizable free exercise burden. *Barnette, 319 U. S., at 631, 63 S. Ct. 1178, 87 L. Ed. 1628*.

**III**

---

viewpoint." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n, 584 U. S. 617, 638, 138 S. Ct. 1719, 201 L. Ed. 2d 35 (2018)*. Existing precedent thus addresses the majority's hypotheticals without resort to its unbounded test. See *infra*, at 21-24.

Rather than follow this Court's unambiguous precedent, the majority rescues petitioners' exposure theory by simply renaming it. Petitioners' free exercise rights are burdened by the Storybooks, the majority claims, because they "carry with them 'a very real threat of undermining' the religious beliefs that the parents wish to instill in their children." *Ante*, at 31. In other words, reading books like Uncle Bobby's Wedding is sufficient, in the majority's view, because of the "'threat'" those books pose to the religious upbringing of petitioners' children. *Ibid.*; see *ante*, at 36-37. That is simply exposure by another name.

From where does the majority derive its novel "threat" test? *Yoder, 406 U. S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15*, the majority claims, established it over half a century ago, unbeknownst to any court of appeals in the Nation (and until today, **[*98]** this Court as well).

The flaws in the majority's reasoning are legion. The Court's reading of *Yoder* is not simply incorrect; it is definitively foreclosed by precedent. The majority's novel test, moreover, imposes no meaningful limits on the types of school decisions subject to strict scrutiny, as the Court's own application of its test confirms. Today's ruling thus promises to wreak havoc on our Nation's public schools and the courts tasked with resolving this new font of litigation.

A

1

Start with the majority's misreading of *Yoder*. According to the Court, *Yoder* held that the government violates the "'rights of parents to direct "the religious upbringing" of their children'" whenever a government policy "poses 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill." *Ante*, at 1, 17. That is incorrect.

*Yoder* addressed a *First Amendment* challenge to Wisconsin's "compulsory-attendance law" for high school students. *406 U. S., at 207, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. The law compelled parents to send their children to public school or an equivalent until age 16, and imposed criminal penalties on violators. See *ibid.* A group of Amish parents punished under the law argued that their convictions violated the **[*99]** *Free Exercise Clause* because "their children's attendance at high school, public or private, was contrary to the Amish religion and way of life." *Id., at 209, 92 S. Ct. 1526, 32 L. Ed. 2d 15*.

This Court agreed. See *id., at 234-236, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. Wisconsin's law violated the *Free Exercise Clause* because it "affirmatively compel[led]" the parents, "under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Id., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. "Formal high school education beyond eighth grade," the Court explained, foreclosed Amish religious practice by "tak[ing children] away from their community" at a time when they "must acquire . . . the specific skills needed to perform the adult role of an Amish farmer or housewife." *Id., at 211, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. Sending their children to school during that "crucial" time would accordingly require the Amish parents to "abandon" their faith. *Id., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*.

*Yoder* thus does not support the proposition that any government policy that poses a "'very real threat'" to a parent's religious development of their child triggers strict scrutiny. *Ante*, at 1, 25. The problem in *Yoder* was not that the law exposed children to material that would incidentally "undermine" religious beliefs, but that it compelled Amish parents to do what their religion forbade: send their children away rather **[*100]** than integrate them into the Amish community at home. Contra, *ante*, at 1, 20-21, 33, n. 11. [6]

If there were any doubt, this Court already rejected the majority's flawed reading of *Yoder* in *Lyng, 485 U. S.*

---

[6] The majority sets up a strawman in response, claiming that the preceding analysis distinguishes *Yoder* because it "involved compulsory school attendance." *Ante*, at 33, n. 11. That misses the point entirely: *Yoder* is distinguishable because the challenged law "affirmatively compel[led]" the parents "*to perform acts undeniably at odds with fundamental tenets of their religious beliefs.*" *406 U. S., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15* (emphasis added). That is not true here. See *supra*, at 12-13. It also bears emphasis that the parents in this case remain free to teach their religious beliefs and practices to their children at home, as petitioners acknowledge. See Reply Brief 8. The parents in *Yoder*, by contrast, were prohibited by the challenged law from engaging in religious teaching at home that was critical to "integrat[ing] . . . Amish child[ren] into the Amish religious community" because the law required them to send their children away to school during that same time. *406 U. S., at 211-212, 92 S. Ct. 1526, 32 L. Ed. 2d 15*; see *id., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. It was thus impossible to both comply with the law and engage in the religious teaching at home deemed necessary by the Amish parents. So they were not "similarly capable of teaching their religious values 'at home.'" Contra, *ante*, at 34-35.

*439, 108 S. Ct. 1319, 99 L. Ed. 2d 534*. There, a group of Native Americans brought a free exercise challenge to the construction of a federal road through an area that the group used "to conduct a wide variety of specific rituals." *Id., at 451, 108 S. Ct. 1319, 99 L. Ed. 2d 534*. This Court rejected the plaintiffs' claim. *Id., at 449-451, 108 S. Ct. 1319, 99 L. Ed. 2d 534*. Although "the challenged Government action would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs," the Court reasoned, the affected individuals would not be "coerced by the Government's action into violating their religious beliefs." *Id., at 449, 108 S. Ct. 1319, 99 L. Ed. 2d 534*. Accordingly, the Court held that the plaintiffs had failed to make out a cognizable free exercise claim. See *id., at 451-452, 108 S. Ct. 1319, 99 L. Ed. 2d 534*.

The dissent in *Lyng* argued that the Court's ruling conflicted with *Yoder*, which it described as "str[iking] down a state compulsory school attendance law on free exercise grounds not so much because of the affirmative coercion the law exerted **[*101]** on individual religious practitioners, but because of 'the impact'" that the law would have on Amish communities. *485 U. S., at 466, 108 S. Ct. 1319, 99 L. Ed. 2d 534* (opinion of Brennan, J.) (emphasis deleted). Wisconsin's law implicated the *Free Exercise Clause*, the dissent claimed, because the school environment "posed 'a very real threat of undermining the Amish community and religious practice.'" *Id., at 467, 108 S. Ct. 1319, 99 L. Ed. 2d 534* (quoting *Yoder, 406 U. S., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*). The majority today uses that same refrain as the foundation of its analysis. See, *e.g.*, *ante,* at 1, 15, 25, 28, 37.

