UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------ x

BEAUTIFUL MINDS OF TOMORROW : 
MINISTRY, NORTH POINT : **MEMORANDUM &**
MINISTRIES, and FAMILY TREE : **ORDER GRANTING IN**
MINISTRY INCORPORATED, : **PART AND DENYING IN**
: **PART MOTION TO**
Plaintiffs, : **DISMISS**
:
-against- :
: 3:24-CV-1783 (VDO)
BETH BYE, in her official capacity as :
Commissioner of the Connecticut Office of :
Early Childhood, LAURIE AUDETTE, in her :
official and personal capacities, and :
ELIZABETH PROIETTI, in her official and :
personal capacities, :
:
Defendants. x

------------------------------------------------------------------

**VERNON D. OLIVER**, United States District Judge:

Plaintiffs Beautiful Minds of Tomorrow Ministry ("BMOT"), North Point Ministry

("North Point"), and Family Tree Ministry ("Family Tree") brought this action against

Defendants Beth Bye, Laurie Audette, and Elizabeth Proietti, for alleged civil rights violations

related to the enforcement of Connecticut's licensure requirement for child care services,

seeking a declaration that Plaintiffs qualify for a licensure exemption for religious education

activity under § 19a-77(b)(8) of the Connecticut General Statutes, an injunction enjoining

Defendants to cease refusing to recognize Plaintiffs as exempt under § 19a-77(b)(8), and

damages.[1] This matter is before the Court on Defendants' motion to dismiss for lack of subject-

matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim

---

[1] *See* Compl., ECF No. 1 at 21.

under Rule 12(b)(6).[2] For the reasons stated herein, the motion to dismiss is **granted in part and denied in part**.

## I.    BACKGROUND

### A.    The Parties

Plaintiffs are alleged to be religious institutions who administer religious educational activities exclusively for children whose parents or legal guardians are members of their congregation.[3] BMOT, founded in July 2022, is a 501(c)(3) Christian ministry operated by Jamie Bailey.[4] North Point, founded in August 2021, is a 501(c)(3) Christian ministry operated by Shawnee Scaniffe.[5] Family Tree, founded in April 2023, is a 501(c)(3) Christian ministry operated by Heather Grim and Colin Grim.[6]

Defendants are alleged to be, at all relevant times, officials of the Connecticut Office of Early Childhood ("OEC"): (1) Beth Bye serves as Commissioner of the OEC, (2) Laurie Audette is a State Program Manager with the OEC, and (3) Elizabeth Proietti is the Director of the Division of Licensing with the OEC.[7]

### B.    Connecticut Child Care Licensure Law

Connecticut law establishes a system of licensure of providers of child care services under the auspices of the Commissioner of Early Childcare and Office of Early Childcare. *See* Conn. Gen. Stat. §§ 19a-77, *et seq.* The Commissioner of the OEC is mandated with ensuring

---

[2] *See* Mot. to Dismiss, ECF No. 32.

[3] ECF No. 1 ¶¶ 20, 40, 55.

[4] *Id.* ¶¶ 1, 19.

[5] *Id.* ¶¶ 2, 38.

[6] *Id.* ¶¶ 3, 54.

[7] *Id.* ¶¶ 4–6.

that child care service providers "meet the health, educational and social needs of children" in Connecticut. Conn. Gen. Stat. § 19a-79(a). Accordingly, OEC regulates, and requires to be licensed, "child care services" within Connecticut. *See* Conn. Gen. Stat. §§ 19a-77, 19a-80, 19a-87b. Included in the definition of "child care services" are child care centers, group child care homes, and family child care homes. Conn. Gen. Stat. § 19a-77(a). Connecticut law also identifies categories of services which are not considered "child care services" for regulatory purposes, and therefore those categories are not subject to licensure by OEC. *See* Conn. Gen. Stat. § 19a-77(b).

At issue in this case is the exclusion from licensing requirements for religious educational activities. Section 19a-77(b)(8) provides that, "[f]or licensing requirement purposes, child care services shall not include such services which are . . . Religious educational activities administered by a religious institution exclusively for children whose parents or legal guardians are members of such religious institution."

### C.    Pre-Suit Events

#### 1.    BMOT

In September 2022, OEC launched an investigation into whether BMOT was operating an illegal, unlicensed child care center.[8] Subsequently, after BMOT provided information to OEC, the then-OEC Director of the Division of Licensing issued a letter in October 2022 acknowledging that BMOT met the exemption from licensure under Section 19A-77(b)(8)[9].

---

[8] *Id.* ¶ 22.