The Court in *Lyng*, however, could not have been clearer: "The dissent . . . misreads *Wisconsin* v. *Yoder*." *485 U. S., at 456, 108 S. Ct. 1319, 99 L. Ed. 2d 534*. "The statute directly compelled the Amish to send their children to public high schools 'contrary to the Amish religion and way of life,'" the Court explained. *Id., at 457, 108 S. Ct. 1319, 99 L. Ed. 2d 534*. "The dissent's out-of-context quotations notwithstanding, there is nothing whatsoever in the *Yoder* opinion to support the proposition that the 'impact' on Amish religion would have been constitutionally problematic if the statute at issue had not been coercive in nature." *Ibid*. So the mere "threat of undermining" Amish beliefs and practices was not, on its own, what gave rise to a cognizable free exercise burden in *Yoder*. Contra, *ante*, at 1, 15, 25, 28, 37. "Whatever may be the exact line between **[*102]** unconstitutional prohibitions on the free

exercise of religion and the legitimate conduct by government of its own affairs," *Lyng* explained, "the location of the line cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development." *485 U. S., at 451, 108 S. Ct. 1319, 99 L. Ed. 2d 534*.

The majority's novel test directly contravenes not only *Lyng*, but also *Bowen, 476 U. S. 693, 106 S. Ct. 2147, 90 L. Ed. 2d 735*. There, the Court addressed a father's free exercise challenge to the Government's use of a Social Security number associated with his daughter as a condition of receiving certain Government benefits. See *id., at 695-696, 106 S. Ct. 2147, 90 L. Ed. 2d 735*. According to the father's sincerely held religious beliefs, use of the Social Security number would "'rob the spirit' of his daughter and prevent her from attaining greater spiritual power," thereby interfering with his ability to direct the religious development of his child. *Id., at 696, 106 S. Ct. 2147, 90 L. Ed. 2d 735*. This Court rejected the father's claim. "Never . . . has the Court interpreted the *First Amendment* to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family," the Court explained. *Id., at 699, 106 S. Ct. 2147, 90 L. Ed. 2d 735* (emphasis in original).

The majority's "very real threat" test is irreconcilable with *Bowen*. There **[*103]** can be no question that the Government's challenged policy in *Bowen* gravely threatened the father's ability to direct his child's religious development; the Government's "us[e]" of his daughter's Social Security number would (in the father's sincerely held view) "rob the spirit" of his daughter." *Id., at 696, 106 S. Ct. 2147, 90 L. Ed. 2d 735*. So if the test for identifying a cognizable free exercise burden is, as the majority today claims, whether the law poses "'a very real threat of undermining'" a parent's religious development of their child, *ante,* at 25, then *Bowen* was wrongly decided.

2

The majority relegates its discussion of *Bowen* and *Lyng* to a few sentences, claiming that those cases involved "internal affairs" of Government. *Ante,* at 28. The majority, however, articulates no coherent line between the "internal affairs" that the Court deemed nonactionable in those two cases and the external effects of government decisions that the majority announces are actionable here.

In *Bowen*, the entire premise of the father's claim was that the Government's internal choices about how to

operate its program would have external effects on his right to direct the religious development of his child: The father averred that the Government's [*104] use of his child's Social Security number would irrevocably destroy his child's "spirit," and thus his ability to protect his spiritual development. *476 U. S., at 696, 106 S. Ct. 2147, 90 L. Ed. 2d 735*. Here, by the majority's own telling, the parents make the same type of claim. They argue that the schools' use of the Storybooks will harm their ability to direct their children's religious development. See *ante*, at 1, 11-12, 25. The underlying theories are indistinguishable.

The incoherence of the majority's "internal affairs" theory comes into even sharper focus as applied to the Court's decision in *Lyng*. There, the Court acknowledged that the Government's construction of the road would "'physically destro[y] the environmental conditions and the privacy without which the [religious] practices cannot be conducted.'" *485 U. S., at 449, 108 S. Ct. 1319, 99 L. Ed. 2d 534* (alterations in original). Yet the majority today recasts the decision to build a road through sacred land as a purely "internal affai[r]" of the Government, thereby rendering *Lyng* inapposite. *Ante*, at 28. Implausible as that assertion may be, it is the majority's only maneuver around *Bowen* and *Lyng*. In short, the Court's novel "threat" test flouts settled precedent, and the majority's contrary claim is illogical.

B

That is [*105] only the beginning of the majority's errors. Turn, next, to the Court's articulation of what, exactly, the "very real threat" is that triggers the most demanding level of judicial review. The majority declares the inquiry will turn on several context clues: the "specific religious beliefs and practices asserted," the "specific nature of the educational requirement or curricular feature at issue," the age of the children, and the context and manner in which the relevant materials "are presented." *Ante,* at 21. On that last point, the majority adds, courts should ask whether the materials are "presented in a neutral manner" or "in a manner that is 'hostile' to religious viewpoints and designed to impose upon students a 'pressure to conform.'" *Ibid.* (quoting *Yoder, 406 U. S., at 211*).

That test lacks any meaningful limit. Consider what the majority deems intolerably "hostile" to religious views. Uncle Bobby's Wedding, the Court asserts, contains a "subtle" "normative" message about marriage that is "contrary to the religious principles that the parents in this case wish to instill in their children": that "two people

can get married, regardless of whether they are of the same or the opposite sex, so long as they [*106] ' "love each other." '" *Ante*, at 23. According to the Court, that message is apparent in the "jubilant" reactions of Uncle Bobby's family to his engagement announcement and a statement by the protagonist's mother that, "' "[w]hen grown-up people love each other that much, sometimes they get married." '" *Ibid.*; see App. to Pet. for Cert. 288a. [7]

With those snippets in hand, the majority concludes that Uncle Bobby's Wedding is akin to "the compulsory high school education law considered in *Yoder.*" *Ante*, at 25. Reading the book aloud in elementary class, the majority claims, "impose[s] upon children a set of values and beliefs that are 'hostile' to their parents' religious [views]" and "exert[s] upon children a psychological 'pressure to conform'" to the view that families can be happy about same-sex weddings. *Ibid.* (quoting *Yoder, 406 U. S., at 211, 92 S. Ct. 1526, 32 L. Ed. 2d 15*). That is apparently enough, in the majority's view, to create a cognizable free exercise burden, for the Court ultimately prohibits use of the Storybooks "or any other similar book" "in any way" absent an opt-out right. *Ante*, at 41.