[9] *Id.* ¶ 26.

Approximately two years later, in September 2024, OEC informed BMOT's counsel that the agency had "an open investigation into a report that BMOT's program has changed and may require licensure."[10] On October 4, 2024, OEC issued a Notice of Illegal Child Day Care Operation to BMOT, which stated that OEC was "investigating a report that [BMOT] may be operating an illegal child care facility or has determined that [BMOT is] operating an illegal child care facility."[11] OEC also notified BMOT that failure to cease operating an illegal child care facility may result in legal action or a civil penalty of up to $100 per day of unlicensed child care operation.[12]

On October 21, 2024, OEC notified BMOT's counsel in an email that the agency "conducted a reassessment of BMOT's program and believes it erred in its prior determination that BMOT is exempt from licensure."[13] Then, in response to an email from BMOT's counsel asking for the basis for the assertion that OEC previously erred, OEC stated the following:

> While religious education is a necessary component of this exclusion, the primary focus of the exclusion is whether the service is an "activity" as opposed to child care. In determining whether a service is an activity or child care, OEC considers the ages of the children services, the regularity or frequency of the services, the number of hours a child participates in the services, and whether the parent or legal guardian remains on-site during the services.[14]

---

[10] Ex. 6 to Compl., ECF No. 1-6 at 2.

[11] Ex. 7 to Compl., ECF No. 1-7 at 2.

[12] *Id.*

[13] Ex. 11 to Compl., ECF No. 1-11 at 4.

[14] *Id.* at 3.

Then, in response to BMOT's counsel asking about the cut offs for the criteria, a Staff Attorney at OEC stated that the agency "interprets the exclusion to apply to services akin to Sunday or Hebrew School."[15]

On October 22, 2024, BMOT was issued a Demand to Cease Unlicensed Child Care Operation by Defendant Elizabeth Proietti, which notified BMOT that it must stop providing child care immediately and that OEC may may impose a civil penalty of up to $100 per day and request the Office of Attorney General to seek an injunction.[16] That same day, BMOT's counsel requested a deficiency letter outlining the steps that must be taken in order to meet the exemption.[17] To date, OEC has not provided such a deficiency letter and has not provided BMOT with a procedure to challenge or appeal its determination.[18]

### 2.    North Point

North Point operates a children's ministry known as "From Seeds to Sprouts."[19] In November 2023, OEC issued a Notice of Illegal Child Care Operation to From Seeds to Sprouts, which stated that OEC was "investigating a report that [North Point] may be operating an illegal child care facility or has determined that [North Point is] operating an illegal child care facility."[20] Thereafter, OEC conducted an investigation into North Point and its claimed exemption under C.G.S. § 19a-77(b)(8), during which North Point provided evidence and

---

[15] *Id.* at 2.

[16] Ex. 12 to Compl., ECF No. 1-12 at 2.

[17] Ex. 13 to Compl., ECF No. 1-13 at 2.

[18] ECF No. 1 ¶¶ 35, 37.

[19] *Id.* ¶ 39.

[20] Ex. 15 to Compl., ECF No. 1-15 at 2.

argument in support of its exemption.[21] On April 1, 2024, Defendant Proietti notified North Point that OEC completed its review of the claimed exemption from licensing and concluded that North Point does not meet the criteria for an exemption.[22] Proietti further informed North Point that it was required to obtain a license for a family child care home, child care center, or group child care home in order to continue operating.[23]

Then, after North Point's counsel sent a letter and materials to OEC in support of its argument that it is exempt from licensure,[24] in September 2024, Defendant Audette issued a Demand to Cease Unlicensed Child Care Operation, which notified North Point that it must stop providing child care immediately and that OEC may may impose a civil penalty of up to $100 per day and request the Office of Attorney General to seek an injunction.[25]

Then, in response to North Point's counsel's inquiry about the demand, a staff attorney at OEC clarified that, (1) it determined that the services being provided by North Point Ministries/Seeds to Sprouts are child care services, not activities, and that (2) OEC interprets the religious educational activities exception "to apply to services akin to Sunday or Hebrew School."[26] Although North Point attempted to question these criteria, OEC ignored that inquiry

---

[21] ECF No. 1 ¶ 43; *see generally* Ex. 17 to Compl., ECF No. 1-17.

[22] Ex. 18 to Compl., ECF No. 1-18 at 4.

[23] *Id.*

[24] ECF No. 1 ¶ 46.

[25] ECF No. 1 ¶ 47; Ex. 21 to Compl., ECF No. 21-1 at 2.