Even if *Yoder* had established some form of "threat" test, the majority's application of it in this case would expand it beyond recognition. [*107] The Court in *Yoder* detailed, at length, the record evidence that compulsory high school attendance would "result in the destruction of the Old Order Amish church community as it exist[ed] in the United States." *406 U. S., at 212, 92 S. Ct. 1526, 32 L. Ed. 2d 15*; see *id., at 209-213, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. Compelled attendance effectively barred "integration of the Amish child into the Amish religious community," *id., at 211-212, 92 S. Ct. 1526, 32 L. Ed. 2d 15*, such that, under Wisconsin's law, the petitioners in *Yoder* were forced "either [to] abandon belief and be assimilated into society at large, or . . . to

---

[7] The majority strains to cast the book as a story about a child who is apprehensive that her uncle is marrying a man. See *ante*, at 6, 23. The book is "coy," the majority claims, about the reason the protagonist, Chloe, asks her mother, "' "Why is Uncle Bobby getting married?" '" *Ante*, at 23. With respect, the reason is plainly stated in the book and has nothing to do with the gender of anyone involved: "Bobby was Chloe's favourite uncle," the book explains, and Chloe "'do[esn't] think [Uncle Bobby] should get married'" because she "'wants [them] to keep having fun together like always.'" App. to Pet. for Cert. 282a, 292a. Perhaps conscious of its creative reading, the majority admits the message it identifies is "subtle." *Ante,* at 23. The right word, instead, might be "imagined."

migrate to some other and more tolerant region," *id., at 218, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. *Yoder* thus set an exceedingly high bar for future plaintiffs to clear. Indeed, the Court in *Yoder* explicitly predicted that "few other religious groups" could make the showing that the Amish parents in that case had. *Id., at 236, 92 S. Ct. 1526, 32 L. Ed. 2d 15*.

Yet, in the majority's eyes, reading aloud Uncle Bobby's Wedding is just "[l]ike the compulsory high school education considered in *Yoder.*" *Ante*, at 25. That assertion is remarkable. Reading a storybook that portrays a family as happy at the news of their gay son's engagement, the majority claims, is equivalent to a law that threatened the very "survival of [the] Amish communit[y]" in the United States. *406 U. S., at 209, 92 S. Ct. 1526, 32 L. Ed. 2d 15*; see *ante*, at 25. To read that sentence is to **[*108]** refute it. [8]

The majority's myopic attempt to resolve a major constitutional question through close textual analysis of Uncle Bobby's Wedding also reveals its failure to accept and account for a fundamental truth: LGBTQ people exist. They are part of virtually every community and workplace of any appreciable size. Eliminating books depicting LGBTQ individuals as happily accepted by their families will not eliminate student exposure to that concept. Nor does the *Free Exercise Clause* require the government to alter its programs to insulate students from that "message." *Ante*, at 23.

In distorting *Yoder* to say otherwise, the majority leaves its test without any discernible limits. How are courts objectively to evaluate what amounts to a "very real threat" to a parent's religious development of their child? Should they try to measure the intensity of the parent's protestations, or must they simply accept the parent's assertion that exposure to any particular book threatens their child's religious upbringing? Or will judges simply know it when they see it and call their analysis "fact-

intensive"? *Ante*, at 21. Perhaps cognizant of this problem, the majority insists repeatedly that its test looks for an **[*109]** "'objective danger to the free exercise of religion.'" *Ante*, at 15, 17, 21, 25, 27. That incantation, however, will be cold comfort to courts attempting to apply this peculiarly subjective test.

What is more, if even potentially imagined "coy" messages hidden in a picture book are sufficient to trigger strict scrutiny when they conflict with a parent's religious beliefs, *ante*, at 23, then it is hard to say what will not. Indeed, as the majority admits, "many books targeted at young children" contain a "normative" message, *ante*, at 22, about, say, the virtues of helping your community or the joys of getting married. (How many children's books, after all, end with a joyous wedding and the couple living happily ever after?) The same is true for books and textbooks throughout any public school curriculum.

Given the multiplicity of religious beliefs in this country, innumerable themes may be "contrary to the religious principles" that parents "wish to instill in their children." *Ante*, at 23. Books expressing implicit support for patriotism, women's rights, interfaith marriage, consumption of meat, immodest dress, and countless other topics may conflict with sincerely held religious beliefs and **[*110]** thus trigger stringent judicial review under the majority's test. Imagine a children's picture book that celebrates the achievements of women in history, including female scientists, politicians, astronauts, and authors. Perhaps the book even features a page that states, "Girls can do it all!" That message may be "directly contrary to the religious principles that" a parent "wish[es] to instill in their chil[d]." *Ibid.* In the majority's view, it appears, that is sufficient to trigger strict scrutiny of any school policy not providing notice and opt out to objecting parents.

These types of challenges are not mere hypotheticals, either. Lower courts have long fielded religious objections of this nature. See, *e.g.*, *Mozert v. Hawkins Cty. Bd. of Ed., 827 F. 2d 1058, 1062 (CA6 1987)* (religious objections to "biographical material about women who have been recognized for achievements outside their homes," lessons on "evolution," and teaching "children to use imagination beyond the limitation of scriptural authority"); *Fleischfresser v. Directors of School Dist. 200, 15 F. 3d 680, 683 (CA7 1994)* (religious objections to materials containing "'wizards, sorcerers, giants and other unspecified creatures with supernatural powers'"); *Altman v. Bedford Central School Dist., 245 F. 3d 49, 56, 60-63 (CA2*

---

[8] The majority's discussion of Prince & Knight is no less eye opening. See *ante*, at 22-23. The Court zeroes in on the book's classic fairytale ending, in which the protagonists' marriage is celebrated by their family and others in the kingdom. See *ante*, at 22; App. to Pet. for Cert. 424a ("[T]he air filled with cheer and laughter, for the prince and his shining knight would live happily ever after"). According to the majority, that makes reading Prince & Knight equivalent to a law that risked "destruction of the Old Order Amish church community." *Yoder, 406 U. S., at 212, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. The absurdity of that claim, once again, requires no explanation.