[26] Ex. 22 to Compl., ECF No. 1-22 at 2.

and, in October 2024, reiterated its demand to cease.[27] To date, OEC has not provided North Point with a procedure to challenge or appeal its determination.[28]

### 3.    Family Tree

On February 7, 2024, OEC issued a Notice of Illegal Child Day Care Operation to Family Tree, which stated that OEC was "investigating a report that [Family Tree] may be operating an illegal child care facility or has determined that [Family Tree is] operating an illegal child care facility."[29] OEC also notified Family Tree that failure to cease operating an illegal child care facility may result in legal action or a civil penalty of up to $100 per day of unlicensed child care operation.[30] Thereafter, OEC conducted an investigation into Family Tree and its claimed exemption under C.G.S. § 19a-77(b)(8), during which Family Tree provided evidence and argument in support of its exemption.[31] On April 1, 2024, Defendant Proietti notified Family Tree that OEC completed its review of the claimed exemption from licensing and concluded that Family Tree does not meet the criteria for an exemption.[32] Proietti further informed Family Tree that it was required to obtain a license for a family child care home, child care center, or group child care home in order to continue operating.[33]

---

[27] ECF No. 1 ¶ 49; Ex. 23 to Compl., ECF No. 1-23 at 2

[28] ECF No. 1 ¶ 50.

[29] Ex. 26 to Compl., ECF No. 1-26 at 2.

[30] *Id.*

[31] ECF No. 1 ¶ 58; *see generally* Ex. 27 to Compl., ECF No. 1-27; Ex. 28 to Compl., ECF No. 1-28.

[32] ECF No. 1-28 at 15.

[33] *Id.*

In response, on April 9, 2024, counsel for Family Tree sent Proietti a letter explaining that Family Tree is exempt, and Proietti acknowledged receipt the following day.[34]

On August 13, 2024, Colin Grim, who acts for Family Tree in operating the children's ministry, received a Notice of Violation and Order to Abate from the Town of Ledyard Building Department for operating a daycare facility without the benefit of a corresponding Certificate of Occupancy.[35] Then on August 29, 2024, the Town of Ledyard issued Family Tree a zoning Notice of Violation and Intent to Cite, stating that the "Land Use Office has received numerous complaints that you are running a daycare before obtaining a license from the state which is a violation of your Zoning Permit[.]"[36]

Then, in response to Family Tree's counsel's inquiry about its ineligibility for exemption, a Staff Attorney at OEC clarified that, (1) it determined that the services being provided by Family Tree are child care services, not activities,[37] and that (2) OEC interprets the religious educational activities exception "to apply to services akin to Sunday or Hebrew School" and thus, "Family Ministry would have to fundamentally restructure its program to satisfy the exclusion criteria."[38]

On October 4, 2024, OEC issued a Notice of Illegal Child Care Operation to Family Tree, which stated that OEC was "investigating a report that [Family Tree] may be operating an illegal child care facility or has determined that [Family Tree is] operating an illegal child

---

[34] ECF No. 1 ¶¶ 60, 61.

[35] Ex. 32 to Compl., ECF No. 1-32 at 2–4.

[36] Ex. 33 to Compl., ECF No. 1-33 at 2.

[37] Ex. 35 to Compl., ECF No. 1-35 at 2

[38] Ex. 36 to Compl., ECF No. 1-36 at 2.

care facility.[39] Family Tree then applied for licensure as a child care center with the OEC.[40] And, in response to the licensure application, OEC issued a deficiency letter outlining steps needed to obtain licensure.[41] On October 8, 2024, Defendant Proietti issued a Demand to Cease Unlicensed Child Care Operation, which notified Family Tree that it must stop providing child care immediately and that OEC may may impose a civil penalty of up to $100 per day and request the Office of Attorney General to seek an injunction.[42]

On October 11, 2024, Family Tree shut down its activities under protest pending its licensure application.[43] Thereafter, Family Tree received its license from OEC, a certificate of zoning compliance from the Town of Ledyard, and a certificate of occupancy from the Town of Ledyard.[44]

### D.    Procedural History

Plaintiffs commenced this action on November 8, 2024 by filing a complaint and a motion for temporary restraining order and preliminary injunction.[45] The Complaint alleges Defendants violated Plaintiffs' rights under the First Amendment's Free Exercise Clause (Count I); First Amendment's Establishment Clause (Count II); Fourteenth Amendment's Equal Protection Clause (Count III); Fourteenth Amendment's Due Process Clause (Count IV); the Connecticut Constitution (Count V); and the Connecticut Religious Freedom Act

---

[39] Ex. 38 to Compl., ECF No. 1-38 at 2.