*2001)* (religious objections to activities involving, among other things, yoga, meditation exercises, and the **[*111]** Drug Abuse Resistance Education (DARE) program); *Moody v. Cronin, 484 F. Supp. 270, 272 (CD Ill. 1979)* (religious objections to "mandatory coeducational physical education" that requires children to "view and interact with members of the opposite sex who are wearing 'immodest attire'").

Nor is the Court's reasoning seemingly limited to reading material. Interactions with teachers and students could presumably involve implicit "normative" messages that parents may find "contrary to the religious principles" they wish to impart to their children and therefore "hostile" to their religious beliefs. *Ante,* at 22-23, 25. A female teacher displaying a wedding photo with her wife; a student's presentation on her family tree featuring LGBTQ parents or siblings; or an art display with the phrase "Love Is Love" all could "positively reinforc[e]" messages that parents disapprove on religious grounds. *Ante,* at 24. Would that be sufficient to trigger strict scrutiny if a school fails to provide advance notice and the opportunity to opt out of any such exposure? The majority offers no principled basis easily to distinguish those cases from this one.

Hard questions might arise, too, from a school's efforts to encourage mutual respect or to prevent bullying. **[*112]** If a student calls a classmate a "sinner" for not wearing a headcovering or coming out as gay, how can a teacher respond without "undermining" that child's religious beliefs? Can parents litigate the content of teacher responses and impose scripts or opt-out policies for everyday interactions designed to foster tolerance and civility? Again, the majority gives no guidance.

C

One thing is clear, however: The damage to America's public education system will be profound. Over 47 million students attend K-12 public schools in the United States, with nearly 17 million in elementary school. See Dept. of Commerce, J. Fabina, E. Hernandez, & K. McElrath, U. S. Census Bureau (Census Bureau), School Enrollment in the United States: 2021, p. 2 (2023). These students and their parents adhere to a wide range of religious beliefs, and the range of curricular topics, from science to literature to music and theater, covered in public schools is similarly vast. Against that backdrop, requiring schools to provide advance notice and the opportunity to opt out of every book, presentation, or field trip where students might encounter materials that conflict with their parents' religious beliefs will impose **[*113]** impossible administrative burdens on schools.

Consider, first, the difficulties of providing adequate advance notice. There are more than 370 distinct religious groups in this country, [9] and as the majority points out, Montgomery County is the "'most religiously diverse county'" in the Nation. *Ante,* at 2. Under the majority's test, school administrators will have to become experts in a wide range of religious doctrines in order to predict, in advance, whether a parent may object to a particular text, lesson plan, or school activity as contrary to their religious beliefs. The scale of the problem is only compounded by the majority's conclusion that even "subtle" and implicit messages contained in children's books can trigger notice and opt-out obligations. *Ante,* at 23. If a parent objects to all material and interactions that support "nontraditional gender roles," for instance, how are schools workably to deduce what books might cross the line? Or take the parents' request in this very case: How should a school go about identifying "any other instruction related to family life or human sexuality that violates the [p]arents' or their children's religious beliefs" in addition to the five Storybooks **[*114]** at issue here? ECF Doc. 23, at 1. Those in the majority will apparently "know it when [they] see it." *Jacobellis v. Ohio, 378 U. S. 184, 197, 84 S. Ct. 1676, 12 L. Ed. 2d 793 (1964)* (Stewart, J., concurring) (referring to pornography).

Of course, school districts are currently free to publish information about their curricula. As one group of *amici* representing over 10,000 school district leaders and advocates and an association of 25 state school board associations attests, however, "it would be an extreme and overly broad burden to force all school districts in the country" to provide the extensive notification regime that the majority's test would require. Brief for School Superintendents Association et al. as *Amici Curiae* 15 (Brief for AASA); see also Brief for National Education Association et al. as *Amici Curiae* 21-29 (explaining that "endless administrative confusion" would result from petitioners' requested notice mandate). Such a regime, *amici* warn, would force school administrators and teachers "to divert their already limited resources and time to ensure full compliance" with these new "parental notification rights." Brief for AASA 15.

Managing opt outs will impose even greater administrative burdens. At present, the vast majority of

---

[9] See Census Bureau, C. Grammich et al., 2020 U. S. Religion Census: Religious Congregations & Adherents Study 7 (2023).

States that allow **[*115]** parents to opt students out of instruction limit that right to a specific course or single curricular unit, rather than permitting opt outs for certain themes or particular materials. See *id.*, at 10-14, and n. 10 (collecting state statutes). That approach ensures that opt outs can be "administered centrally" in a way that "reduce[s] the burden on teachers and principals" and "minimizes interruption o[f] classroom instruction for other students." *Id.*, at 14.

Establishing a new constitutional right to opt out of any instruction that involves themes contrary to anyone's religious beliefs will create a nightmare for school administrators tasked with fielding, tracking, and operationalizing highly individualized and vaguely defined requests for particular students, as this Board learned. See App. to Pet. for Cert. 606a-607a.

Opt outs will not just affect classroom instruction, either. Teachers will need to adjust homework assignments to exclude objectionable material and develop bespoke exams for students subject to different opt-out preferences. See Brief for Justin Driver et al. as *Amici Curiae*. Schools will have to divert resources and staff to supervising students during opt-out periods, **[*116]** too, which could become a significant drain on funding and staffing that is already stretched thin. See Brief for AASA 15-16.

Worse yet, the majority's new rule will have serious chilling effects on public school curricula. Few school districts will be able to afford costly litigation over opt-out rights or to divert resources to administering impracticable notice and opt-out systems for individual students. The foreseeable result is that some school districts may strip their curricula of content that risks generating religious objections. See Brief for Justin Driver et al. as *Amici Curiae* 22. In the current moment, that means material representing LGBTQ students and families, like the Storybooks here, will be among the first to go, with grave consequences for LGBTQ students and our society. See Brief for State of Maryland et al. as *Amici Curiae* (discussing the importance of efforts like MCPS's in combating harassment against LGBTQ youth). Next to go could be teaching on evolution, the work of female scientist Marie Curie, or the history of vaccines.