[40] ECF No. 1 ¶ 72.

[41] Ex. 39 to Compl., ECF No. 1-39 at 2.

[42] Ex. 40 to Compl., ECF No. 1-40 at 2.

[43] ECF No. 1 ¶ 76.

[44] *Id.* ¶ 77.

[45] *See generally* ECF Nos. 1, 5.

(Count VI).[46] The Court subsequently denied as moot Plaintiffs' motion for temporary restraining order and preliminary injunction in light of defense counsel's representation that Defendants do not intend to enforce the licensure law at issue against Plaintiffs for the duration of this action.[47] On March 3, 2025, Defendants filed their motion to dismiss, which Plaintiffs oppose.[48] Replies have been filed by both parties.[49]

## II.  LEGAL STANDARD

### A.  Rule 12(b)(1)

A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court "lacks the statutory or constitutional power to adjudicate it, such as when the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (cleaned up). "A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or fact-based." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). When the Rule 12(b)(1) motion is facial, "*i.e.*, one 'based solely on the allegations of the complaint or the complaint and exhibits attached to it,' plaintiffs have no evidentiary burden, for both parties can be said to rely solely on the facts as alleged in the plaintiffs' pleading." *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017) (quoting *Carter*, 822 F.3d at 57). The pleading must "show[] by a preponderance of the evidence that subject matter jurisdiction exists." *Lunney v. United States*, 319 F.3d 550, 554 (2d Cir. 2003). In considering a Rule

---

[46] ECF No. 1 at 12–20.

[47] ECF No. 30.

[48] ECF Nos. 32, 36.

[49] ECF Nos. 37, 38, 39, 42, 43.

12(b)(1) motion to dismiss for lack of standing, courts in this Circuit construe "the complaint in [the] plaintiff's favor and accept as true all material factual allegations contained therein." *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 173 (2d Cir. 2012).

"Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the Pleading." *Carter*, 822 F.3d at 57 (cleaned up). "It is only where 'jurisdictional facts are placed in dispute' that the court has the 'obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.'" *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 442 (2d Cir. 2022) (quoting *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)). "If the extrinsic evidence presented by the defendant is material and controverted, the district court will need to make findings of fact in aid of its decision[.]" *Carter*, 822 F.3d at 57.

### B.    Rule 12(b)(6)

A party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When considering a Rule 12(b)(6) motion, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104,

111 (2d Cir. 2010). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995)). "[T]he court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief." *Leonard v. Gen. Motors L.L.C.*, 504 F. Supp. 3d 73, 83 (D. Conn. 2020).

## III.    **DISCUSSION**

As discussed below, the motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is denied. But the Court grants Defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6) on the ground that Plaintiffs fail to plausibly allege any of their federal claims. The Court does not reach the issue of whether any defendant is entitled to qualified immunity because all federal claims are dismissed and the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

### A.    **Defendants' 12(b)(1) Motion**

Defendants assert that all federal claims must be dismissed for lack of subject matter jurisdiction because the Eleventh Amendment to the United States Constitution bars all of the claims.[50] In response, Plaintiffs argue that the Eleventh Amendment is not a complete bar

---

[50] ECF No. 32 at 10.

where, as here, Plaintiffs are seeking equitable relief against all Defendants in their official capacities and damages against Audette and Proietti in their individual capacities.[51]

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Thus, the "Eleventh Amendment bars suits for monetary damages against state governments and state officials when they are sued in their official capacities in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity" *Doe v. United States*, No. 24-CV-1146 (VDO), 2025 WL 2740575, at *7 (D. Conn. Sept. 26, 2025) (cleaned up). And the Supreme Court recognized an exception to Eleventh Amendment immunity in *Ex parte Young*, 209 U.S. 123 (1908), where a plaintiff seeks prospective relief from state officers in their official capacities for an ongoing violation of federal law. *Seneca Nation v. Hochul*, 58 F.4th 664, 670 (2d Cir. 2023); *see also In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007) ("A plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for 'prospective injunctive relief' from violations of federal law.").