In effect, then, the majority's new rule will hand a subset of parents a veto power over countless curricular and administrative decisions. **[*117]** Yet that authority has long been left to democratically elected state and local decisionmakers, not individual parents and courts. This

Court has repeatedly recognized the wisdom of that regime, including in *Yoder* itself. See *406 U. S., at 235* (underscoring the "obvious fact that courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education"); *San Antonio Independent School Dist. v. Rodriguez, 411 U. S. 1, 42, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973)* (recognizing that "educational policy" is an "area in which this Court's lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels"); *Epperson v. Arkansas, 393 U. S. 97, 104, 89 S. Ct. 266, 21 L. Ed. 2d 228 (1968)* ("By and large, public education in our Nation is committed to the control of state and local authorities").

At present, States and localities across the Nation have adopted a patchwork of different policies governing school material related to gender and sexuality and parental opt-out rights. For instance, some States mandate, while others forbid, instruction on sexual orientation. See Brief for AASA 5-6, and nn.4-8 (collecting state statutes). Statutes governing opt-out policies are equally diverse. See *id.*, at 10-14, and nn. 10-22. Tellingly, **[*118]** however, only a handful of States have permitted opt-out rights for all material that a parent finds objectionable, see *id.*, at 13-14, and nn. 20-21, and even some of those States have required that the parents and school agree upon an alternative lesson plan that the parent will fund, *id.*, at 13, and n. 20. Today's decision will thus usher in a sea change in the law, shifting the primary locus of decisionmaking on these difficult and often contested policy issues from democratically elected officials to judges.

There is also real reason to think that the democratic process and local mechanisms for parental advocacy were working here. Three of the seven MCPS Board members were voted out during the most recent election, see ABC 7 News, K. Lynn, Montgomery County Voters Elect New School Board Members in Significant Shift (Nov. 12, 2024), https://wjla.com/news/local/montgomery-county-voters-elect-new-school-board-members-education-association-president-david-stein-leadership-rita-montoya-laura-stewart-natalie-zimmerman-accountability-maryland-dmv, and two of the seven books to which the parents originally objected are no longer in use, see Brief for Respondents 8. Parents, additionally, remain free **[*119]** to raise objections to specific material through the multilevel appeal system established by Board and state policies in Maryland, see

*supra*, at 7-8, which the parents in this case apparently never tried to pursue.

The Court today subverts Maryland's functioning democratic process, whistling past decades of precedent that recognizes the primacy and importance of local decisionmaking in this area of law. Members of this Court have oft and recently called for deference to the democratic process in other contexts. See, *e.g.*, *Dobbs v. Jackson Women's Health Org., 597 U. S. 215, 269, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022)* (decrying decisions that "wrongly remov[e] an issue from the people and the democratic process"); *United States v. Skrmetti, 605 U.S. ___, ___, 222 L. Ed. 2d 136, 150 (2025)* ("'[T]he Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes'" (quoting *Cleburne v. Cleburne Living Center, Inc., 473 U. S. 432, 440, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)*)); *Grants Pass v. Johnson, 603 U. S. 520, 556, 144 S. Ct. 2202, 219 L. Ed. 2d 941 (2024)* (objecting that "[i]nstead of encouraging 'productive dialogue' and 'experimentation' through our democratic institutions, courts have frozen in place their own 'formulas' by 'fiat'" and "interfered with 'essential considerations of federalism,' taking from the people and their elected leaders difficult questions traditionally 'thought to be the[ir] province'"). Yet today, it seems, those principles do not apply to the Government when **[*120]** it designs curricula for a free public education. [10]

D

Unwilling to acknowledge the implications of its ruling, the majority insists that it has not announced a new "'exposure'" theory of free exercise violations. *Ante*, at 27. The record in this case goes "far beyond mere 'exposure,'" the majority claims, because "the storybooks unmistakably convey a particular viewpoint about same-sex marriage and gender," and because the "Board has specifically encouraged teachers to reinforce this viewpoint and to reprimand any children who disagree." *Ibid.*

The majority, however, makes clear that reading aloud the books is sufficient under its test. The Court mandates that the schools "notify [petitioners] in advance whenever one of the books in question or any other similar book is to be used *in any way* and to permit [petitioners] to have their children excused from that instruction." *Ante,* at 41 (emphasis added). The Court could only issue such a directive if *any* instructional use of the books in class, including merely reading them aloud, would prove intolerably "'hostile'" to religious beliefs under the majority's test. *Ante,* at 25. [11] Indeed, if the problem arose from the teacher guidance, **[*121]** rather than exposure to the books themselves, the Court could (and should) simply issue an injunction mandating the opportunity to opt out of the specific teacher statements deemed objectionable. See *Madsen v. Women's Health Center, Inc., 512 U. S. 753, 765, 114 S. Ct. 2516, 129 L. Ed. 2d 593 (1994)* ("[An] injunction [should be] no broader than necessary to achieve its desired goals").

As a result, what it comes down to under the majority's test is that students will hear or read the text of books that "convey a particular viewpoint" that is "contrary to the religious principles" that a parent wishes to instill in their child. *Ante,* at 23, 27. That is mere exposure to objectionable ideas in its clearest form. [12]

The majority, in any event, badly misreads the Board's teacher guidance. Far from directing teachers to "accuse [students] of being 'hurtful' when they express a degree of religious confusion," *ante,* at 27; see also *ante,* at 10 (Thomas, J., concurring), the guidance is plainly designed to foster mutual civility and "respect." App. to Pet. for Cert. 628a.

That purpose is clear throughout the materials. For instance, the guidance suggests that, in response to a

---

[10] Having refused to apply "the *Bill of Rights* and the doctrine of judicial review [to] protect individuals who cannot obtain legislative change," *ante,* at 35, in several recent decisions, see, *e.g.*, *Dobbs, 597 U. S., at 231, 269, 142 S. Ct. 2228, 213 L. Ed. 2d 545*; *Skrmetti, 605 U. S., at ___, ___, 222 L. Ed. 2d 136*, the Court now asserts it has no choice but to play school board here. Of course, our precedent requires just the opposite result. See *supra*, at 13-19.