First, considering that Plaintiffs are seeking solely prospective injunctive and declaratory relief against Defendants in their official capacities to end alleged violations of federal law, these claims are not barred by the Eleventh Amendment. Plaintiffs' requested relief includes a declaration that they qualify for a licensure exemption for religious education activities under § 19a-77(b)(8) of the Connecticut General Statutes and a permanent injunction

---

[51] Resp., ECF No. 36 at 11.

enjoining Defendants from refusing to recognize Plaintiffs as exempt under § 19a-77(b)(8).[52] "When a court reviews the legal merits of a claim for purposes of *Ex parte Young*, it reviews only whether a violation of federal law is *alleged*[,]" and accordingly, "only frivolous and insubstantial claims will not survive its scrutiny." *In re Deposit Ins. Agency*, 482 F.3d 612, 623 (2d Cir. 2007) (emphasis in original). Plaintiffs allege that the ongoing enforcement of Connecticut's licensure requirements for child care services violates their rights under the First and Fourteenth Amendments to the United States Constitution. The Court finds that these allegations are more than sufficient to show that they are not frivolous or insubstantial. As such, these allegations affirmatively show that the *Ex parte Young* exception to Eleventh Amendment immunity applies to the claims asserted against Defendants in their official capacities. *See, e.g.*, *Unkechaug Indian Nation v. Seggos*, 126 F.4th 822, 829 (2d Cir. 2025).

Second, considering that Plaintiffs are seeking solely damages from Audette and Proietti in their individual capacities, these claims are not barred by the Eleventh Amendment. "The Eleventh Amendment does not bar a federal court from granting monetary relief against" defendants sued in their individual capacities under 42 U.S.C. § 1983. *Williams v. Marinelli*, 987 F.3d 188, 197 (2d Cir. 2021) (citing *Hafer v. Melo*, 502 U.S. 21, 31 (1991)).

Accordingly, Plaintiff's motion to dismiss for lack of subject matter jurisdiction is denied.

---

[52] ECF No. 1 at 21.

14

B.      Defendants' 12(b)(6) Motion

   1.      Violation of the First Amendment to the United States
           Constitution: Free Exercise

Defendants assert that Plaintiffs fail to state a free exercise claim on the ground that Connecticut's licensing scheme is neutral and generally applicable and thus, survives rational basis scrutiny.[53] In response, Plaintiffs argue that the licensing scheme is got generally applicable and that, because Defendants are targeting Plaintiffs in their religious ministry, the law does not survive strict scrutiny.[54]

The First Amendment's Free Exercise Clause, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const., amend. I. The Free Exercise Clause "protect[s] the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through "the performance of (or abstention from) physical acts." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). It "guarantees to all Americans the right to believe and profess whatever religious doctrine they desire, even doctrines out of favor with a majority of fellow citizens." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 161 (2d Cir. 2020) (cleaned up). The Supreme Court has "made clear that the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018). The Free Exercise Clause "guarantees not only that our

---

[53] ECF No. 32-1 at 25–27.

[54] ECF No. 36 at 18–20.

laws be neutrally drafted, but that they subsequently be applied in a manner that is neutral toward religion." *Mid Vermont Christian Sch. v. Saunders*, 151 F.4th 86, 93 (2d Cir. 2025) (cleaned up). "[A] law that incidentally burdens religious exercise is constitutional when it (1) is neutral and generally applicable and (2) satisfies rational basis review. If the law is not neutral or not generally applicable, it is subject to strict scrutiny, and the burden shifts to the government to establish that the law is narrowly tailored to advance a compelling government interest." *We The Patriots USA, Inc. v. Connecticut Off. of Early Childhood Dev.*, 76 F.4th 130, 144 (2d Cir. 2023). The Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Kane v. De Blasio*, 19 F.4th 152, 164 (2d Cir. 2021) (cleaned up).

### a.     Facial Challenge

The Court concludes that the Connecticut licensing scheme is neutral and generally applicable. First, Plaintiffs do not challenge that Connecticut licensing scheme is neutral, nor could they. A law is not neutral if its object "is to infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). "To determine the object of a law, [a court] must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Id.* Here, Plaintiffs have not alleged anything in the statutory text that would "facially regulate a religious practice." *Cent. Rabbinical Cong. of the U.S. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 194 (2d Cir. 2014) (quoting *Lukumi*, 508 U.S. at 533). Nor have Plaintiffs alleged anything in the legislative record that would amount to evidence of hostility to religious believers, such as "subtle departures from neutrality" or "slight suspicion" of

16

"animosity to religion or distrust of its practices." *We The Patriots*, 76 F.4th at 148 (quoting *Masterpiece Cakeshop*, 584 U.S. at 638–39).