[11] Petitioners conceded that they have no objection "to the books being on the shelf or available in the library." Tr. of Oral Arg. 48. The Court's injunctive relief can thus only cover use of the books as part of "instruction" in the classroom. *Ante,* at 41. The injunction therefore should not be read to prohibit schools from placing the books on shelves or in libraries.

[12] Despite stating that the age of the child matters to its "threat" analysis earlier in the opinion, see *ante,* at 21, the majority declines to limit the injunctive relief that it orders based on the age of the students involved. The majority thus fails to put its age-based test into practice, treating 5-year-old kindergarteners and 11-year-old fifth graders identically when it comes to reading Uncle Bobby's Wedding.

child's statement that, "[b]eing . . . gay, lesbian, queer, etc[.] is wrong and not allowed in my religion," **[*122]** a teacher could respond: "I understand that is what you believe, but not everyone believes that. We don't have to understand or support a person's identity to treat them with respect and kindness . . . In any community, we'll always find people with beliefs different from our own and that is okay—we can still show them respect." *Ibid.*

That recommended response is careful to respect the religious views of students, while still encouraging civility and "kindness" towards others. *Ibid.* Those values, moreover, are precisely what the parents in this case say they endorse. See, *e.g.*, *id.*, at 529a ("We . . . believe that all humans . . . must be respected, regardless of the person's faith, race, ethnic origin, sex, gender identity, sexual orientation, or social status"); *id.*, at 536a ("We firmly reject that any student should be bullied or harassed for any reason, and we teach our son to treat all others with kindness and respect"); *id.*, at 543a ("We believe that all persons should be treated with respect and dignity regardless of religion, race, sex, ethnicity, gender identity, sexual orientation, or other characteristics").

To the extent students make comments that may be hurtful to classmates **[*123]** in the room, the guidance recommends teachers discourage such behavior. If a student says, "*That's so gay,*" the guidance suggests a teacher may respond: "Regardless of how it's intended, using gay to describe something negative reflects a long history of prejudice against LGBTQ+ people, so please don't use it in that way. . . . You may not have meant to be hurtful: but when you use the word 'gay' in any way outside of its definition, it's disrespectful." *Id.*, at 634a (emphasis added). Similarly, if a child says, "*That's weird.* He can't be a boy if he was born a girl," the guidance encourages teachers to respond: "That comment is hurtful; we shouldn't use negative words to talk about peoples' identities." *Id.*, at 630a (emphasis added).

The majority reads these portions of the guidance to direct teachers to "accuse [students] of being 'hurtful' when they express" "confusion" based on their religious views. *Ante,* at 27 (quoting App. to Pet. for Cert. 630a). The majority only reaches that conclusion, however, by omitting portions of the student commentary to which the teachers are responding in the guidance. See *id.*, at 630a (omitting "[t]hat's so gay" and "that's weird"). Those excised **[*124]** statements, the majority should presumably agree, could be hurtful to students in the

classroom and thus warrant discouragement. *Id.*, at 630a, 634a.

Comments like that, moreover, are sadly not uncommon in the Nation's school system today. In a recent study, "the overwhelming majority" of LGBTQ students reported hearing homophobic language used by their peers, including "that's so gay," "dyke," "faggot," and "tranny." J. G. Kosciw, C. Clark, & L. Menard, GLSEN, The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools xv-xvi (2022). Over two-thirds of LGBTQ students, moreover, reported feeling unsafe at school because of their sexual orientation or gender identity. *Ibid.* Numerous other studies have found similar trends. See Brief for State of Maryland et al. as *Amici Curiae* 7-8, and nn. 7-17 (collecting additional studies).

The Board's guidance to teachers thus simply seeks to anticipate the kinds of difficult interactions that might arise in response to greater inclusivity toward LGBTQ students. [13] If that is sufficient to render classroom instruction "coercive," *ante,* at 26, then mutual tolerance and respect may no longer have a place in public schools. **[*125]** [14]

The majority and concurrence also draw on news articles about comments that a Board member apparently made to reporters. See *ante,* at 10-11 (majority opinion); *ante,* at 9 (opinion of Thomas, J.). All Members of the majority have recognized before, however, that "statements by individual legislators" and members of similar decisionmaking entities are not appropriately attributed to the entire body. *NLRB v. SW General, Inc., 580 U. S. 288, 307, 137 S. Ct. 929, 197 L. Ed. 2d 263 (2017)*; see also *Trump v. Hawaii, 585 U. S. 667, 692, 138 S. Ct. 2392, 201 L. Ed. 2d 775 (2018)*; *Dobbs, 597 U. S., at 253-254, 142 S. Ct. 2228, 213 L. Ed. 2d 545* ("Even when an argument about legislative

---

[13] The majority apparently misses the foregoing in claiming that the dissent "ignores" the Board's teacher guidance. *Ante,* at 27.

[14] JUSTICE THOMAS views the Board's LGBTQ-inclusive program as designed to enforce "ideological conformity." *Ante,* at 8 (concurring opinion). If there is any conformity that the Board seeks to instill, it is universal acceptance of kindness and civility. JUSTICE THOMAS can claim otherwise only by attributing to the Board a few selectively excerpted statements of individual Board members. See *infra,* at 33, and n. 16. That approach is inconsistent with the views JUSTICE THOMAS has taken elsewhere. See *infra,* at 33, and n. 16.

motive is backed by statements made by legislators who voted for a law, we have been reluctant to attribute those motives to the legislative body as a whole. 'What motivates one legislator to make a speech about a statute is not necessarily what motivates . . . others to enact it'"). The statement by this individual Board member, apparently made outside any official proceeding, should not be treated differently, particularly in light of the Board's consistent commitment to fostering mutual respect and civility, reflected in its official policies and guidance. See, *e.g.*, App. to Pet. for Cert. 581a-589a, 669a-675a. [15]

Lastly, the majority is, of course, right to **[*126]** observe that not all parents can afford to send their children to private religious schools or to provide for homeschooling. See *ante,* at 32-33. Yet for public schools to function, it is inescapable that some students will be exposed to ideas and concepts that their parents may find objectionable on religious grounds. Indeed, this Court has long recognized that reality. See *Lee v. Weisman, 505 U. S. 577, 591, 112 S. Ct. 2649, 120 L. Ed. 2d 467 (1992)* (observing students may be "expos[ed]" or "subjected during the course of their educations to ideas deemed offensive and irreligious"). To presume that public schools must be free of all such exposure is to presume public schools out of existence.