The Connecticut licensing scheme is also generally applicable. "The general applicability requirement prohibits the government from in a selective manner imposing burdens only on conduct motivated by religious belief." *Cent. Rabbinical Cong.*, 763 F.3d at 197. (cleaned up) "[A] law may not be "generally applicable" for either of two reasons: first, 'if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions'; or, second, 'if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'" *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 284 (2d Cir. 2021) (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533–34 (2021)). OEC regulates, and requires to be licensed, "child care services" within Connecticut. *See* Conn. Gen. Stat. §§ 19a-77, 19a-80, 19a-87b. Included in the definition of "child care services" are child care centers, group child care homes, and family child care homes. Conn. Gen. Stat. § 19a-77(a). In arguing that the Connecticut licensing scheme is not generally applicable, Plaintiffs overlook the exemption for religious educational activities.

At issue in this case is the exclusion from licensing requirements for religious educational activities. Section 19a-77(b)(8) provides that, "[f]or licensing requirement purposes, child care services shall not include such services which are . . . Religious educational activities administered by a religious institution exclusively for children whose parents or legal guardians are members of such religious institution." Put another way, Section 19a-77(b)(8) enables a party to be excluded from licensure if it meets three statutory criteria: first, the provider must be a religious institution; second, the provider must administer religious

17

educational activities; and third, the parents or legal guardians of participating children must be members of the religious institution. The exemption at issue here is therefore "mandatory and framed in objective terms" such that "it does not give government official discretion to decide whether a particular individual's reasons for requesting exemption are meritorious." *Connecticut Off. of Early Childhood Dev.*, 76 F.4th at 150.

Connecticut's child care licensure law survives rational basis review. "Rational basis review requires the [state] to have chosen a means for addressing a legitimate goal that is rationally related to achieving that goal." *Kane* 19 F.4th at 166. Here, licensure of child care services is rationally related to ensuring that child care service providers "meet the health, educational and social needs of children" in Connecticut. Conn. Gen. Stat. § 19a-79(a).

### b.    As Applied Challenge

"Nonetheless, even under a neutral law of general applicability, the government still fails to act neutrally when it proceeds in a manner intolerant of religious beliefs." *Mid Vermont Christian Sch.*, 151 F.4th at 94 (cleaned up). To withstand a motion to dismiss a free exercise claim, a plaintiff is required to "plead sufficient facts to raise a 'slight suspicion' of hostility to religious beliefs." *King v. City of New York*, 2023 WL 2398679, at *2 (2d Cir. Mar. 8, 2023) (quoting *New Hope Fam. Servs.*, 966 F.3d at 165). A plaintiff may "prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany" actions taken by the government to enforce its laws, and in such cases courts may set aside the adverse results of tainted enforcement proceedings "without further inquiry." *Kennedy*, 597 U.S. at 525 n.1 (quoting *Masterpiece Cakeshop*, 584 U.S. at 639).

Plaintiffs fail to plead sufficient facts to raise a "slight suspicion" of hostility to their religious beliefs. Plaintiffs rely on statements made by a non-party staff attorney at OEC who

18

stated that the agency interprets the exclusion to apply to services akin to Sunday or Hebrew School.[55] However, these statements, standing alone, do not raise any suspicion of hostility to Plaintiffs' religious beliefs. There are no allegations as to whether the staff attorney played any role in deciding that Plaintiffs did not qualify for the exemption. Nor are there any allegations describing how Plaintiffs' religious practices differ from Sunday or Hebrew School. Without more allegations describing Plaintiffs' religious practices and how decisionmakers weighed facts underlying those practices in denying the exemption requests, Plaintiffs have not plausibly shown that there is any suspicion of hostility to their religious beliefs. Legal conclusions aside, Plaintiffs have not plausibly alleged that state officials failed to be "neutral decisionmaker[s] who [gave] full and fair consideration to [Plaintiffs'] religious objection." *Masterpiece Cakeshop*, 584 U.S. at 640.

Accordingly, Plaintiff's free exercise claim is dismissed for failure to state a claim.

### 2. Violation of the First Amendment to the United States Constitution: Establishment Clause

Defendants assert that Plaintiffs fail to state an establishment clause claim on the ground that Defendants' conduct survives the test articulated by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). In response, Plaintiffs argue that Defendants' interpretation of the religious activities exemption fails to satisfy the *Lemon* test.

The First Amendment's Establishment Clause, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion . . . ." U.S. Const., amend. I. The Supreme Court "has instructed that

---

[55] ECF No. 1 ¶¶ 90, 91.

the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Kennedy*, 597 U.S. at 535 (quoting *Town of Greece v. Galloway*, 572 U.S. 576 (2014)). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Cath. Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247 (2025) (cleaned up). As such, "[t]he Establishment Clause prevents the enactment of laws that have the 'purpose' or 'effect' of 'advancing or inhibiting religion.'" *New Yorkers for Religious Liberty, Inc. v. City of New York*, 125 F.4th 319, 330 (2d Cir. 2025) (quoting *Agostini v. Felton*, 521 U.S. 203, 222–23 (1997)). States are barred by the Establishment Clause from passing laws that aid or oppose particular religions, or interfere in the competition between sects. *Cath. Charities Bureau, Inc.*, 605 U.S. at 247.