IV

Not content to invent a new standard for free exercise burdens, the majority goes on to consider an issue beyond the question presented and unaddressed by the Fourth Circuit below: whether the alleged burden in this case is "constitutionally permitted." *Ante,* at 35.

---

[15] The majority and concurrence describe the Board member as "suggest[ing] that the objecting parents were comparable" to "'white supremacists'" and "'xenophobes.'" *Ante,* at 11 (majority opinion); *ante,* at 9 (opinion of THOMAS, J.). The full quote, however, indicates the member intended to express concern about the potential administrative implications of having to accommodate opt out requests from other hypothetical parents. See E. Espey, Parents, Students, Doctors React to MCPS Lawsuit Targeting LGBTQ+ Storybooks, Bethesda Magazine, June 2, 2023, https://bethesdamagazine.com/2023/06/02/parentsstudents-doctors-react-to-mcps-lawsuit-targeting-lgbtq-storybooks ("Do [the petitioners] realize it would be an impossible disruption to the school system if teachers had to screen the content they plan to teach every day and send out notices so white supremacists could opt out of civil rights content and xenophobes could opt out of stories about immigrant families").

That decision runs roughshod over the Court's procedural practices. "As a general rule," this Court "do[es] not decide issues outside the questions presented by the petition for certiorari," *Glover v. United States, 531 U. S. 198, 205, 121 S. Ct. 696, 148 L. Ed. 2d 604 (2001)*, and it is fundamental to this Court's role in our Nation's judicial system that "we are a court of review, not of **[*127]** first view." *Cutter v. Wilkinson, 544 U. S. 709, 718, n. 7, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005)*.

The majority's exercise in judicial maximalism is not without cost to our precedent, either. The majority recognizes, as it must, that "the government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable." *Ante,* at 35. That bedrock principle of free exercise doctrine ensures that "'professed doctrines of religious belief '" are not "'superior to the law of the land,'" for an "individual's religious beliefs [may not] excuse him from compliance with an otherwise valid law" or policy (in this case, the Board's generally applicable rule against opt outs based on any reason). *Employment Div., Dept. of Human Resources of Ore. v. Smith, 494 U. S. 872, 878-879, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990)*). The majority nevertheless proceeds to announce that "the character of the burden" in this case "requires [it] to proceed differently." *Ante,* at 36. *Smith*, the Court claims, "recognized *Yoder* as an exception to the general rule," and "the burden in this case is of the exact same character as the burden in *Yoder.*" *Ante,* at 36-37.

The problem for the majority is that this is not what *Smith* said. *Smith* recognized that "[t]he only decisions in which we have held that the *First Amendment* bars application of a neutral, generally applicable **[*128]** law to religiously motivated action have involved not the *Free Exercise Clause* alone, but the *Free Exercise Clause* in conjunction with other constitutional protections." *494 U. S., at 881, 110 S. Ct. 1595, 108 L. Ed. 2d 876.* Only in such "hybrid situation[s]" does the Court set aside its neutral and generally applicable inquiry. *Id., at 882, 110 S. Ct. 1595, 108 L. Ed. 2d 876.* *Yoder*, the *Smith* Court explained, was such a hybrid rights case because the parents relied on both their substantive due process rights to "direct the education of their children" and the *Free Exercise Clause*. *494 U. S., at 881, 110 S. Ct. 1595, 108 L. Ed. 2d 876*, and n. 1 (discussing *Yoder*). Here, however, the Court's analysis makes no mention of substantive due process rights or the *Fourteenth Amendment Due Process Clause*. It instead asserts, simply, that "the burden in this case is

of the exact same character as the burden in *Yoder*." *Ante*, at 37. But saying so does not make it so. To the contrary, as detailed above, the burden asserted in this case is vastly different from that identified in *Yoder*. See *supra*, at 14-17.

Finally, the Court's application of strict scrutiny itself only underscores the folly of its new approach. Under strict scrutiny, the government bears the burden of demonstrating that its policy "advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton v. Philadelphia, 593 U. S. 522, 541, 141 S. Ct. 1868, 210 L. Ed. 2d 137 (2021)* (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U. S. 520, 546, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993)*). The Court acknowledges that schools **[*129]** "have a 'compelling interest in having an undisrupted school session conducive to the students' learning.'" *Ante*, at 38 (quoting *Grayned v. City of Rockford, 408 U. S. 104, 119, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972)*). It concludes the Board's policy permitting no opt outs, however, is not narrowly tailored to that interest. *Ante*, at 38-39. The Court notes that the Board permits opt outs from the "Family Life and Human Sexuality" program, a discrete health-education unit that MCPS offers in accordance with Maryland law. See *ante*, at 38-39; Code of Md. Regs., tit. 13a §§04.18.01(C)(1)(c), (D)(2) (2019). "If the Board can structure the 'Family Life and Human Sexuality' curriculum to more easily accommodate opt outs, it could structure instruction concerning the 'LGBTQ+-inclusive' storybooks similarly," the Court asserts. *Ante*, at 39.

That misguided assessment illustrates perfectly why judges should not be tasked with second-guessing questions of school administration. The Court assumes, with no "specialized knowledge and experience" in the field of "educational policy," *Rodriguez, 411 U. S., at 42, 93 S. Ct. 1278, 36 L. Ed. 2d 16*, that MCPS can simply create a new unit of instruction on these particular Storybooks and thereby resolve any undue administrative burdens from managing opt outs. *Ante,* at 38-39; see also *ante*, at 11-12 (Thomas, J., concurring) (making this same point). What **[*130]** the majority elides, however, is that its ruling is not limited to a set of five storybooks. It applies, expressly, to "any other similar book," *ante*, at 41, an amorphous category the Court declines to define, but which will presumably include all other books that contain "subtle" messages on gender and sexuality, even not involving LGBTQ characters, that the parents here (and others in the future) might find objectionable, *ante*, at 23.