The Court finds that Plaintiff fails to plausibly plead an establishment clause claim, but not for the reasons advanced by Defendants. Considering the Supreme Court's declaration that it has "long abandoned *Lemon* and its endorsement test offshoot," *Kennedy*, 597 U.S. at 534, and the Second Circuit's decision post-*Kennedy* to not use the *Lemon* test in evaluating whether a plaintiff states an Establishment Clause claim, *see Emilee Carpenter, LLC v. James*, 107 F.4th 92, 111 (2d Cir. 2024), this Court declines at this juncture to wade into the murky waters of the *Lemon* test. Instead, the Court will evaluate whether Plaintiffs plausibly allege facts "to suggest that the [defendants] preferred certain religions over others or was infected with religious animus." *New Yorkers for Religious Liberty*, 125 F.4th at 332 (affirming dismissal of Establishment Clause claim under Rule 12(b)(6)).

Here, much like *New Yorkers for Religious Liberty*, the complaint includes "only legal conclusions regarding the reasoning provided by the [defendants] for its religious

20

accommodation denials." 125 F.4th at 331. To illustrate, Plaintiffs allege that "[b]y OEC's own words, the religious exemption under Connecticut law only applies to 'services akin to Sunday or Hebrew school'" and that "[b]y stating the religious exemption has to be a Sunday school or Hebrew school, OEC is preferencing certain religions over others.[56] But, even accepting these conclusory allegations as true, they do not specify how these comments would amount to "state coercion" in violation of the Establishment Clause. *Emilee Carpenter*, 107 F.4th at 112. The statements describing that the religious exemption under Connecticut law applies to services akin to Sunday or Hebrew School were made by a staff attorney at OEC and there are no allegations about the role that attorney played in denying Plaintiffs' exemption request. To be sure, "under the Establishment Clause, the government may not make a religious observance compulsory, coerce anyone to attend church, or force citizens to engage in a formal religious exercise." *Id.* at 111 (cleaned up). But because Plaintiffs do not specify how they would be coerced by the state to modify their practices, the Court finds that Plaintiffs have not shown that these statements "imply an intent on the part of the State to target those with religious beliefs[.]" *We The Patriots*, 17 F.4th at 283. This Court's ruling finding that Connecticut's child care licensure regime does not violate the Establishment Clause is fully consistent with our nation's historical practices. *See Brokamp v. James*, 66 F.4th 374, 399 (2d Cir. 2023) (collecting cases related to licensure of health professionals and recognizing a state's broad power to establish and enforce standards of conduct within its borders relative to the health of everyone residing there).

---

[56] ECF No. 1 ¶¶ 90, 91.

Accordingly, Plaintiff's Establishment Clause claim is dismissed for failure to state a claim.

### 3. Violation of the Fourteenth Amendment to the United States Constitution: Equal Protection

Defendants assert that Plaintiffs fail to state an Equal Protection claim on three grounds. First, Defendants argue that the Complaint is devoid of any factual support demonstrating that Plaintiffs were treated differently because of their religion. Second, Defendants argue that Plaintiffs have not alleged a reasonably close resemblance between themselves and the comparators. Third, Plaintiffs fail to identify any similarly situated comparators.[57] In response, Plaintiffs argue that Defendants are dissimilarly treating religious institutions that operate Hebrew and Sunday schools by recognizing them as exempt from Connecticut's licensure requirement for child care services.[58]

Under the Equal Protection Clause of the Fourteenth Amendment, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state a claim under the Fourteenth Amendment, there are two "distinct pathways for proving a non-class-based Equal Protection violation." *Hu v. City of New York*, 927 F.3d 81, 93 (2d Cir. 2019). The first pathway, "[a] selective enforcement claim[,] requires a demonstration that a person was treated differently than others similarly situated based on impermissible considerations, such as race or religion." *Caldwell v. Geronimo*, No. 22-1866, 2023 WL 6381292, at *2 (2d Cir. Oct. 2, 2023). To prevail on a selective enforcement claim, a plaintiff must "prove that (1) the person, compared with others similarly situated, was

---

[57] ECF No. 32-1 at 29–31.