The logic of the Court's ruling will also apply to countless other topics, interactions, and activities that may conflict with a parent's religious preferences. What of the parent who wants his child's curriculum stripped of any mention of women working outside the home, sincerely averring that such activity conflicts with the family's religious beliefs? It blinks reality to suggest that the simple solution for schools is to create new discrete units of instruction to cover any set of material to which a parent objects. The Court's analysis thus reflects, all too well, the "obvious fact that courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education." **[*131]** *Yoder, 406 U. S., at 235, 92 S. Ct. 1526, 32 L. Ed. 2d 15*. [16]

What is more, the point of the Board's program is to ensure that diverse groups of students are represented in reading materials across the curriculum. The Board cannot accomplish that purpose simply by consolidating all books involving LGBTQ characters into a single inclusivity hour and allowing opt outs, as the majority appears to believe. *Ante*, at 39. That approach would emphasize difference rather than sameness and foster exclusion rather than inclusion. The point of inclusivity is to use books representing a diversity of identities and viewpoints the same way one might use any other book, communicating that one's LGBTQ classmates should be treated in the same manner as anyone else.

\*\*\*

---

[16] JUSTICE THOMAS goes yet further. He argues that the strict scrutiny analysis should require schools to identify a "history and tradition" of teaching the relevant subject or material. *Ante*, at 2 (concurring opinion); see *ante*, at 3-5 (faulting the Board for failing to demonstrate a history and tradition of "LGBTQ+-inclusive" teaching). That approach fails to appreciate the constantly evolving nature of education. Classes on computer literacy, robotics, and film studies, to take just a few examples, are modern developments. In the early 19th century, moreover, "the common curriculum usually included a handful of elementary subjects," such as "reading, writing, and arithmetic." W. Reese, America's Public Schools 28 (2005). Under JUSTICE THOMAS's test, it appears, schools may have no compelling interest in teaching anything beyond those topics. It is not clear, either, how far back JUSTICE THOMAS would have courts look. Should courts limit their inquiry to the founding era or the 19th century for guidance on which topics schools have a sufficiently compelling interest in teaching for purposes of this "history and tradition" test? It is inconceivable that learning should be shackled to a moment in time.

Today's ruling threatens the very essence of public education. The Court, in effect, constitutionalizes a parental veto power over curricular choices long left to the democratic process and local administrators. That decision guts our free exercise precedent and strikes at the core premise of public schools: that children may come together to learn not the teachings of a particular faith, but a range of concepts and views that reflect our entire **[\*132]** society. Exposure to new ideas has always been a vital part of that project, until now.

The reverberations of the Court's error will be felt, I fear, for generations. Unable to condone that grave misjudgment, I dissent.

APPENDIX

App. to Pet. for Cert. 279a, 281a-305a.







2025 U.S. LEXIS 2500, *132



Once, they even climbed to the top of a lighthouse. "Let's live here!" said Chloe. "I'd like that," said Uncle Bobby.



Mummy and Chloe made iced tea and chicken drumsticks, banana bread and rhubarb pie. Bobby and his friend, Jamie, brought bottles of fizzy lemonade.



Most of all, Chloe loved flying kites with Uncle Bobby. So when Mummy planned the first picnic of summer, Chloe was as happy as a ladybird.



After pie, Uncle Bobby and Jamie made an announcement. "We're getting married!" said Uncle Bobby.

Mummy whooped and hugged him. Daddy shook hands with Jamie. Everyone was smiling and talking and crying and laughing.



Everyone except . . . Chloe.



"But," said Chloe, "Bobby is my
special uncle. I don't want him to get married."
"I think you should talk to him," said Mummy.



"Mummy," said Chloe, "I don't understand!
Why is Uncle Bobby getting married?"
"Bobby and Jamie love each other," said Mummy.
"When grown-up people love each other that
much, sometimes they get married."



Chloe found Uncle Bobby sitting on a swing.
"Why do you have to get married?" she asked.
"Jamie and I want to live together and have
our own family," said Bobby.

"You want kids?"
"Only if they're just like you," said Bobby.

"That's a pretty good reason," said Chloe.







"But—" said Chloe.
"But what?" asked Uncle Bobby.
"But I still don't think you should get married.
I want us to keep having fun together like always."



"I promise we'll still have fun together," said Bobby.
"You'll always be my sweet pea."



Bobby and Jamie asked Chloe to go to the ballet with them.



Afterwards, they had milkshakes.

Jamie imitated the ballet dancers and Chloe laughed so hard, her milkshake went up her nose.



Then Bobby jumped in, too, and they all swam until suppertime.



Uncle Bobby and Jamie taught Chloe to sail. She fell in the water at the dock, but Jamie dove in after her.



At night, Chloe, Bobby and Jamie sang songs by the campfire and toasted marshmallows.

"I wish both of you were my uncles," said Chloe.



"Well, you're getting your wish," said Jamie.
"When we get married, I'll be your uncle, too."



On the day of the wedding,
Chloe put on her new dress.

Everyone was excited and busy.

Uncle Bobby lost the rings.

Jamie couldn't tie his bow tie.

2025 U.S. LEXIS 2500, *132



Chloe found the rings in Bobby's jacket pocket.
She helped Jamie with his tie. And she helped Mummy
put the perfect finishing touches on the wedding cake.
"We're ready!" said Chloe.



And then Bobby and Jamie got married.



An afternoon breeze cooled the garden.
Daisies and violets bloomed in the grass and
the air smelled like roses. Cousins, grandparents
and friends watched Chloe walk down the
aisle holding a basket of flowers.

She was so happy, she felt
like doing a cartwheel. Instead,
she scattered flower petals all around.



"That was the best wedding ever!" said Chloe.
"I think so, too," said Uncle Jamie.

2025 U.S. LEXIS 2500, *132