[58] ECF No. 36 at 22–24.

selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Hu*, 927 F.3d at 91 (citing *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)). "A selective enforcement theory merely requires a reasonably close resemblance between a plaintiff's and comparator's circumstances." *Mozzochi v. Town of Glastonbury*, No. 21-CV-1159 (MPS), 2023 WL 3303947, at *3 (D. Conn. May 8, 2023) (cleaned up). The second pathway, a class of one claim, "also requires a comparator and a lack of rational basis for the differential treatment." *Caldwell*, 2023 WL 6381292, at *2. To prevail on a class of one claim, a plaintiff must prove that he is "*prima facie* identical" to a comparator by showing that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

> *Hu*, 927 F.3d at 92 (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005)).

The Court finds that Plaintiffs fail to plausibly allege an Equal Protection claim. While Plaintiffs argue that Defendants selected them for adverse treatment because their religion involves more frequent and cumulative ministry to children than those religions that only run Sunday/Hebrew schools, Plaintiffs have not identified any churches or synagogues, let alone a similarly situated church or synagogue, that was treated more favorably. Plaintiffs' failure to plausibly allege the existence of even a single similarly situated comparator precludes a reasonable inference that Defendants were "motivated by an intention to discriminate on the basis of impermissible considerations[.]" *Hu*, 927 F.3d at 91.

Accordingly, Plaintiff's equal protection claim is dismissed for failure to state a claim.

23

**4.    Violation of the Fourteenth Amendment to the United States Constitution: Denial of Due Process**

Defendants assert that Plaintiffs fail to state a procedural due process claim on the ground that Plaintiffs have failed to identify a constitutionally protected liberty or property interest of which they were deprived.[59] In response, Plaintiffs argue that they "were denied their freedom to exercise, their freedom from establishment of religion, and their right to equal protection under the law."[60]

"A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012).

As an initial matter, in opposing the motion to dismiss, Plaintiffs did not assert that they possessed a protected property interest. Property interests "cannot be found on the face of the Constitution, but rather 'are created[,] and their dimensions are defined by[,] existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits.'" *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576–77 (1972)). Plaintiffs have not identified a source other than the United States Constitution as the source of the interest allegedly deprived without due process and, consequently, this opinion expresses no view as to whether Connecticut law creates a constitutionally protected property interest in the case at hand.

---

[59] ECF No. 32-1 at 32.

[60] ECF No. 36 at 17.

While Plaintiffs have identified liberty interests protected by the First and Fourteenth Amendments, the Court finds that Plaintiffs have not plausibly alleged a deprivation sufficient to support a due process claim. Plaintiffs' due process claims necessarily fail here, as they are coextensive with the other federal claims that were dismissed for failure to state a claim, namely that Defendants' enforcement of Connecticut's licensure requirement for child care services violates the Free Exercise Clause, Establishment Clause, and the Equal Protection Clause. *See Connecticut Off. of Early Childhood Dev.*, 76 F.4th at 159 ("The district court correctly held that plaintiffs' claim that the Act violates their liberty interest in childrearing was coextensive with their Free Exercise Clause claim. Therefore, upon deciding that the free exercise claim was without merit, the district court correctly dismissed plaintiffs' childrearing claim as well.").

Accordingly, Plaintiff's due process claim is dismissed for failure to state a claim.

### 5.      Supplemental Jurisdiction

Having dismissed all federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law causes of action. *See Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006).

### C.      Leave to Amend

While leave to amend a complaint should be freely granted "when justice so requires," Fed. R. Civ. P. 15(a)(2), "motions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008). These factors are not present here, where Plaintiffs are requesting to amend the complaint for the first time in response to a motion to

dismiss and have indicated that they are able to allege comparators to support their federal claims.[61] Accordingly, Plaintiffs' request to amend the complaint is **granted**.

## IV.    CONCLUSION

For the preceding reasons, Defendants' motion to dismiss (ECF No. 32) is **GRANTED IN PART AND DENIED IN PART**. Specifically, all claims are dismissed without prejudice under Rule 12(b)(6) of the Federal Rules of Civil Procedure, but with leave to amend. On or before **May 18, 2026**, Plaintiffs shall file an amended complaint. The filing of an amended complaint completely replaces the initial complaint and thus, Plaintiffs may not merely incorporate by reference the allegations or exhibits of any prior complaint. Plaintiffs shall include a redline comparison of the initial complaint and amended complaint. Failure to timely file an amended complaint will result in dismissal of all claims with prejudice.

**SO ORDERED.**

Hartford, Connecticut
March 17, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

---

[61] ECF No. 36 at 24.

26